Melinda Williams:maw

AO 91 (Rev. 11/11) Criminal Complaint

2014R00133

# UNITED STATES DISTRICT COURT

for the

District of Minnesota

UNITED STATES OF AMERICA

v.

ALICE SPENCER WARREN,
a/k/a "SUMALEE INTARATHONG,"
a/k/a "ALICE INTARATHONG,"
a/k/a "SUMALEE NOIBUMRUNG,"
a/k/a "ALISA SPENCER WARREN,"
a/k/a "EMILY SPENCER WARREN,"
a/k/a "EMILY ALICE SPENCER WARREN,"
a/k/a "P'DEW,"
a/k/a "MS. TEW,"
a/k/a "P'M,"
a/k/a "JOY,"
a/k/a "M,"

Case No. 16-MJ-510 HB

**FILED UNDER SEAL
PURSUANT TO COURT ORDER**

## CRIMINAL COMPLAINT

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief. Starting on or about 2009 and up through the present, in the County of Hennepin, in the State and District of Minnesota, and elsewhere throughout the United States and in Thailand, the defendant Alice Spencer Warren, a/k/a Sumalee Intarathong, a/k/a Alice Intarathong, a/k/a Sumalee Noibumrung, a/k/a Alisa Spencer Warren, a/k/a Emily Spencer Warren, a/k/a Emily Alice Spencer Warren, a/k/a P'Dew, a/k/a Ms. Tew, a/k/a P'M, a/k/a Joy, a/k/a M,

knowingly in or affecting interstate and foreign commerce, recruited, enticed, harbored, transported, provided, obtained, and maintained by any means a person and benefited, financially or by receiving anything of value, from participation in such a venture, knowing, or in reckless disregard of the fact, that means of force, threats of force, fraud, coercion, and any combination of such means would be used to cause the person to engage in a commercial sex act, and aided and abetted and attempted and conspired to commit such an offense, in violation of Title 18, United States Code, Sections 1591(b)(1) and 1594(c) **(Sex Trafficking)**;

knowingly transported any individual in interstate and foreign commerce with intent that such individual engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense, and aided and abetted and attempted and conspired to commit such an offense, in violation of Title 18, United States Code, Section 2421 **(Transportation To Engage in Prostitution)**;

knowingly uttered, used, attempted to use, possessed, obtained, accepted, and received any visa, permit, border crossing card, alien registration receipt card, or other document prescribed by statute or regulation for entry into or as evidence of authorized stay or employment in the United States, knowing it to be forged,

SCANNED
JUL 29 2016
U.S. DISTRICT COURT ST. PAUL

counterfeited, altered, and falsely made, and to have been procured by means of any false claim or statement, and to have been otherwise procured by fraud and unlawfully obtained, and aided and abetted and attempted and conspired to commit such an offense, in violation of Title 18, United States Code, Section 1546 **(Visa Fraud)**;

knowingly provided and obtained the labor or services of a person by any one of, or by any combination of, the following means—(1) by means of force, threats of force, physical restraint, and threats of physical restraint to that person or another person; (2) by means of serious harm and threats of serious harm to that person or another person; (3) by means of the abuse and threatened abuse of law or legal process; and (4) by means of any scheme, plan, and pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint, and aided and abetted and attempted and conspired to commit such an offense, in violation of Title 18, United States Code, Section 1589 and 1594(b) **(Forced Labor)**;

knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, namely proceeds from commercial sex acts, engaged in a conspiracy to conduct and attempted to conduct such a financial transaction which in fact involved the proceeds of specified unlawful activity (1) with the intent to promote the carrying on of specified unlawful activity and (2) knowing that the transaction was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity; and (3) transported, transmitted, and transferred, and attempted to transport, transmit, and transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States, and aided and abetted and attempted and conspired to commit such an offense, in violation of Title 18, United States Code, Sections 1956(a)(1)(A)(i), 1956(a)(1)(B)(i), 1956(a)(2), and 1956(h) **(Money Laundering)**;

all in violation of Title 18, United States Code, Sections 1546, 1589, 1591(b)(1), 1594, 1956, and 2421.

I further state that I am a Special Agent and that this complaint is based on the following facts:

### SEE ATTACHED AFFIDAVIT OF SPECIAL AGENT TONYA M. PRICE

Continued on the attached sheet and made a part hereof:   ☒Yes   ☐ No

_____
*Complainant's signature*

TONYA M. PRICE, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date:   July 29, 2016

_____
*Judge's signature*

City and State:   St. Paul, Minnesota

The Honorable Hildy Bowbeer, U.S. Magistrate Judge
*Printed name and Title*

16-MJ-510 HB

STATE OF MINNESOTA

COUNTY OF RAMSEY

ss.  AFFIDAVIT OF SA TONYA M. PRICE

**FILED UNDER SEAL**
**PURSUANT TO COURT ORDER**

Your affiant, Tonya M. Price, being duly sworn, does depose and state as follows:

## AGENT BACKGROUND AND EXPERIENCE

1.     I am a Special Agent with the United States Department of Homeland Security (DHS), Homeland Security Investigations (HSI) and have been so employed since December of 2008.  I am currently assigned to the Office of Investigations, Special Agent in Charge, St. Paul, Minnesota.  As part of my duties, I am responsible for enforcing the laws of the United States, particularly those laws relating to the importing and/or exporting of goods; smuggling, trafficking and importation of contraband and controlled substances; and the lawful migration and immigration of individuals entering and exiting the United States; as well as enforcing labor and sex trafficking laws.  I am currently assigned to investigate cases involving labor and/or sex trafficking allegations involving foreign or domestic entities.

2.     Upon employment with the then-Immigration and Customs Enforcement, I received eighteen weeks of instruction, training and education on the many aspects of the criminal justice system, criminal investigations and law enforcement related subjects at the Federal Law Enforcement Training Center (FLETC).  Prior to becoming a Special Agent, I earned a bachelor's degree in Criminal Justice from Minnesota State University, Mankato

1

as well as a Masters of Arts in Criminology from the University of Minnesota, Duluth. Additionally, I was a probation officer, specializing in juvenile offenders and gender specific programming. During my career as a Special Agent, I have conducted numerous document and benefit fraud related investigations, child pornography investigations, and human trafficking investigations; sworn to and executed search and arrest warrants; conducted physical and electronic surveillance; and arrested numerous individuals for violations of federal laws. For the past six years, as a Special Agent with HSI, I have specialized in investigations involving labor and sex trafficking as defined in Title 18, United States Code, Sections 1589, 1590, and 1591. I have been designated by HSI as a subject matter expert in human trafficking cases, have trained local and federal law enforcement across the United States in conducting these investigation, and have provided in-court expert testimony.

3. The facts and information contained in this affidavit are based upon my own investigation and observations and those of other agents and law enforcement officers involved in the investigation. All observations referenced below that were not made by me were relayed to me by the persons who made such observations. This affidavit contains information necessary to support probable cause for the attached Criminal Complaint and Application for an Arrest Warrant. It is not intended to include each and every fact and matter observed by me or known to the government.

2

4. Based on the facts set forth in this affidavit as well as my training and experience, there is probable cause to believe that ALICE SPENCER WARREN (DOB 2/28/1961, place of birth Ranong, Thailand), a/k/a "SUMALEE INTARATHONG," a/k/a "ALICE INTARATHONG," a/k/a "SUMALEE NOIBUMRUNG," a/k/a "ALISA SPENCER WARREN," a/k/a "EMILY SPENCER WARREN," a/k/a "EMILY ALICE SPENCER WARREN," a/k/a "P'DEW," a/k/a "JOY," a/k/a "M," a/k/a "MS. TEW" has committed violations of, *inter alia*, Title 18, United States Code, Sections 1591 and 1594(c) (Sex Trafficking by Use of Force, Fraud or Coercion); Title 18, United States Code, Section 2421 (Transportation to Engage in Prostitution); Title 18, United States Code, Section 1546 (Visa Fraud); Title 18, United States Code, Sections 1589 and 1594(b) (Labor Trafficking); and Title 18, United States Code, Section 1956(h) (Money Laundering).

## BACKGROUND REGARDING HUMAN TRAFFICKING

5. Based upon my knowledge, training, and experience, I am aware that the following characteristics may be found in varying combinations in people engaging in the business of sex and/or labor trafficking through the use of force, fraud, or coercion, including through debt bondage schemes:

a. Victims of sex trafficking schemes who are brought to the United States are typically women from impoverished backgrounds in their native country. When a victim enters into a debt bondage "contract," she generally agrees to incur an exorbitant debt—one which, in her native country, neither the victim nor her family could ever hope

3

to repay—in exchange for a visa and travel to the United States. The bondage debt amount far exceeds the actual expenses the trafficker incurs to bring the victim to the United States.

      b.     Traffickers often facilitate the international transportation of their victims by assisting victims with obtaining their visas and travel documents. Traffickers typically complete the visa paperwork and visa fraud is common. Traffickers often coach their victims as to what to say to law enforcement in order to avoid detection.

      c.     The victims are usually brought to the United States under false pretenses. While a trafficker may tell a victim that she will engage in sex work, the trafficker often paints a rosy picture of life in the United States, with promises that the victim will quickly be able to pay down her debt, support her family back in her native country, and make a better life for herself in the United States.

      d.     However, once a victim enters the United States, the terms of her "contract" often change dramatically to favor the trafficker. Victims are often charged for all manner of things, such as housing and travel, such that the victim keeps very little if any of the money she makes engaging in commercial sex acts.

      e.     While a trafficker may portray themselves as kind and sympathetic during the recruitment process in the native country, once a victim enters the United States, the trafficker often turns controlling, manipulative, threatening, and violent.

      f.     Moreover, the debt bondage terms are often enforced through means of force, threats of force, physical restraint, perceived restraint, or threats of law, legal

4

process or deportation. A trafficker may use these means to control a victim and compel a victim to continue working or return to work if the victim runs away. As a result, human trafficking, sex trafficking, and debt bondage is often referred to as modern-day slavery.

g.     Once in the United States, the traffickers typically arrange for housing, to further isolate the victim from the outside world. The victims, who usually speak little to no English, find they do not have control over their movement and are not allowed to decline commercial sex buyers who might be physically or sexually abusive or otherwise unwanted. The victims are advertised for commercial sex acts in any number of ways, including in online escort ads on websites such as backpage.com and erosads.com. The victims are often expected to have sex with numerous men in a given day.

h.     Commercial sex transactions are typically paid for in cash. Traffickers may keep ledgers or other documents to reflect how much a victim has paid towards their bondage debt. Traffickers may also keep "client lists," which reflect the preferences and payments of particular sex buyers. The illegal proceeds from the commercial sex transactions are often deposited in bank accounts in a manner so as to avoid detection, including depositing cash in smaller amounts to evade reporting requirements. Illegal proceeds are often used by sex trafficking organizations to further promote the sex trafficking operation, including through purchases of lodging and travel for the victims.

## PROBABLE CAUSE

6.      Since 2013, law enforcement has been involved in an ongoing labor and sex trafficking investigation of Thai nationals.   Law enforcement has discovered that, beginning at least in 2009 and continuing to the current date, the criminal organization is responsible for trafficking Thai nationals from Bangkok to the United States, notably to Minnesota, Los Angeles, Phoenix, Chicago, Atlanta, Houston, and Dallas, for the purposes of engaging in commercial sex activities.  Law enforcement has learned that the criminal organization uses extortion and other means of coercion to force women to engage in the commercial sex acts.  The criminal organization uses email accounts to send and receive bank information, photos of Thai females to be used later in escort ads, and travel information of known/potential trafficking victims.   Law enforcement has identified, through numerous witness interviews and through a variety of documents, including travel records, passports, emails, escort ads, and bank records, over a dozen Thai women who were trafficked to Minnesota in connection with this ongoing scheme.  Law enforcement understands that the total number of victims trafficked by this organization, both in Minnesota and across the United States, far exceeds the number of victims thus far identified by law enforcement.

7.      Law enforcement has identified numerous members of the conspiracy, located both in Thailand and across the United States, who work together to coordinate the movement of Thai women across the United States for commercial sex activities.  Law

enforcement has identified a number of different roles fulfilled by members of this trafficking organization, to include:

a.      "Boss/Trafficker."   A boss/trafficker is an individual to whom a victim of sex trafficking owes her bondage debt.  A boss/trafficker may recruit the victim directly in Thailand to enter into the bondage debt scheme with the trafficker.   The boss/trafficker facilitates the travel of the victim to the United States and "owns" the victim until the bondage debt is paid.

b.      "House Boss."  The organization uses various "houses of prostitution" (which can in fact be apartments, hotels, houses, massage parlors, etc.) located throughout the United States to conduct its sex trafficking operation.  A house boss "owns" one or more houses of prostitution and runs the day-to-day operations at those locations, which includes advertising the trafficking victims for commercial sex acts (or "dates"), procuring and maintaining the houses of prostitution, scheduling sex buyers (or "Johns"), and ensuring that the cash made by the victims is routed back to the boss/trafficker to pay down the bondage debt.   The house boss will develop a relationship with one or more bosses/traffickers, who will send victims to the house boss.  In return for their services, the house boss receives a portion of the cash the victims earn from the commercial sex transactions.  A boss/trafficker may also act as a local house boss in order to maximize their profit.

7

c. "Runner." The victims are not allowed to leave the prostitution houses unaccompanied, for fear that they might run away from the trafficking organization. Accordingly, the house bosses may employ runners to escort the victims to and from the airport, on trips for personal items, etc. Runners may also be asked to rent hotel rooms, apartments, or other facilities. Runners are typically men and may be paid in part through sex with the victims.

d. "Facilitators." The trafficking organization relies on a number of different facilitators to assist in the commercial sex operation. These may include financial facilitators (who engage in money laundering activities to send the cash earned by flowers back to the bosses/traffickers), travel facilitators (who book travel for the victims), and advertisers (who may post escort ads or answer the phones to schedule "dates" for the victims).

e. "Flowers." The organization refers to the victims of this sex trafficking scheme—the women who engage in commercial sex acts to pay down their bondage debts—as flowers. The flowers are typically adult Thai women from impoverished backgrounds who have previously engaged in commercial sex activities in Thailand. As described below, during the term of their bondage debt, flowers have virtually no control over their lives. The organization compels the flowers to engage in commercial sex activities through the use of force, fraud or coercion, including through threats of violence against the families of the flowers located in Thailand. Flowers who

8

are able to pay off their bondage debts may eventually rise within the organization to themselves become facilitators, house bosses, or bosses/traffickers.

8.    Law enforcement has identified defendant ALICE SPENCER WARREN (hereinafter "JOY") as a boss/trafficker with the organization who has trafficked more than a dozen flowers to the United States, including to Minnesota.  JOY is a Thai citizen who has repeatedly changed her name and who goes by various nicknames, as listed above, at least in part in an attempt to hide her identity and evade detection by law enforcement.[1]

9.    JOY has engaged in human trafficking since at least 2009.  JOY personally escorted flowers to the United States and trafficked them at various prostitution houses.  In 2011, JOY was identified as a human smuggler and was banned from re-entering the United States.  Since that time, JOY has continued to direct her sex trafficking scheme from Thailand, relying on various co-conspirators in the United States (notably, as discussed below, LILY and GANGSMOO) to carry out her on-the-ground sex trafficking and money laundering operations.  JOY is currently in Brussels, having been recently arrested and charged with sex trafficking-related offenses.

### CI-1:  A House Boss in Phoenix

10.    HSI identified and interviewed a Confidential Informant (hereinafter "CI-1") who worked for the criminal trafficking organization, including as a "house boss" in

---

[1]    JOY has been issued at least five Thai passports under multiple different names, including Sumalee Intarathong, Alice Spencer Warren, and Alice Intarathong.

Phoenix, Arizona, from approximately 2010 until CI-1's arrest in 2014.  Following CI-1's arrest, CI-1 provided law enforcement with information about the organization.[2]

11.    CI-1 explained that there is a large sex trafficking organization that operates in Thailand, sending women, whom the organization calls "flowers," to work in the commercial sex industry in the United States, as well as in other countries throughout the world.  "Bosses/traffickers" located in Thailand recruit the flowers to work for the criminal organization.   The flowers are typically from impoverished backgrounds and have previously engaged in commercial sex acts in Thailand.  The flowers enter into a bondage debt agreement with the bosses/traffickers in Thailand; in exchange for a visa and travel to the United States, the flowers agree to pay a "tax" or bondage debt to the boss/trafficker. This bondage debt can run anywhere from $40,000 to $60,000 U.S. dollars.  The flowers are told they will be able to pay off their debt relatively quickly by working for the organization in the commercial sex industry in the United States.

12.    CI-1 explained that the organization engages in widespread visa fraud in order to enable the flowers to enter the United States.  This is accomplished through a

---

[2]    CI-1, who has been twice previously deported from the United States, has been granted deferred action to remain in the United States during the pendency of CI-1's cooperation. CI-1 has been paid $3000 to cover travel and immigration costs related to the investigation. In 2014, CI-1 was arrested on immigration-related offenses while attempting to re-enter the United States after deportation. CI-1 remained in custody for approximately six months.  CI-1 has not been charged with any offense related to the instant criminal investigation, nor has CI-1 been promised that CI-1 will not be charged for CI-1's involvement in the criminal conspiracy.

variety of means but typically involves the flowers applying for a B2 Tourist Visa and subsequently overstaying the stated length of their "tourism" trip. The bosses/traffickers handle the visa paperwork, which includes false statements on the visa application that the flower is not entering the United States to engage in prostitution activities. The flowers are coached by the bosses/traffickers as to how to respond to immigration questions when they make entry to the United States. Flowers are also told not to travel with items such as lingerie, as this might attract the attention of law enforcement. The bosses/traffickers instruct the flowers to open bank accounts in Thailand. These bank accounts are then funded by the trafficking organization so that the flower's visa application is more likely to be approved. False address and job information is typically included on these visa applications. All of this is done at the direction of the bosses/traffickers.

13.    CI-1 explained that the trafficking organization utilizes various "houses of prostitution" (which can be apartments, houses, hotels, massage parlors, spas, etc.) located in cities across the United States. These houses are typically run by a "house boss," who owns the local business and takes as payment a significant portion of the money the flowers earn from commercial sex acts. The house boss will work with the boss/trafficker (who "owns" the flowers during the term of the bondage debt) to ensure that the flowers are paying down the bondage debt owed to the boss/trafficker.

14.    CI-1 explained that, soon after entering the United States (primarily through Los Angeles) flowers are taken to open bank accounts by members of the conspiracy. The

flowers surrender their bank cards to conspiracy members. These bank accounts are later used to transfer the cash earned from commercial sex acts back to bosses/traffickers within and outside the United States, including the bosses/traffickers in Thailand.

15.    Flowers are then typically routed to houses of prostitution throughout the country. Once at such a location, the flower works for the house boss, engaging in commercial sex activities with multiple men a day. During her term of bondage debt, the flower is not allowed to refuse to have sex with any particular customer. The house boss will keep track of the commercial sex activities of a given flower to ensure that both the house boss and the boss/trafficker are receiving the majority of the income generated by the flower. For example, CI-1 explained that if a flower received $170 for a commercial sex transaction, $70 would be paid to the house boss and $100 would be sent to the boss/trafficker to pay down the flower's bondage debt. The flowers are allowed to keep any tips they earn (which can be generated by treating a customer "well," including engaging in sex without a condom), but may be charged additional fees by either the house boss or the boss/trafficker for expenses such as condoms, lubricant, food, and transportation. Flowers often send whatever money they do manage to save to their families back home in Thailand.

16.    The flowers are isolated once they enter the United States. CI-1 explained that the flowers typically speak little to no English and do not have freedom of movement. The flowers live in the prostitution houses and are generally not allowed to leave unless

12

they are escorted by "runners" (men who work for the organization and who may be allowed to have sex with the flowers as payment for their services). Flowers are often moved from city to city within the United States, further isolating them and preventing them from developing support networks outside of the criminal organization. Flowers are typically charged for airfare and other travel expenses, further preventing them from paying down their sizeable bondage debts.

17.    While all flowers are victims of a bondage debt scenario in which they are forced to have sex with a multitude of men until their debts are paid, some flowers experience substantially more hardship than others. CI-1 explained that if, for whatever reason (typically age and "enthusiasm"), a flower is relatively unpopular with the customers, the flower may be demoted to increasingly unpleasant living and working conditions. This may culminate in an "unpopular" flower being sent to work at a 24/7 brothel (known as a "spa") where the flower will be forced to have sex with more men at lower prices. These establishments typically involve the victims living together in a single room, sleeping on thin mattresses on the floor, and serving sex buyers at all hours of the day and night. CI-1 explained that customers who frequent these walk-in brothels are often less "picky" and that a flower is expected to make up for the lower price of each commercial sex transaction with an increased volume of customers.

18.    CI-1 explained that, should a flower misbehave—by refusing customers, "stealing" money (*i.e.,* keeping the money she makes from commercial sex transactions),

or running away from the organization before her debt is paid—compliance may be enforced by the boss/trafficker or the house boss in a number of ways. Most significantly, the boss/trafficker may threaten to have gangsters/mobsters harm the flower's family back in Thailand if the flower does not comply/return to work. This is often an effective threat, as the boss/trafficker is in possession of personal information for each flower, including passport information, that can be used to track down the flower's family in Thailand.

19.  CI-1 identified JOY (whom CI-1 knew as "M") as one of the bosses/traffickers in Thailand who recruited flowers and sent them to the United States to engage in commercial sex transactions. CI-1 explained that JOY's flowers worked primarily at prostitution houses located in Los Angeles, Minnesota, Phoenix, and Chicago. From approximately 2010 until her arrest in 2014, CI-1 acted as either the house boss in Phoenix or assistant to the house bosses in Phoenix. During this time, CI-1 worked with JOY to facilitate the organization's sex trafficking scheme.

20.  CI-1 identified over a dozen flowers who were sent to work in the Phoenix prostitution houses who were trafficked or "owned" by JOY, including W-7, W-11, W-14, and W-16. The majority of the flowers identified by CI-1 were also trafficked to other cities, including to cities in Minnesota. CI-1 provided law enforcement with records relating to these flowers, including escort photos of the flowers that were sent to CI-1 from

JOY.[3]  Per the scheme, CI-1 used these photos to advertise the flowers on escort sites for commercial sex.  Flowers were typically given one or more "English" nicknames, which were often used for the flowers on escort sites and with their sex buyers.

21.     CI-1 additionally identified Chabaprai BOONLUEA, a/k/a LILY (whom CI-1 knew as "PLOY" and "LINDA") (hereinafter "LILY") as a flower that JOY sent to Phoenix, Minnesota, and Atlanta.  CI-1 explained that LILY rose through the ranks and eventually partnered with JOY, assisting JOY in running the trafficking operation and running the Minnesota prostitution houses.  CI-1 further identified a woman named DEU as one of the house bosses in Chicago and explained that LILY had also worked for DEU in Chicago.

22.     CI-1 and JOY communicated via telephone calls and email messages.  CI-1 identified JOY's email address as catcat_ty@live.com.  CI-1 also identified the phone numbers and email addresses of various other individuals in the criminal organization.  CI-1 identified several emails sent between CI-1 and JOY concerning the trafficking operation. (As discussed below, law enforcement obtained numerous emails as a result of search warrants executed on numerous email accounts, including the catcat_ty@live.com email account.)  Additionally, at the direction of law enforcement, following her release from

---

[3]     The escort photos used by this organization are distinct.  They are professional in quality, which is consistent with witness reports that the photos are taken in professional studio settings.  While the flower's face is often visible in the escort photos sent internally between members of the conspiracy, it is frequently the case that the flower's face will be blurred out in the photos that are ultimately posted online.

15

jail, CI-1 recorded several telephone calls between CI-1 and various members of the criminal organization, including JOY. These recorded calls from JOY include discussions of JOY's business in Minnesota as well as flowers that JOY would be sending to work in Phoenix.

23.     For example, on July 5, 2013, the then-house boss in Phoenix ("PARIS") sent an email to CI-1. Attached to the email was a handwritten ledger (in Thai) concerning W-11. W-11 owed her bondage debt to JOY and, at the time, was working for PARIS, the house boss in Phoenix. CI-1 explained that W-11 ultimately became ill in the United States and was unable to work, so she was returned to Thailand. The ledger PARIS sent CI-1 reflected the money W-11 paid towards her bondage debt while working in the prostitution house in Phoenix. After receiving the document from PARIS, CI-1 forwarded the email to JOY, who was owed the debt. The ledger reflected that W-11 had earned $700 towards her bondage debt (after the fees to the house boss were deducted). A second email generated on July 7, 2013 showed that W-11 had earned $1800 towards her bondage debt.

24.     CI-1 explained that money is moved back to Thailand with the assistance of Noppawan Lerslurchachai, a/k/a GANGSMOO (whom CI-1 knew as GANGSMOO), a Thai female who resides in California and works for JOY by booking flights and hotels for the flowers and by laundering money. CI-1 identified the email account gangsmoo@hotmail.com as belonging to GANGSMOO. CI-1 explained that flowers who worked for CI-1 in Phoenix and owed their bondage debt to JOY would be sent bank

16

account information by GANGSMOO.  The flowers would then deposit cash into those bank accounts for GANGSMOO to ultimately transfer to JOY.

### W-6:  A Flower Trafficked by JOY

25.     Law enforcement located and interviewed W-6, a flower who was trafficked by JOY in October and November 2010.  W-6 explained that she was recruited directly by JOY in Bangkok.  W-6 agreed to incur a bondage debt to JOY of $40,000 in exchange for a visa and transport to the United States.  JOY handled the visa paperwork for W-6 which falsely stated that W-6 intended to come to the United States for tourist purposes.  JOY told W-6 that W-6 would be able to repay the bondage debt in three or four months and then W-6 would be free.  JOY also told W-6 that if W-6 failed to pay her debt to JOY or attempted to run away, JOY would send people to abuse and torture W-6's family in Thailand.  W-6, who both needed money to support her family and who wanted a better life in the United States, agreed to JOY's terms.

26.     JOY completed W-6's visa paperwork and coached W-6 on how to falsely answer questions at the American embassy in Thailand in order to obtain her visa.  W-6's visa application falsely stated that she did not intend to enter the United States in order to engage in prostitution activities.

27.     JOY had W-6 open up a bank account in Thailand.  JOY funded the account with money so that it appeared that W-6 had a substantial income.  Following the visa interview, JOY instructed W-6 to empty the account and return the money to JOY, which

W-6 did. JOY also sent W-6 to take escort-type photos at a local studio in Thailand; these photos feature W-6 wearing lingerie and were later used to advertise W-6 online for commercial sex.

28. In October 2010, JOY traveled with W-6 and others to the United States. JOY coached W-6 on how to "pass" her immigration interview in the United States. W-6 entered the United States in Los Angeles. JOY then took W-6 and a second flower who traveled with them from Los Angeles to Chicago. In Chicago, W-6 lived in an apartment with other Thai women where she engaged in commercial sex acts at the direction of JOY. JOY posted online escort ads of the flowers; W-6 identified a photograph of herself that was posted on erosads.com, advertising her for sex. JOY answered the customer phone calls and told W-6 when she had a customer. JOY instructed W-6 to greet her customers wearing "sexy clothing." Following the sex act, W-6 received cash from the customer which she handed directly to JOY. JOY took the vast majority of W-6's money. W-6 was allowed to keep only small sums for the purchase of personal items, such as toiletries.

29. W-6 did not have freedom of movement; W-6 lived and worked in the apartment and, if she needed a personal item, was only allowed to leave the apartment in the company of a male "runner." W-6 spoke very little English and had limited communication with the outside world. W-6 engaged in commercial sex acts with approximately three to four men per day. This was less than the number of men served by the other flowers and JOY repeatedly told W-6 that she wasn't making enough money, that

she was too old, and that she needed to treat her customers better.   (W-6 did not wish to engage in oral sex without a condom, which was one way to make additional money and retain customers.)

30.   Within a week or two of W-6's arrival in Chicago, JOY sent W-6 to a motel in Chicago.  W-6 was isolated further; there were no other flowers at the location and W-6's customers entered the motel through a back door.  W-6 began to fear for her safety. JOY brought W-6 food and collected W-6's money daily.  W-6 was not allowed to leave the motel.  JOY continued to answer the phones; JOY provided W-6 with a cell phone that JOY used to tell W-6 when a sex buyer was arriving.  Unbeknownst to JOY, W-6 had a friend from Thailand who was living in Seattle (W-9).  W-6 used the cellular phone to contact W-9 and tell W-9 about W-6's working conditions.  Meanwhile, JOY continued to be dissatisfied with the money W-6 was making and told W-6 she was going to send her to a Chinese-run "spa" in Texas so that she could make more money.

31.   After approximately a week in Chicago, JOY took W-6 to the airport and put her on a plane to Houston, Texas.  In Houston, W-6 was met at the airport and taken to a 24/7 brothel (or "spa").  W-6 slept in one room of the brothel on the floor on a thin mattress. Everyone who worked at the spa spoke Chinese; W-6 did not speak Chinese and the owners/workers at the spa did not speak Thai, which left W-6 to communicate in extremely poor and broken English.  The spa was open 24 hours a day 7 days a week and served walk-in customers.  While the spa charged a lower fee for each commercial sex act, it made up

19

for this in volume. W-6 was kept in the "sleeping" room (shared with another woman in a similar situation) all day and all night. A bell would ring when a customer entered and W-6 would be required to "serve" the customer. A portion of W-6's earnings was paid directly to the owners of the spa. JOY kept in contact with W-6 by cell phone and told W-6 that she was to send the rest of the money W-6 earned from her commercial sex acts back to JOY to pay down W-6's bondage debt. JOY provided W-6 with bank account numbers in which to deposit JOY's money; W-6 was to be taken by one of the spa "runners" to a local bank and make the deposit.

32.     W-6 grew increasingly concerned for her safety and welfare. She continued to call W-9 and tell W-9 about what was happening. W-9 and W-6 came up with a plan for W-6 to escape. W-6 ran from the spa and, with W-9's assistance, made her way to Seattle. When she ran away, W-6 received threatening emails from JOY, which W-6 showed to law enforcement. JOY sent the emails from her email account eswgraphicdesign@hotmail.com to W-6's email account namfon0@hotmail.com.[4] These emails included the following messages:

> 11/12/10 Email 6:22AM: "[W-6] If you not contact me in 24 hour I will send someone to your family"

> 11/12/10 Email 6:13PM: "I give you a chance to contact me in 24 hour, But you not take it, I will link your web page from escort website page to US EMBASSY, including your details: Your name, your date of birth your

---

[4]     W-6 identified eswgraphicdesign@hotmail.com as the email address JOY used to contact W-6 during the recruitment process in Bangkok. Because W-6 got rid of the cell phone from JOY when W-6 ran, email was the only way JOY had of contacting W-6.

passport number..ETC and they will cancel your visa, SIMPLE THATIF YOU NOT BELIEVE YOU CAN TRY THIS LINK."

JOY then included in the email a link to W-6's above-referenced escort ad on erosads.com.

33.     Law enforcement verified that W-6 arrived in the country (Los Angeles from Thailand) on a B2 Tourist Visa on October 13, 2010, accompanied by several other individuals, including JOY.  W-6 recently identified a photograph of JOY as her trafficker.[5]

## JOY's Travel to the United States

34.     Between 2009 and 2011, JOY traveled to the United States at least a half dozen times, including in the company of identified flowers.

35.     Following W-6's November 2010 identification of JOY as W-6's trafficker, when JOY next arrived in the United States (on July 7, 2011 at the San Francisco International Airport), she was interviewed by Customs and Border Protection ("CBP"). At the time, JOY was traveling with four other Thai women.  During her CBP interview, JOY admitted to using the name Emily Alice Spencer Warren.  JOY further admitted to helping women prepare visas to travel to the United States so that they could meet and marry American men.  Following this interview, JOY was identified as a known smuggler and her visa to the United States was revoked for a five-year period of time.  Law enforcement understands that, after JOY was banned from the United States, she used other

---

[5]     This photograph of JOY identified by W-6 matches a photograph of JOY recently taken upon her arrest in Europe for sex trafficking-related offenses, as discussed below.

members of the conspiracy, including LILY and GANGSMOO, to run her on-the-ground commercial sex and money laundering operations in the United States.

### CI-2:  A Runner for the Minnesota Operation

36.     Law enforcement located and interviewed a source of information, herein referred to as CI-2. CI-2 worked as a "runner" for JOY and LILY in Minnesota from 2013 until 2015. Law enforcement confirmed CI-2's involvement with the criminal organization through, *inter alia*, surveillance, phone records, electronic messages, hotel records, bank and financial records, e-mails, and other electronic communications.

37.     CI-2 explained that he acted at the direction of JOY and LILY. As a runner, CI-2 picked up the flowers from the airport and drove them to Minnesota "houses" (apartments and hotels) where the flowers lived and engaged in commercial sex acts. The flowers typically spoke very little English and were not allowed to leave the houses without an escort. CI-2 accompanied the flowers when they needed to purchase personal items, including condoms and lubricant. CI-2 was paid both in money and in sex with the flowers.[6] The criminal organization instructed CI-2 to open a bank account that was used

---

[6]     When CI-2 was initially interviewed, he did not disclose that he was paid, in part, with sex. When he was later questioned about his compensation, CI-2 admitted that he was allowed to have sex with the flowers as partial payment for his services as a runner. Additionally, on July 27, 2016, CI-2 was arrested in connection with a separate sex trafficking scheme, not involving Thai nationals.  CI-2 has been given no benefit concerning that case.

only for the criminal organization.  CI-2 was told to deposit (and in fact did deposit) money

into the bank account to pay for expenses for the Minnesota prostitution house.

38.     CI-2 was also responsible at times for renting apartments and hotel rooms in

Minnesota for the organization.  CI-2 identified various houses of prostitution in Minnesota

used by the organization.  (Law enforcement confirmed these locations through various

means, including through CI-2's name on the lease of one such apartment in Edina,

Minnesota.)  At one point, the criminal organization also requested that CI-2 rent an

apartment in Chicago, but CI-2 declined to do so.

39.     CI-2 identified the Minnesota boss/trafficker as JOY.  CI-2 explained that,

as JOY was physically located in Thailand, LILY worked as JOY's right-hand woman in

the United States, helping to facilitate the criminal activity in Minnesota and, later, in

Atlanta.  CI-2 was instructed by JOY, in a message relayed through LILY, not to talk about

the organization with law enforcement and was threatened by the organization.  CI-2 is

familiar with JOY's voice (JOY and LILY used Skype to communicate and facilitate the

trafficking business) and identified JOY's voice on a recorded phone call provided to law

enforcement by CI-1.

40.     CI-2 identified two other "runners" who worked for the organization in

Minnesota.[7]  CI-2 also identified numerous flowers who were trafficked by JOY and her

---

[7]     One of these identified runners was Todd VASSEY.  Law enforcement has
identified several prostitution houses in Minnesota, including two prostitution houses (in
an apartment complex) rented by VASSEY in Bloomington, Minnesota.  On March 24,

23

organization in Minnesota, including W-2, W-7, and W-10. Law enforcement confirmed the involvement of these and other flowers in the criminal organization through a variety of means, including, *inter alia*, through emails, travel records, online escort ads, interviews, and surveillance.

### W-10:  A Flower Trafficked by JOY to Minnesota

41.    CI-2 explained that W-10 worked as a flower in Minnesota in 2015. CI-2 explained that W-10 told CI-2 that she hated working for JOY and that she found the work degrading. W-10 told CI-2 that W-10 had previously worked for JOY as a prostitute in Bangkok. W-10's husband was unhappy about W-10 engaging in sex work and confronted JOY, telling JOY that W-10 would no longer work for JOY. In response, JOY sent people to W-10's home in Thailand to assault W-10's husband. W-10 told CI-2 that her husband's face was fractured as a result of this incident. JOY then sent W-10 to the United States to work in the sex industry.

42.    CI-2 explained that one day, he went to the Minnesota prostitution house to pick up W-10 and take her to the store. When CI-2 got to the room, W-10 and all of her belongings were gone. CI-2 believed that W-10 had run away; prior to this incident, W-10 told CI-2 that she was afraid of JOY and wanted to run away.

---

2014, law enforcement conducted surveillance at one of these prostitution houses. Law enforcement observed an adult male enter the apartment and leave the apartment after approximately one hour. A traffic stop was conducted and the male admitted to law enforcement that he had just paid $170 to engage in a commercial sex act with a Thai woman.

43.     Law enforcement confirmed that W-10 entered the United States on February 2, 2015 and left the United States on April 15, 2015.   On February 12, 2015, flight information concerning a Los Angeles-to-Chicago flight for W-10 was sent from catcat_ty@live.com (the email CI-1 explained was used by JOY) to another member of the conspiracy.  A second email from catcat_ty@live.com to another member of the conspiracy had as its subject line a nickname of W-10 and contained twenty-two escort-style photos of W-10 wearing lingerie.

### W-4:  A Facilitator for JOY

44.     On April 13, 2015, HSI in Chicago conducted an interview with an individual who worked for the organization (herein W-4).[8]

45.     W-4 told law enforcement that she received money every month to post ads on backpage.com and similar websites for commercial sex transactions.  W-4 posted these ads at the direction of a female Thai boss/trafficker.  W-4 claimed that she did not know the identity of the Thai boss/trafficker but that the boss/trafficker called W-4 using the same phone number associated with the backpage.com ads.  W-4 explained that the boss/trafficker also communicated with W-4 by email, using the email address: catcat_ty@live.com.   It was through that email account that the boss/trafficker sent

---

[8]     Although W-4 provided some information to law enforcement that was confirmed as truthful, law enforcement believes that, following the interviews with W-4, W-4 alerted the organization to law enforcement's investigation, prompting the organization to relocate its Minnesota-based operation to Atlanta in August 2015.

scantily-clad photographs of the women that W-4 posted on backpage.com. Law enforcement confirmed through subpoenas that W-4's email address was used to post a backpage.com escort ad on October 21, 2013.

46.     W-4 provided law enforcement with a November 27, 2014 email the boss/trafficker, using email address catcat_ty@live.com, sent to W-4. The email included eight photos of an Asian female dressed in lingerie and posed provocatively. The subject line of the email listed the nickname of W-13 and a phone number with a Minnesota-based area code. Further investigation revealed that this phone number was connected to several online escort ads for an Asian female located in the Minneapolis area, including an ad placed on February 11, 2015.[9]

47.     On April 16, 2015, law enforcement received an email from W-4 stating that the boss/trafficker for Minnesota was called "P'M." W-4 also provided a phone number that W-4 used to contact the boss/trafficker. Law enforcement found that the subscriber of this phone number was Khanong INTHARATHONG, sister-in-law to JOY.[10] W-4 told

---

[9]     On November 27, 2014, law enforcement responded to the La Quinta Inn located in Bloomington, Minnesota, where they made contact with CI-2. (This contact occurred prior to CI-2's cooperation with law enforcement.) In the hotel room, law enforcement found two flowers—W-2 and W-13—as well as signs of commercial sex activities (to include massage oil and feminine hygiene wipes). CI-2 admitted he had rented the room for the females to engage in commercial sex transactions.

[10]     Law enforcement has identified INTHARATHONG as a member of the criminal conspiracy. The phone number registered to INTHARATHONG was also connected with the Skype account used by JOY and other members of the criminal organization as well as

law enforcement that, although "P'M" had used different Skype phone numbers (which law enforcement determined were all connected to INTHARATHONG's Skype account), "P'M" continued to use the email address catcat_ty@live.com.

### W-2: A Flower Trafficked by JOY to Minnesota

48.     On October 31, 2014, law enforcement was notified that a new flower (W-2) was being sent from Phoenix to Minnesota to engage in commercial sex transactions at the direction of the criminal organization. Upon W-2's arrival in Minnesota, surveillance was conducted. Law enforcement observed CI-2 (prior to CI-2's cooperation) pick up W-2 from the Minneapolis/St. Paul Airport and drive W-2 to a hotel in Bloomington, Minnesota.

49.     On November 5, 2014, law enforcement conducted surveillance at this same hotel in Bloomington, Minnesota. Law enforcement observed a male enter and then exit the hotel a short time later. Law enforcement interviewed the male, who confirmed that he had just engaged in a commercial sex transaction with W-2. The sex buyer further provided the phone number from the online escort ad that he used to schedule the commercial sex transaction. That phone number was the same Minnesota-based phone number provided by W-4 as the phone number of "P'M," the boss/trafficker for Minnesota.

50.     In 2016, law enforcement located and interviewed W-3. W-3 was a sex-buyer who paid to have sex with various flowers in Minnesota, including W-2. W-3 then

---

with various escort ads featuring photographs of Thai women available for commercial sex transactions.

entered into a romantic relationship with W-2. During W-3's conversations with W-2, W-2 told W-3 that she did not have control over where she was sent around the United States. W-2 also said that she had to continue to engage in commercial sex transactions for a one-year period of time. W-2 said that her family's home was burned down and she needed to send money back to her family in Thailand. W-2 said that she still owed money to an "employer" who was in Thailand who W-2 identified as "JOY."

51.     In 2016, law enforcement located a prostitution house in Atlanta associated with the criminal organization. The "house" (an apartment) was rented by LILY. On May 11, 2016, law enforcement observed known members of the criminal conspiracy, including W-2 and LILY, at the prostitution house in Atlanta. Two men who entered and left the prostitution house were subsequently interviewed by law enforcement. Both men admitted to having engaged in commercial sex transactions with a Thai female (who they identified by W-2's known nickname) at the prostitution house. Law enforcement subsequently executed a search warrant at the prostitution house. Law enforcement found various items in the prostitution house consistent with commercial sex activities, including cash (hidden in various locations), cell phones, and condoms. Law enforcement briefly spoke with W-2, who denied being involved in any commercial sex activity. W-2 identified herself by providing law enforcement with her Thai passport. Inside that passport was the visa that W-2 obtained by making false statements.

52.    Law enforcement examined two bank accounts opened in W-2's name and found evidence consistent with the money laundering scheme described herein and by various witnesses in the case.

53.    Specifically, as to the first account ("Account 1"), law enforcement examined the account for the time period of November 2014 through June 2016. Account 1 was opened on November 7, 2014 with a $300 cash deposit at a branch in Bloomington, Minnesota. Account 1 was funded entirely by cash. The cash deposits into Account 1 totaled $37,155. The cash deposits were made at bank branches around the country, including Minnesota, Illinois, Georgia, Nevada, Pennsylvania, Texas, Virginia, Washington, and California. There were numerous occasions where, on a single day, deposits were made into Account 1 from branches in different states. For example, on February 29, 2016, cash deposits into Account 1 were made in Austin, Texas ($1,000) and Reno, Nevada ($1,010). The vast majority of the money in Account 1 (93%, or $34,860) was withdrawn. All withdrawals were conducted in Los Angeles, California. (As noted above, GANGSMOO, who promotes the money laundering scheme, resides in Los Angeles.) No single withdrawal was over $300. Withdrawals were conducted in Los Angeles on the same days in which deposits were made in other parts of the country. For example, on February 29, 2016, the same day deposits were made into Account 1 in Texas and Nevada, two withdrawals from Account 1 were made in Los Angeles.

54.     As to the second account ("Account 2"), law enforcement examined the account for the time period of November 2014 through May 2016.  Account 2 was funded entirely by cash deposits.  Those cash deposits were made in Texas and Virginia and totaled $11,500.  There were a total of 34 debits on Account 2 for airline tickets (a total of 29 flights) and Uber car services.

### W-18:  A Flower Trafficked by JOY to Minnesota

55.     On February 15, 2013, law enforcement responded to the Village Park Apartments in Bloomington, Minnesota.  At that time, law enforcement observed W-18, an Asian female, standing outside an apartment.  W-18 had a split lip, dried blood on her lip, redness and swelling on her face, and she appeared to be praying.  W-18 was wearing a thin shirt and pants, no shoes, and was limping.  She spoke little to no English.  W-18 took the responding officers into an apartment, later discovered to be leased in the name of a known member of the conspiracy.  In the apartment, officers observed numerous signs of sex trafficking, including several boxes of unused condoms, lingerie, 6-10 condom wrappers and used condoms in the trash, and baggage tags in the name of another member of the criminal conspiracy.  W-18 was unable to care for herself and was transported to a medical center.  There, through a translation service, W-18 admitted to being involved in commercial sex activities.  W-18 was taken to a safe house, which she was afraid to enter. W-18 asked instead to be taken to the Quality Inn.

56.     In the catcat_ty@live.com emails (which as CI-1 and other explained were used by JOY), law enforcement discovered a reservation for W-18 for the Quality Inn & Suites in Bloomington, Minnesota for February 6-7, 2013.   Law enforcement further discovered a February 4, 2013 email sent from gangsmoo@hotmail.com to catcat_ty@live.com that contained travel reservations for W-18; a February 2, 2013 reservation for W-18 to travel from Bangkok to Los Angeles and a February 11, 2013 reservation for W-18 depart the United States and return to Bangkok.  As discussed above, W-18 failing to return to Thailand and overstaying the stated length of her booked "visit" would be consistent with the visa fraud scheme employed by this organization.

### Email Search Warrants

57.     During the course of this investigation, law enforcement obtained and executed numerous search warrants, including search warrants for ten different email accounts associated with the criminal organization.  Upon review of the email content, which included JOY's catcat_ty@live.com email account, law enforcement identified hundreds of emails, sent between 2009 and 2016, between known members of the criminal conspiracy concerning the ongoing sex trafficking scheme.

58.     Within the catcat_ty@live.com emails, law enforcement found information concerning numerous identified flowers trafficked by the organization in Minnesota and elsewhere across the United States.   For example, law enforcement discovered numerous emails where a member of the criminal conspiracy, often catcat_ty@live.com, sent escort-

type photographs of a flower for later use on backpage.com and similar escort websites. These emails began at least in 2009 and continued until at least April 7, 2015. For example, on November 4, 2009, catcat_ty@live.com sent an email to another member of the conspiracy, attaching seven photos of a Thai woman wearing lingerie. The email also contained a U.S. phone number with a Minnesota-based area code. These photographs were then shared with various members of the conspiracy. At one point the subject line of the email read "Photo from M" (M being a known alias for JOY). On February 12, 2015, another email was sent from catcat_ty@live.com to an email associated with a Chicago house boss. The email subject line contained the nickname of W-5, an identified flower. Attached to the email were twenty-two photos of W-5 wearing lingerie and posed provocatively. Also on February 12, 2015, an email was sent from catcat_ty@live.com to another known member of the conspiracy that included flight information for travel from Los Angeles to Chicago. The subject title of the email was also an identified nickname for W-5.

59.    Law enforcement discovered over a hundred emails sent between gangsmoo@hotmail.com (the email associated with GANGSMOO) and catcat_ty@live.com. The emails sent from gangsmoo@hotmail.com to catcat_ty@live.com included photos of Asian women in lingerie, often with their faces blurred out, similar to those previously identified in this investigation on backpage.com. Other emails sent to catcat_ty@live.com from gangsmoo@hotmail.com included flight

32

information.  Law enforcement further located bank account and financial information, consistent with the money laundering scheme described herein, in the catcat_ty@live.com and gangsmoo@hotmail.com email accounts.

60.     Within the catcat_ty@live.com emails, law enforcement identified emails concerning the York Place Apartment, located in Edina, Minnesota, which was rented by CI-2 and, as later verified by CI-2, used by the criminal organization for commercial sex transactions.  On January 26, 2015, the York Place Apartment sent an email to CI-2 concerning an incident that took place at the apartment building.  That same day, CI-2 forwarded the email to an email account associated with LILY.  The email was in turn forwarded from LILY to catcat_ty@live.com.  This pattern of communication was repeated on April 3, 2015 when CI-2 received a second email from the York Place Apartment manager.

61.     The catcat_ty@live.com account also contained emails explicitly discussing sex trafficking.    For  example,  on  October  10,  2009,  an  email  was  sent  from catcat_ty@live.com to another member of the criminal conspiracy.  The email (translated from Thai to English) asked if the receiver "could take a look at [W-17's] ads" and "bring it up a little" because "[e]verybody has been getting work except her."  On October 13, 2009, an email was sent from catcat_ty@live.com containing the names of several women, including W-5 and W-17, along with phone numbers for each woman.  The phone numbers

listed for W-5 and W-17 both had Minnesota-based area codes.  Attached to the October

13, 2009 email were twelve escort-style photographs of an Asian woman.

62.     Law enforcement also discovered over a dozen occasions where a

photograph of the passport for a flower or other member of the conspiracy was sent to or

from the catcat_ty@live.com email account.  This included the passports of flowers W-2,

W-5, W-7, W-11, W-13, W-14, and W-15.

### Money Laundering

63.     As discussed above, the trafficking organization employs a sophisticated

money laundering scheme in order to, among other things: (1) route the cash generated

across the United States from the commercial sex transactions to the bosses/traffickers,

including those located outside of the United States; (2) conceal and disguise the true

source, nature, location, ownership, and control of the proceeds, which are generated

through illegal commercial sex transactions and through human trafficking; and (3) further

promote the sex trafficking business.

64.     Specifically, the money laundering scheme initiates as soon as a flower is

recruited in Thailand.  As set forth above, the flower is directed to open a bank account in

Thailand.  This bank account is then funded by the organization in order to support the

false statements on the flower's visa application that the flowers is coming to the United

States for tourist purposes.  The organization, notably JOY and GANGSMOO, facilitates

and funds the flower's travel from Thailand to the United States.  Once in the United States,

GANGSMOO and others pick up the flower from the airport, transport the flower to purchase lingerie, and direct the flower to open a bank account, to which the organization, including GANGSMOO, has access. The organization facilitates the travel of the flower around the United States to engage in commercial sex acts. Further, as explained by CI-1, the organization, including GANGSMOO, directs the flower to use various bank accounts to send the proceeds from the illegal acts back to the organization.

65.     Law enforcement has confirmed the money laundering scheme in a variety of ways, including through witness statements. For example, as noted above, W-4 told law enforcement that she was hired and paid by the organization to post escort ads. Law enforcement confirmed W-4's involvement, *inter alia*, through a review of emails, which included numerous escort-type photos of identified flower W-13 that we sent from catcat_ty@live.com to W-4. A review of a bank account (ending in 1150) connected to W-4 and another member of the conspiracy revealed 27 ATM cash deposits totaling approximately $22,000 for a less than two-month period of time (between August 27, 2014 and October 6, 2014), consistent with the organization's money laundering scheme.

66.     Law enforcement has also confirmed the money laundering scheme through a review of financial records. For example, a review of the credit card records of GANGSMOO, including from Chase, Capital One, and Citi Bank, revealed numerous purchases made to promote commercial sex acts. Details in the credit card statements show domestic flight information for known flowers and other unidentified Thai nationals. The

flights depart and arrive in cities known to be involved in the organization's sex trafficking operation, including Minneapolis/St. Paul. For instance, on January 19, 2011, GANGSMOO purchased an airline ticket for LILY using a Citi Bank account (ending in 9543) for January 31, 2011 travel from Minneapolis/St. Paul to Los Angeles. Law enforcement has additionally identified purchases of car rentals and hotels from that same Citi Bank account.

67.     Moreover, a review of Bank of America records (for the time period from February 1, 2015 to March 29, 2016) shows activity consistent with the above-described ongoing money laundering scheme. The records document multiple cash deposits of $1,000 or less from locations throughout the United States connected with this organization. Those same records show withdrawals of the deposits in the Los Angeles area.

### JOY's Arrest

68.     On January 14, 2016, JOY was arrested in Amsterdam in the Netherlands, while she was traveling under the name Alice Spencer Warren. JOY was arrested on human trafficking charges out of Belgium. On February 11, 2016, JOY was extradited to Belgium and is currently pending trial on charges of exploitation, debauchery, and prostitution of Thai women.

## CONCLUSION .

69.     Based on the foregoing, I respectfully submit that there is sufficient probable

cause for issuing a Complaint and Arrest Warrant for Alice Spencer Warren, a/k/a Sumalee

Intarathong, a/k/a Alice Intarathong, a/k/a Sumalee Noibumrung, a/k/a Alisa Spencer

Warren, a/k/a Emily Spencer Warren, a/k/a Emily Alice Spencer Warren, a/k/a P'Dew,

a/k/a Ms. Tew, a/k/a P'M, a/k/a Joy, a/k/a M, for engaging in and conspiring to engage in

sex trafficking by force, fraud, or coercion; transportation to engage in prostitution; visa

fraud; forced labor; and money laundering.

Further your Affiant sayeth not.


_____
Tonya M. Price
Special Agent, Homeland Security Investigations


Sworn and subscribed to before me
this **29** day of July 2016


_____
The Honorable Hildy Bowbeer
UNITED STATES MAGISTRATE JUDGE