UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

------------------------------------------------------------
                              )   COURT FILE
UNITED STATES of AMERICA      )   NO. 16-CR-257 (DWF/TNL)
                              )
          vs.                 )   Courtroom 9 West
                              )   Thursday, October 7, 2021
(1) SUMALEE INTARATHONG       )   Minneapolis, Minnesota
                              )   1:00 P.M.
------------------------------------------------------------


**<u>CRIMINAL MOTIONS HEARING</u>**


BEFORE THE HONORABLE TONY N. LEUNG
UNITED STATES MAGISTRATE JUDGE



**A P P E A R A N C E S :**


**For the Government:**   **OFFICE OF THE U.S. ATTORNEY**
                          By:  LAURA M. PROVINZINO
                               MELINDA A. WILLIAMS
                               Assistant U.S. Attorneys
                          600 United States Courthouse
                          300 South Fourth Street
                          Minneapolis, Minnesota  55415


**For the Defendant:**    **WOLD MORRISON LAW**
                          By:  AARON J. MORRISON, ESQUIRE
                          331 Second Avenue South - Suite 705
                          Minneapolis, Minnesota  55401


**Thai Interpreter:**     Chintana Barden



**TIMOTHY J. WILLETTE, RDR, CRR, CRC**
Official Court Reporter - United States District Court
Warren E. Burger Federal Building & U.S. Courthouse
316 North Robert Street - Suite 146
St. Paul, Minnesota  55101
651.848.1224

1     (1:00 p.m.)

2              **P R O C E E D I N G S**

3              **IN OPEN COURT**

4     (Defendant present)

5           THE COURT:  Thanks, everyone.  Please be seated.

6           Good afternoon, everyone.  This is the United

7     States District Court for the District of Minnesota, and the

8     case before the bench today for a motions hearing is

9     captioned as follows:  The United States of America versus

10    Intarathong, and it's Case Number 16-CR-257, and

11    Ms. Intarathong is Defendant No. 1 in this case.

12          We'll note that we are in a COVID situation and

13    I'll give further instructions at a later point after

14    identification of the lawyers.

15          For the Government, please identify yourselves for

16    the record.

17          MS. PROVINZINO:  Good afternoon, Your Honor.

18    Laura Provinzino and Melinda Williams on behalf of the

19    United States, and we are joined at counsel table by Special

20    Agent Tonya Price of Homeland Security Investigations.

21          THE COURT:  And for Defense?

22          MR. MORRISON:  Good afternoon, Your Honor.  Aaron

23    Morrison appearing on behalf of Mrs. Intarathong, who is

24    present to my right.

25          THE COURT:  Good afternoon.  Thank you for being

1    here.

2              Counsel, in light of the well-documented concerns

3    regarding COVID-19 and in the interest of health of all

4    participants in today's hearing, I'd ask that you speak from

5    your seated position at your respective tables rather than

6    coming to the lectern.  However, if you believe that you

7    want to come to the lectern, please let us know and you'll

8    have to bring your mike covers and so forth.  Except for a

9    witness when testifying, please wear your masks utilizing

10   the mike covers.

11             I believe Ms. Intarathong -- does she have any

12   mike cover left on her --

13             MR. MORRISON:  I'll put one on, Judge.

14        (Pause)

15             THE INTERPRETER:  The interpreter has a face

16   shield instead of a mask.

17             THE COURT:  Yes.  Yes.  You have a speaking part,

18   so when you're speaking, feel free to take off your shield.

19             One other housekeeping matter.  Sorry, folks.

20   Remember, you have to clean your tables after we're finished

21   with the hearing.  Again, we have to adjust -- just for your

22   information, I'm reminded by my clerks to wipe the bench,

23   which is sort of strange, because I think I'm the only one

24   up here.

25             (Laughter)

1        THE COURT:  But we do follow the rules and that is

2    the rule, so I appreciate everyone working together on this.

3        So I just want to make a short record.  This

4    matter was continued from the previous hearing date,

5    August 17, 2021, because Defendant had trouble understanding

6    her interpreter.  And while at the last hearing the Court

7    discussed that this was a dialect matter, counsel for

8    Defendant I think indicated that it was really an issue of

9    accent, Mr. Morrison, you indicated, and that that was why

10    Ms. Intarathong could not understand the accent of a

11    non-native speaker.

12        Mr. Morrison, I think that's correct, but do you

13    care to elaborate any more on that?

14        MR. MORRISON:  No, Your Honor.

15        THE COURT:  Okay.  Since that time, the Court has

16    looked and secured an interpreter this afternoon.  We are

17    joined by Chintana Barden.  And Mr. Morrison, you have

18    communicated with your client and that the accent or any

19    issues, dialect issues and the like, are not -- are fine in

20    this situation, is that correct?

21        MR. MORRISON:  It is, Your Honor.  We did a test

22    together on Zoom and Ms. Intarathong has indicated that she

23    can understand the interpreter that's present today.

24        THE COURT:  Okay.  Very well.

25        And also, of course, the Court reviews things as

1    well and I noticed it seems like Ms. Barden has a very

2    extensive resume, including that she's a graduate of

3    Thammasat University, I believe, in Thailand, and I think by

4    general reputation Thammasat and Chulalongkorn are probably

5    the best known of the universities in Thailand, so I would

6    expect that the fluency in Thai would not be an issue in

7    this case.

8              Okay.  With that, I believe we can go ahead and

9    move forward with the interpreter and I'll swear you in,

10   ma'am.  If you could stand up for me, please.

11            **CHINTANA BARDEN, COURT INTERPRETER, SWORN**

12             THE INTERPRETER:  Yes, I do.

13             THE COURT:  Okay.  Thank you.  You can lower your

14   hand.

15             Could you state your name and spell it slowly for

16   the reporter.

17             THE INTERPRETER:  Yes.  Chintana Barden,

18   B-A-R-D-E-N, interpreter for Thai for the federal court,

19   immigration court, and also state court, Your Honor.

20             THE COURT:  Okay.  Very well.  Thank you very

21   much.

22             All right.  The interpreter has been sworn in.  I

23   think what I'd like to do before we get into the heart of

24   the motions is go through some of the other motions that I

25   believe we can handle just on paper.

1          We'll start with ECF number 262 and ECF number

2     884, Government's motion for discovery pursuant to Federal

3     Rules of Criminal Procedure 16(b), as in boy, 12.1, 12.3 and

4     26.2.  These papers appear largely the same except that ECF

5     number 884 applies to Ms. Intarathong only and ECF 262 was

6     filed in connection with all defendants' cases.

7          How would the Government like to handle these two

8     motions?  For example, would you like to withdraw the

9     original motion that's at 262 in favor of the more recent

10    motion that was filed relative to Ms. Intarathong's case in

11    ECF 884?

12          MS. PROVINZINO:  Yes, Your Honor.  We would move

13    to dismiss document 262, because as this Court has

14    identified, it's largely duplicative and we would just

15    pursue the discovery motion as to document 884.

16          THE COURT:  Mr. Morrison, your position on that?

17          MR. MORRISON:  No objection, Your Honor.

18          THE COURT:  Okay.  Then we'll grant the motion

19    with respect to -- note the withdrawal of 262 and we'll just

20    deal with 884.

21          I just want to touch base on experts a little bit

22    here.  Neither of these motions nor Defendant's motion

23    mentions an expert disclosure schedule.  Any agreement by

24    the parties on that timeline for experts?

25          MR. MORRISON:  We were just discussing that issue,

1   Your Honor.  I am generally familiar with the experts the

2   Government's going to use in this case from the previous

3   trial and I've read that trial transcript.  I have indicated

4   to the Government it's my intent to make a **Daubert** challenge

5   to one of the Government's expert witnesses, so I would ask

6   for at least 30 days prior to trial for the Government to

7   make their disclosure so I can properly frame that issue

8   before the district court.

9            MS. PROVINZINO:  Thank you, Your Honor.

10           The Government would agree to that.  I think as

11   Mr. Morrison has indicated, he's largely familiar with at

12   least one of the two experts that we would intend to call.

13   We also anticipate identifying somebody who's an expert in

14   visas, and so we would agree to make those disclosures 30

15   days prior to trial.

16           THE COURT:  All right.  I'll note that then.

17           Okay.  Let's turn to ECF number 895, defendant's

18   motion for disclosure of Rule 404(b) evidence.  Defendant

19   asks for disclosure of 404(b) evidence no later than 30 days

20   before trial.  In their motion the Government proposes 21

21   days.

22           Any agreement by the parties on this one?

23           MS. PROVINZINO:  Your Honor, while the Government

24   believes the 21 days is reasonable, we would agree to the 30

25   days to keep that consistent with when our expert

1    disclosures are.  In large part we've made Defendant aware

2    of what we anticipate our 404(b) evidence to be, but we

3    would agree to a 30-day deadline.

4              THE COURT:  Mr. Morrison.

5              MR. MORRISON:  No objection to their agreement,

6    Judge.

7              THE COURT:  All right.  ECF number 896 is

8    defendant's motion to retain agent notes.

9              Anything further from the Government on this?

10             MS. PROVINZINO:  We agree to retain -- obviously

11   we take a different position as to discoverability, whether

12   those need to be produced, but we have no objection to the

13   motion as written to retain agent notes.

14             THE COURT:  Anything further, Mr. Morrison?

15             MR. MORRISON:  No, Your Honor.

16             THE COURT:  Okay.  ECF number 897 is defendant's

17   motion for discovery pursuant to Federal Rule of Criminal

18   Procedure 16.  I believe we've covered the expert witness

19   disclosures with the Government's motion for pretrial

20   discovery, ECF 262 and 884.

21             Anything further on this from the Government?

22             MS. PROVINZINO:  Well, we're happy to announce

23   we've provided the defendant's A file as we indicated we

24   would and have otherwise complied with our disclosure

25   obligations, but we recognize the continuing nature of those

1    and will continue to comply with those.

2              THE COURT:  Mr. Morrison, anything?

3              MR. MORRISON:  Nothing further.

4              THE COURT:  Okay.  ECF number 898 and 899, they

5    relate, respectively, to a motion to suppress statement from

6    July 7, 2011 and from July 13, 2017.  I believe those are

7    the two that we'll be litigating with witnesses today.

8              Government, is that your understanding?

9              MS. PROVINZINO:  Yes, Your Honor.

10             THE COURT:  Mr. Morrison?

11             MR. MORRISON:  Yes, Your Honor.

12             THE COURT:  Okay then.  Before we get into that

13   testimonial portion of this hearing, anything else from the

14   Government?

15             MS. PROVINZINO:  No, not before the testimonial

16   portion, Your Honor.

17             MR. MORRISON:  No, Your Honor.

18             THE COURT:  Okay.  Government, your case, first

19   witness.

20             MS. PROVINZINO:  As to the motion to suppress the

21   July 2011 statement, the United States calls Supervisory

22   Customs and Border Protection Officer Phillip Simoy.

23             THE COURT:  Okay, sir.  Before you take the stand,

24   if you could raise your right hand.

25

1          **PHILLIP SIMOY, GOVERNMENT'S WITNESS, SWORN**

2                  THE WITNESS:  Yes, sir.

3                  THE COURT:  Okay.  Please be seated.

4                  Why don't you get comfortable, and when you are

5          comfortable and ready to go, please indicate that by stating

6          and spelling your name slowly for the record.

7                  THE WITNESS:  My name is Phillip Simoy.

8                  THE COURT:  You can take off your mask.

9                  THE WITNESS:  Phillip Simoy.  Last name is

10         S-I-M-O-Y.

11                 THE COURT:  How do you spell your first name?

12                 THE WITNESS:  Phillip, P-H-I-L-L-I-P.

13                 THE COURT:  With whom are you employed?

14                 THE WITNESS:  U.S. Customs and Border Protection.

15                 THE COURT:  And for how long?

16                 THE WITNESS:  Fifteen years.

17                 THE COURT:  I believe that given the protocol, I

18         think there's some documents that have been placed on the

19         witness table in advance and I believe that procedure was

20         discussed with everybody.  We might as well get that cleared

21         up as everyone brings up the documents.

22                 Is that the understanding?

23                 MS. PROVINZINO:  Thank you, Your Honor.

24                 Prior to you taking the bench, I'd asked the

25         deputy if I could place Exhibits 1 and 2 face down on the

SIMON - DIRECT

1    witness stand as I would not have to approach.  I believe
2    Mr. Morrison is also in agreement with that, but they're not
3    currently face up.  But in our testimony these were the
4    exhibits I've provided to the Court and also filed under
5    seal.  At that point in time, I will ask the witness to turn
6    those over and we'll admit those at that time.

7              THE COURT:  Mr. Morrison, that procedure?

8              MR. MORRISON:  No objection.

9              THE COURT:  Okay.  Why don't you flip over
10   everything, and when you're inquired about it, obviously, I
11   think we should be able to tell when you reference it.
12   You're free to look at any of those documents to refresh
13   your recollection, but when you do, could you indicate to us
14   on the record that you are referring to the documents, okay?

15             THE WITNESS:  Yes, Your Honor.

16             THE COURT:  With that, please proceed.

17             MS. PROVINZINO:  Thank you, Your Honor.

18

19                      **DIRECT EXAMINATION**

20   BY MS. PROVINZINO:

21   Q.  What is your current position within Customs and Border
22   Protection?

23   A.  My current position is supervisor.

24   Q.  And what is your title?

25   A.  Supervisory CBP Officer.

1    Q.  You've indicated you've been with CBP for 15 years?

2    A.  That is correct.

3    Q.  What have been your roles and responsibilities with CBP?

4    A.  I've been an officer in various positions in Immigration

5    and in Customs areas.

6    Q.  What is your educational background?

7    A.  I finished and graduated from Virginia Commonwealth

8    University with a Bachelor of Science.

9    Q.  What specific field did you study?

10   A.  Forensic and cultural anthropology.

11   Q.  Do you have any special training to become a federal

12   law-enforcement officer?

13   A.  Yes.

14   Q.  What is that?

15   A.  We have to go to the academy, the Federal Law

16   Enforcement Training Center in Glynco, Georgia.

17   Q.  Is that FLETC?

18   A.  Yes.

19   Q.  And how long did you attend the classes at FLETC?

20   A.  It's about three and a half, four years.

21   Q.  And do you continue to do training as a federal

22   law-enforcement officer?

23   A.  Yes.

24   Q.  Supervisor Simoy, where do you currently work?

25   A.  I currently work at the Chicago O'Hare International

1      Airport port of entry.

2      Q.  How long have you been there?

3      A.  Approximately four, five years.

4      Q.  Prior to working in Chicago, what other locations have

5      you been at?

6      A.  I have worked in San Francisco International Airport.

7      That included San Jose, Oakland, Fresno, Sacramento, as well

8      as Guam, Saipan, Seyaquanco (ph), Northern Mariana Islands,

9      which is all part of Hawaii.

10     Q.  Where were you working in July of 2011?

11     A.  In San Francisco International Airport port of entry.

12     Q.  How long had you been there at that point?

13     A.  In July, it was approximately four years.

14     Q.  So you were pretty familiar with the passenger flights

15     coming in and out of the San Francisco International

16     Airport?

17     A.  That is correct.

18     Q.  Where were they principally from?

19     A.  Asia, Southeast Asia, and we had flights from Australia

20     and occasionally from Europe.

21     Q.  In your role with Customs and Border Protection, are you

22     familiar with human smuggling?

23     A.  Yes.

24     Q.  And human trafficking?

25     A.  Yes.

1    Q.  What has your training and experience been in those

2    areas?

3    A.  We have recurring annual training through our courses,

4    as well as in-person class courses that we've done.

5    Q.  Okay.  Are you familiar with various types of visas?

6    A.  Yes.

7    Q.  And what types of visas do you principally deal with in

8    your role?

9    A.  In my role we do the B-1/B-2 nonimmigrant visitor visa,

10   visa waiver programs, and working class visa.

11   Q.  What is a B-1/B-2 nonimmigrant visa?

12   A.  B-1/B-2 nonimmigrant visa is for visiting for pleasure

13   or business.

14   Q.  Would that be more commonly known as a tourist visa?

15   A.  That is correct.

16   Q.  And what are the restrictions on a B-1/B-2 visa?

17   A.  They cannot work without authorization in the United

18   States, and they can't engage in illegal or criminal

19   activity in the United States.

20   Q.  How long is someone permitted to stay in the United

21   States under one of those visitor visas?

22   A.  Generally, it's six months.

23   Q.  And if you stay beyond six months, what happens?

24   A.  Then you are an overstayer, considered unlawfully

25   present.

1    Q.  So I want to focus on the period of time July of 2011.

2             Where were you working at that time?

3    A.  At that time it was called Secondary Immigration, which

4    is an area where individuals go for further questioning.

5    Q.  And that was at the San Francisco Airport, is that

6    right?

7    A.  That is correct.

8    Q.  And when you're in Secondary, are you technically in the

9    United States?

10   A.  You are not.

11   Q.  And describe that.

12   A.  You are in Secondary to undergo further questioning.

13   Some of those questions can be related to discrepancies in

14   your paperwork, as you're applying -- for instance, working

15   requires other certifications of paperwork, or you're

16   questioned about your true intent or purpose for coming into

17   the United States.

18   Q.  How is it determined who will go into that Secondary

19   inspection or immigration area?

20   A.  It's either determined by the officer working on Primary

21   through their questioning, or through an alert that the

22   officer in Primary is viewing.

23   Q.  Can you describe what a typical day would have been like

24   for you back in July of 2011 in the airport?

25   A.  During that time, that is the peak season for any air

1    travel, so it's very busy with students, tourism,

2    individuals also coming in to work in the United States.

3    It's busy.

4    Q.  And what would their typical hours be like working?

5    A.  Hours for CBP officers, it's anywhere from eight to ten

6    hours.

7    Q.  And are you familiar with the defendant in this case,

8    Sumalee Intarathong?

9    A.  Yes.

10   Q.  And how did you become familiar with her?

11   A.  She was referred to Secondary with other individuals on

12   that day.

13   Q.  And was there also something that you referred to, for

14   lack of a better term, as an alert that made you aware of

15   Ms. Intarathong?

16   A.  Yes.

17   Q.  And what were you alerted to?

18   A.  I was alerted to the possibility that she required

19   further interviewing with Homeland Security Investigations.

20   Q.  So when you were made aware of her, got that alert, what

21   did you do?

22   A.  I notified my supervisor, who in turn contacted HSI, or

23   Homeland Security.

24   Q.  And when HSI is involved, what are they typically doing?

25   A.  They are typically going to interview somebody -- to my

SIMGP - DIRECT

1   knowledge -- somebody that's potentially involved in illegal

2   matters, or criminal matters.

3   Q.  And what would be your responsibility as the CBP

4   officer?

5   A.  My responsibility is only determining admissibility into

6   the United States.

7   Q.  So did you understand the first referral was to HSI?

8   A.  That's correct.

9   Q.  And when that was happening, what were you doing to

10  prepare for your administrative process?

11  A.  I was reviewing Systems, seeing if she's ever traveled

12  to the United States before, and then putting things

13  together just to determine whether or not she would be

14  admissible to the United States.

15  Q.  And were you able to learn about the defendant's

16  previous travel history?

17  A.  Yes.

18  Q.  And were you able to learn about whether she traveled

19  with other people?

20  A.  Yes.

21  Q.  And why was that relevant to your administrative

22  process?

23  A.  With respect to the other individuals that were also

24  alerted or referred to Secondary, I discovered that there

25  was a pattern of her entering the United States with other

SIMON - DIRECT

1    people who subsequently were overstaying, unlawfully present

2    in the United States.

3    Q.  So what did you do with that information?

4    A.  I started putting together a photo lineup, as well as

5    just putting -- writing down my notes of how I would be

6    asking Ms. Intarathong who those individuals were.

7    Q.  And were these people who had come in on one of those

8    visitor B-1/B-2 visas?

9    A.  I confirmed they came in on a B-1/B-2.

10   Q.  And they had come in and stayed beyond the six-month

11   limit?

12   A.  That is correct.

13   Q.  And what's significant about that to you in your

14   administrative process?

15   A.  This is establishing a pattern that when somebody enters

16   with Ms. Intarathong, the likelihood of somebody remaining

17   is there, so there's an administrative or thought process of

18   her bringing them in, in which I would later confirm with a

19   sworn statement.

20   Q.  Now, when you're doing your administrative process, what

21   is your goal?

22   A.  The goal or objective is just to determine if the person

23   is a bona fide visitor for pleasure into the United States.

24   Q.  And if they are a bona fide visitor, what would that

25   mean?

1    A.  If they're a bona fide visitor, they're admissible, and

2    on what they applied is a B-1/B-2, she would be admissible.

3    Q.  So you're attempting to determine admissibility, is that

4    correct?

5    A.  That's correct.

6    Q.  Do you take any steps to learn if somebody maybe isn't

7    otherwise admissible, if there would be any concerns for

8    their safety if they're returned to their home country?

9    A.  Yes.

10   Q.  And what do you do in that regard?

11   A.  We ask them -- there's -- we ask them if they have any

12   credible fear which would relate to U.S. citizenship, and if

13   so, we would send them to Immigration Service to further

14   determine their credible fear or asylum application.

15   Q.  I'm going to ask you some questions about your actual

16   encounter with Ms. Intarathong and other encounters she had

17   with law enforcement prior to that date in July 2011, but

18   first I want to ask:  That was a while back.  Are you able

19   to remember what happened that day?

20   A.  Yes.

21   Q.  And how are you able to?

22   A.  I remember that day as a result -- because when there

23   was an encounter with HSI, both the agent and

24   Ms. Intarathong were visibly upset, as well as I used this

25   as a training tool for a field training officer for

1    subsequent classes that I've taught.

2    Q.  So you recall her reaction to the situation --

3    A.  Yes.

4    Q.  -- and you subsequently used that in your trainings?

5    A.  Yes.

6    Q.  Do you also -- are there records or documents that

7    you're able to go back to and look at as it relates to that

8    interaction?

9    A.  Yes.

10   Q.  And in fact, some of that's almost like a step-by-step

11   verbal, word-by-word interview, is that true?

12   A.  Correct.

13   Q.  So let's talk about that first law-enforcement encounter

14   with the Homeland Security agents.  What did you understand

15   the Homeland Security agents' goal to be?

16   A.  All I -- the only objective that I know is that when

17   they question anybody, it's along the lines of some sort of

18   criminal issue.  I was not aware of where they -- what they

19   asked her.

20   Q.  And so on that day you weren't fully aware of the scope

21   or nature of their investigation, is that right?

22   A.  Correct.

23   Q.  But you understood it to be something criminal, fair?

24   A.  Something more higher than my administrative process.

25   Q.  Have you subsequently come to know more about the nature

SIMON - DIRECT

1      of that interview?

2      A.  Yes.

3      Q.  And what were they investigating?

4              MR. MORRISON:  Object to foundation.  How did he

5      learn.

6              THE COURT:  Can you be more specific?

7              MR. MORRISON:  How did he learn about what

8      happened, the foundation for that.

9              THE COURT:  I'll sustain.  Go ahead.

10     BY MS. PROVINZINO:

11     Q.  Have you had an opportunity to look at information and

12     subsequently learn about the basis for that Homeland

13     Security interview?

14     A.  Yes, some, yes.

15     Q.  And what documents have you reviewed?

16     A.  I've reviewed my previous own sworn statement, as well

17     as other statements that were taken with other people at the

18     time.

19     Q.  And were those records found in the defendant's A file?

20     A.  Yes.

21     Q.  And what is an A file?

22     A.  An A file is an identifying number to an individual who

23     has either been removed as an illegal individual from or

24     permanent resident to the United States.  It just identifies

25     them as just that for immigration purposes.

1   Q.  And so is an A file somebody's official immigration

2   history with the United States?

3   A.  That's correct.

4   Q.  And are those records that you rely on in your job?

5   A.  Yes.

6   Q.  And you've had an opportunity to review those as it

7   relates to -- or portions of those as it relates to the

8   defendant?

9   A.  Yes.

10  Q.  And based on that, what did you understand they were

11  investigating?

12  A.  Based on what I understand now, currently, there was an

13  investigation of potential -- investigations resulting in

14  human smuggling or sex trafficking.

15  Q.  Supervisor Simoy, it may help if you turn now to what

16  should be overturned in front of you, what's been marked for

17  identification purposes as Government Exhibit 1.  Do you

18  want to turn that document over, look at it and see if

19  you're familiar with it?

20  A.  Yes.

21  Q.  Do you have that in front of you?

22  A.  Yes, I do.

23  Q.  And what is Exhibit 1?

24  A.  Exhibit 1 is the interview of the encounter the Special

25  Agent had during that day.

SIMON - DIRECT

1    Q.  And was this found in the A file?

2    A.  Yes.

3    Q.  And is this a true and accurate copy of the one you

4    reviewed in the defendant's A file?

5    A.  Yes.

6        MS. PROVINZINO:  The Government would move for

7    admission of Exhibit 1.

8        MR. MORRISON:  Your Honor, I do want to make just

9    an objection for the record on this.  I obviously understand

10   that hearsay is admissible in motion hearings.  My specific

11   objections to this is that this Exhibit 1 contains an

12   interview that occurred of Ms. Intarathong that this witness

13   was not present for.  It details the waiver of her --

14       THE COURT:  Can you give me the legal objection,

15   Counsel?

16       MR. MORRISON:  Yes.  The legal objection is

17   because this is related directly to the admissibility of her

18   statement, my objections are Sixth Amendment and *Crawford*,

19   but also due process, that she's not able to actually

20   question the agents that were present during this interview

21   and purportedly read her Miranda rights.

22       THE COURT:  Any response?

23       MS. PROVINZINO:  I believe defense counsel

24   acknowledged that there is -- it's permissible to use

25   hearsay and rely on hearsay.  This is also offered in

SIMOY - DIRECT                                    24

1    context of what I understand to be Defendant's objections to

2    the statements taken by Mr. Simoy, that it wasn't

3    Mirandized.  This provides the full sequence of all of her

4    law-enforcement encounters.  He has familiarity with this

5    because it's in the A file, which is the certified record of

6    everything related to Ms. Intarathong's immigration, and

7    it's admissible for the purposes of the -- determining the

8    suppression of the statements all made to Mr. Simoy.  It was

9    also Mirandized.  I don't understand there to be any

10   challenge as to that, so I don't think there's any due

11   process right and based on we were only able to bring one

12   agent for this hearing.  So I understand some of the limited

13   *Crawford* allegations made, but as to the limited purposes

14   for this hearing hearsay is admissible and it's admissible

15   as a certified record from the defendant's A file.

16            MR. MORRISON:  And the last piece of the record

17   that I'd like to correct, Judge, is that at the time I filed

18   my motion to suppress statements given by Ms. Intarathong to

19   Officer Simoy, the July 7th memo that's Government Exhibit 1

20   had not been produced to the defense.  It was only after the

21   filing of my motion that this document was produced, and I

22   certainly believe my motion covers suppression of all of her

23   statements on that day.

24            THE COURT:  Overruled.  Please proceed.

25            MS. PROVINZINO:  Thank you, Your Honor.

1    BY MS. PROVINZINO:

2    Q.  Supervisor Simoy, do you see Exhibit 1 in front of you?

3    A.  Yes.

4    Q.  And this was created by a Special Agent Alex Chan, is

5    that correct?

6    A.  Yes.

7    Q.  Do you know him?

8    A.  I know of him, yes.

9    Q.  And have you interacted with him?

10   A.  We have.

11   Q.  In what way?

12   A.  We have in relation to any other investigation or

13   communication at the San Francisco Airport, but it's not as

14   frequent, wasn't as frequent.

15   Q.  Okay.  And why is that?

16   A.  He was part of the investigative side should we ever

17   have to call them, but rarely did we have to ever call them.

18   Q.  So it would be more unusual to have an HSI agent doing a

19   criminal investigation at the airport, is that correct?

20   A.  Yes.

21   Q.  Because most of what you were doing was focusing on the

22   administrative side of things.

23   A.  Yes.

24   Q.  Now, were you part of the interview that Special Agent

25   Alex Chan did with the defendant?

1    A.  I was not.

2    Q.  Were you able to overhear anything?

3    A.  I did not.

4    Q.  After that interview concluded, then what happened?

5    A.  Then I did witness that as they both came out, Special

6    Agent Chan just said, "Get this lady out of here" -- he was

7    visibly upset and so was Ms. Intarathong -- out of the

8    office.

9    Q.  And that was memorable to you, is that right?

10   A.  Yes.

11   Q.  How did you know that the defendant was upset?

12   A.  I could see it in her face as she was walking right

13   behind him.

14   Q.  And that interaction as you understand ended when the

15   defendant invoked her right not to answer any more

16   questions, is that right?

17   A.  Yes.

18   Q.  And at that point in time, that was an interview that

19   lasted about an hour and a half, is that right?

20   A.  Approximately.

21   Q.  And then you were also intending or needed to go through

22   your administrative review process, is that right?

23   A.  Yes.

24   Q.  Was there a break between that interview and yours?

25   A.  Yes.

SIMON - DIRECT

1   Q.  And what happened during that time?

2   A.  During that time, I was still gathering information

3   through Systems, as well as we conducted a bag exam, as well

4   as getting her food.

5   Q.  And so after that food break, what was your next step?

6   A.  I did talk to Ms. Intarathong prior to the statement,

7   preliminary questions, but after the food break and when I

8   initiated the sworn statement.

9   Q.  And again, what's the purpose of your sworn statement?

10  A.  The purpose of the sworn statement is to capture what

11  her statements were when she referred to a photo lineup that

12  I presented, as well as some of her statements that she told

13  me prior to it.

14  Q.  And is this part of that determination you needed to

15  make about admissibility or whether there's any fear?

16  A.  Yes, correct.

17  Q.  And do you create a record of that process?

18  A.  Yes.

19  Q.  And that's documented?

20  A.  Yes.

21  Q.  And that's something that you also do in conjunction

22  with the defendant, is that correct?

23  A.  Yes.

24  Q.  And did you follow that process in this case?

25  A.  Yes.

1    Q.  Supervisor Simoy, I'll ask you to turn to what's been

2    premarked for identification purposes as Government Exhibit

3    2.  You probably have that on the stand in front of you.

4    I'll ask you to turn that over and let me know when you've

5    had a chance to look at it.

6    A.  Yes.  I've looked at it.

7    Q.  And do you recognize this document?

8    A.  I do.

9    Q.  What is it?

10   A.  The first portion is the I-213 Record of

11   Deportable/Inadmissible Alien.

12   Q.  And what is that document?

13   A.  That is the document that captures all the biographic

14   information that's required in her A file, identifiers and

15   the narrative of the encounter of that day.

16   Q.  And is that standard practice every time you do your

17   administrative determination?

18   A.  Yes.

19   Q.  And on that it appears to be your name and signature, is

20   that correct?

21   A.  Yes.

22   Q.  And does this appear to be a true and accurate copy of

23   that I-213?

24   A.  Yes.

25   Q.  And that's the first two pages, is that correct?

1    A.  That is correct.

2    Q.  So if we turn to page 3, there appears to be something

3    referred to as an I-867A that has about nine pages connected

4    to it, is that right?

5    A.  That's correct.

6    Q.  And what is that?

7    A.  This is a Record of Sworn Statement that I conducted

8    with Ms. Intarathong.

9    Q.  And how do you know this is the one that you conducted?

10   A.  I conducted it because I signed each page after page 1,

11   and then towards the end on the 867B I signed it again.

12   Q.  I also see on each of the pages there appear to be the

13   initials "S.I."  Do you see that?

14   A.  Yes.

15   Q.  And what is that?

16   A.  The initials are provided by Ms. Intarathong after I

17   provide this statement to her for her review.

18   Q.  And based on your review, is this a true and accurate

19   copy of the document you made in July of 2011?

20   A.  Yes.

21   Q.  And if we turn, there's two more portions of this

22   Government Exhibit 2.  Do you see what appears to be an

23   I-867B, Bates labeled 6598, a Jurat for Record of Sworn

24   Statement?

25   A.  Yes.

1   Q.  What is that?

2   A.  The purpose of this is to include the statement as well

3   as determine if there was any fear of being removed from the

4   United States.

5   Q.  And is this a true and accurate copy of the document you

6   created?

7   A.  Yes.

8   Q.  How do you know that?

9   A.  At the Port of San Francisco, once we ask these

10  questions -- and we give this, again, to any person that

11  we're determining admissibility, but then it's my signature,

12  as well as each question is signed by the person.

13  Q.  There also appears to be another individual's signature

14  as a witness.  Do you see that?

15  A.  Yes.

16  Q.  And who is that?

17  A.  That is Officer Erolin.

18  Q.  And what was his role?

19  A.  His role was putting -- conducted the baggage check and

20  also put the A file together.

21  Q.  Now I want to turn to the very last page of this.  Do

22  you see what appears to be a photocopy with hole punches at

23  the top?

24  A.  Yes.

25  Q.  And does that mean this was taken out of the defendant's

1    A file?

2    A.  Yes.

3    Q.  And what is this?

4    A.  The last page is the photo lineup that I created while

5    she was in the room talking with the agent and what I pieced

6    together when we had that break in time.

7    Q.  Is that a true and accurate copy of the photo lineup and

8    your interaction with Ms. Intarathong related to that

9    lineup?

10   A.  Yes.

11           MS. PROVINZINO:  At this time the United States

12   moves the admission of Government Exhibit 2.

13           MR. MORRISON:  No objection.

14           THE COURT:  Court receives Government 2.

15   BY MS. PROVINZINO:

16   Q.  So I'm going to ask you a series of questions as it

17   relates to the information contained in --

18   A.  Sure.

19   Q.  I want to focus first on that administrative interview

20   that you did.  Did you provide a Miranda warning?

21   A.  I did not.

22   Q.  Why not?

23   A.  When we're determining admissibility, being the

24   functional equivalent of a border, we don't require Miranda

25   warnings.

SIMON - DIRECT

1    Q.  Do you provide some other type of advisement to the

2    individual you're questioning?

3    A.  We provide an advisement as far as the severity of the

4    sworn statement, the possibility of being removed, and as

5    well as credible fear.

6    Q.  So your advisement would include consequences of lying

7    to you in the statement?

8    A.  That's correct.

9    Q.  In the process of conducting an interview like this, do

10   you make a determination of whether the individual can speak

11   and understand English?

12   A.  Yes.

13   Q.  And in Ms. Intarathong's case, did you make that

14   determination?

15   A.  Yes.

16   Q.  How did you do that?

17   A.  I made that assessment when I was able to speak with her

18   prior to this and even asking her the question:  "Are you

19   comfortable with the English language?"

20   Q.  And she indicated she was.

21   A.  Yes.

22   Q.  And prior to your interview with Ms. Intarathong, did

23   you understand the Homeland Security Investigations

24   interview -- what language was that in?

25   A.  I believe that was in English.

SIMON - DIRECT

1    Q.  If an individual's not able to speak and understand your

2    questions in the English language, what would you do?

3    A.  We would resort to finding an officer who speaks the

4    language.  If we do not, then we call the interpreter

5    service.

6    Q.  And did you feel that was necessary in this

7    circumstance?

8    A.  No.

9    Q.  So after you make a determination that somebody can

10   understand the language, it appears that you made some

11   initial inquiry into the defendant's state of mind, is that

12   fair?

13   A.  Yes.

14   Q.  And why do you do that?

15   A.  We do that just to make an assessment whether they can

16   continue with the rest of the statement, as well as seeing

17   if there's anything prohibiting them from answering any of

18   the subsequent questions.

19   Q.  And so in doing that assessment of whether somebody's

20   capable, did you make that same inquiry as to

21   Ms. Intarathong?

22   A.  Yes.

23   Q.  Did you ask or have an indication that she was using

24   medications that would make it difficult for her to answer

25   your questions?

SIMON - DIRECT

1   A.  Yes, I did ask that question.

2   Q.  What did you learn?

3   A.  I learned that she was not under the influence of any

4   medication.

5   Q.  And what about alcohol?

6   A.  Also the same.  It would not prohibit her from answering

7   the questions.

8   Q.  I want to step back and I should have asked this

9   earlier.  Where did this actual interview take place?

10  A.  This took place in a separate area in our Secondary

11  office.  So we have a lobby in Secondary and this

12  questioning was in another area separate from everyone else.

13  Q.  And can you describe that area.

14  A.  The area is about -- I want to say anywhere from 15

15  to -- it's a pretty big area, but there's only a few people

16  that have accessibility.

17  Q.  Is it a private area?

18  A.  Yes.

19  Q.  What is the rest of the area like?

20  A.  The rest of the area has people sitting around waiting

21  for their opportunity to be called up and talked to, which

22  includes anywhere from 20 to 50 people at a time.

23  Q.  Can that get noisy and loud?

24  A.  Yes.

25  Q.  When you were in the separate room with Ms. Intarathong,

SIMON - DIRECT

```
 1   who else was in that room?
 2   A.  Officer Erolin was.
 3              THE COURT:  Could you spell that?
 4   A.  Officer Erolin is E-R-O-L-I-N.
 5   Q.  What were you wearing when you were doing that
 6   interview?
 7   A.  My uniform that I'm wearing right now.
 8   Q.  And do you want to describe that on the record?
 9   A.  The uniform is I have my badge, my name tag, my
10   epaulettes, and writing on the side of my arms to indicate
11   my agency.
12              THE COURT:  Is that your duty uniform?
13              THE WITNESS:  Yes, sir.  Yes, Your Honor.
14   Q.  And while you're on duty, do you carry a weapon?
15   A.  I do.
16   Q.  And were you carrying a weapon on that day you
17   interviewed Ms. Intarathong?
18   A.  Yes, I was.
19   Q.  Did you draw your weapon?
20   A.  I did not.
21   Q.  What voice did you use in your interview with
22   Ms. Intarathong?
23   A.  The similar tone that I'm using right now.
24   Q.  What about volume?
25   A.  Volume, similar, professional.
```

SIMON - DIRECT

1    Q.  And did you provide the advisement that you talked

2    about, knowing about what the consequences may be if

3    somebody's not truthful and about what the penalties might

4    be if somebody is deemed inadmissible?

5    A.  Yes.

6    Q.  And then did you swear out the defendant?

7    A.  I did.

8    Q.  How do you do that?

9    A.  I ask her -- or I tell her in the initial portion of the

10   I-867A and also ask her to swear or affirm that all of her

11   statements are true and complete.

12   Q.  If somebody were to elect not to answer any questions,

13   what would the consequences of that be?

14   A.  If they do not answer any of your questions, then they

15   fail to complete the inspection.  They would just be

16   returned.

17   Q.  And in this situation, was Ms. Intarathong willing to

18   answer your questions?

19   A.  Yes.

20   Q.  And I think you had identified that she had seemed upset

21   earlier in the evening, maybe an hour or so before you had

22   food, is that right?

23   A.  Yes.

24   Q.  What was her demeanor in interacting with you?

25   A.  She was really calm and she elected to really speak to

SIMON - DIRECT

 1    me rather than the HSI agent.

 2    Q.  And she in fact had identified that you were more calm,

 3    is that right?

 4    A.  Yes.

 5    Q.  Do you remember what word she used?

 6    A.  "You're a lot more calm and nicer."

 7            THE REPORTER:  "I believe" what?  I'm sorry.

 8    A.  "I believe that you're calm and nicer."

 9    Q.  Just to clarify, did you get that?  That's what she

10    says, is that correct?

11    A.  Mm-hm.

12    Q.  At the start of your interview, did you note the time?

13    A.  Yes.

14    Q.  Why do you do that?

15    A.  We note the time to know when it really begins.

16    Q.  I think I asked some questions earlier that this

17    interview took place in English.  Did you ask some questions

18    or learn some things about Ms. Intarathong's comfort in the

19    English language?

20    A.  Yes, I did.

21    Q.  What did you learn?

22    A.  She was very familiar with the English language.  She

23    studied and married a U.S. -- a British citizen, U.K.

24    citizen.

25    Q.  Now, at the start of your administrative interview it

SIMON - DIRECT

```
 1    appeared you asked a lot of biographical questions.
 2    A.  Yes, that's correct.
 3    Q.  Why do you do that?
 4    A.  We do that just to determine if there's any derivative
 5    immigration status that she could obtain, herself being
 6    present in the United States or through family members.
 7    Q.  And did you learn where she was born?
 8    A.  Yes.
 9    Q.  And was it in the United States?
10    A.  No.
11    Q.  Did you learn if she had any other names other than
12    Sumalee Intarathong?
13    A.  Yes.
14    Q.  What did you learn?
15    A.  Her other name when I asked her was Emily Alice Spencer
16    Warren.
17    Q.  And was that in connection to her marriage, that last
18    name?
19    A.  Yes.
20    Q.  And you asked about her spouse at the time, is that
21    right?
22    A.  Yes.
23    Q.  What was the purpose of that question?
24    A.  To also determine if the spouse had any -- she would
25    obtain any derivative status or the spouse was also a U.S.
```

1    citizen.

2    Q.  And you did the same thing related to her parents, is

3    that correct?

4    A.  That's correct.

5    Q.  And through that did you learn or determine if the

6    defendant had any derivative status she could obtain through

7    family members?

8    A.  I concluded that she did not have any derivative status

9    or immigration status.

10   Q.  But after completing that biographical part of the

11   administrative interview, you started focusing on the

12   defendant's purpose in coming to the United States, is that

13   correct?

14   A.  That's correct.

15   Q.  And what was the reason for those questions?

16   A.  That establishing a platform for deciding what their

17   intention is or what their purpose in the United States is.

18   Q.  Did you learn what type of visa the defendant was coming

19   on?

20   A.  Yes.  She was coming on a B1/B2 visitor.

21   Q.  Did you learn if she was traveling with any other

22   people?

23   A.  Yes.

24   Q.  What did you learn?

25   A.  I learned that she was traveling with three other people

SIMON - DIRECT                                                    40

1   who were referred to Secondary.

2   Q.  And why were those other individuals referred to

3   Secondary?

4   A.  They also had alerts from Primary.

5   Q.  And what was important about that information, that

6   there were three others traveling on a visitor visa who were

7   referred to Secondary?

8   A.  They were all tied in with Ms. Intarathong.  They all

9   came in under the same itinerary.

10  Q.  And those were women, is that right?

11  A.  That's correct.

12  Q.  And were they undergoing the same administrative

13  interview process that you were conducting with

14  Ms. Intarathong?

15  A.  Yes.

16  Q.  And was that happening at the same time?

17  A.  Yes.

18  Q.  What were you learning from those interviews?

19  A.  I learned that from one of them, one of them admitted or

20  provided more information about Ms. Intarathong and what

21  their true intention coming to the United States was.

22  Q.  How was that relevant to your administrative process?

23  A.  It becomes -- after I ask for purpose, then it becomes

24  change and what I know and what I'm asking her, what I'm

25  going to be asking her in the rest of the sworn statement.

1    That's going to be opposite of what her true intention is.

2    Q.  And what other steps did you take to learn about her

3    true intent?

4    A.  I began asking her about the people she was traveling

5    with, also her past travels and who she's coming here with.

6    Q.  And in relation to her past travel, you had indicated

7    earlier and on the last page of Government Exhibit 2 that

8    you had put together a photographic lineup, is that right?

9    A.  That's correct.

10   Q.  I'll have you turn to that last page of the photographic

11   lineup in front of you.  Did you show this to

12   Ms. Intarathong?

13   A.  Yes, I did.

14   Q.  And what did you ask her about?

15   A.  I'd asked her, "Do you know anybody in these pictures?"

16   Q.  And how did she respond?

17   A.  She responded with, "Yes, I know a few of these people."

18   Q.  And how did you put together this photographic lineup in

19   the first place?

20   A.  I initially did Systems queries, you know, reviewing if

21   there was anybody that she traveled with in the past and if

22   they had the same itinerary.  And then when I did find that

23   they had the same itinerary, I started looking to each

24   individual and asked if they were still here, and

25   eventually -- or she pointed to they were still here in the

SIMON - DIRECT

1    United States.

2    Q.  So what would be relevant about those individuals who

3    previously traveled with her on a B-1/B-2 visitor visa if

4    they're still in the United States?

5    A.  This establishes the pattern that when she comes into

6    the United States with somebody else, that these individuals

7    remain here.

8    Q.  So in addition to those individuals that the defendant

9    had previously traveled with, did you put together photos of

10   any other individuals?

11   A.  No.

12   Q.  So everybody in this photographic lineup were people she

13   previously traveled with?

14   A.  No, not everyone.

15   Q.  Oh.  So describe your process --

16   A.  I did -- I found people that she did travel with before

17   and then I randomly started pointing to individuals that

18   there was no connection or nexus to her at all.

19   Q.  And why did you do that?

20   A.  I did that just -- not to provide her or direct, like,

21   pinpoint of who they are.  My opening question was, "Do you

22   know anybody in this picture?"  That's why I included those

23   people.

24   Q.  And when you asked that question, "Do you know anyone,"

25   how did Ms. Intarathong respond?

1    A.  She pointed to a couple of the people that were here and

2    those were the people that I already knew through my System

3    inquiries that were still unlawfully present in the United

4    States.

5    Q.  Did she document that on this photographic lineup?

6    A.  Yes.

7    Q.  How did she do that?

8    A.  She pointed to the individuals and I asked then

9    specifically who they were, she wrote down who they were,

10   and then at one point there was one in particular I asked

11   her if she's ever traveled with who she pointed out as her

12   sister-in-law.

13   Q.  When you say the "sister-in-law," are you referring to

14   the individual in the bottom column on the far right?

15   A.  Yes.

16   Q.  So there are a couple check marks on the top two

17   photographs on the left on the top line, is that correct?

18   A.  Yes.

19   Q.  And what appear to be Thai names for those individuals?

20   A.  Yes.

21   Q.  Who put that information on this photo lineup?

22   A.  That -- I put the pictures on there, but I did not write

23   anything that's on this photo lineup.

24   Q.  So who did the writing on the photos?

25   A.  Ms. Intarathong.

SIMOY - DIRECT                                                      44

1    Q.  And so all of the words in there, the names of these

2    individuals and whether she knows them, was from

3    Ms. Intarathong, is that right?

4    A.  That's correct.

5    Q.  And then is that her signature on here?

6    A.  That is correct.

7    Q.  So what did you learn from showing her this photographic

8    lineup that was important to your administrative process?

9    A.  I learned that there was -- confirming that there was a

10   pattern of individuals remaining, as well as what was

11   currently happening with three other individuals that were

12   also being removed administratively.

13   Q.  So taking all of that information together, were you

14   able to make a determination as to whether Ms. Intarathong

15   was admissible or not?

16   A.  Yes.

17   Q.  And what was your determination?

18   A.  She was determined inadmissible to the United States.

19   Q.  Once you make that determination, what do you do?

20   A.  Once that's concluded I ask her just a couple more

21   questions on the jurat as far as fear.

22   Q.  And when you're referring to the jurat, Supervisor

23   Simoy, are you referring to the second-to-the-last page in

24   Government Exhibit 2?

25   A.  Yes.

SIMES - DIRECT

1    Q.  And walk the Court through the jurat.

2    A.  When we're asking these -- the jurat questions, we ask

3    them obviously why did you leave, so it reintroduces the

4    purpose of their trip, why they're coming to the United

5    States.

6              And then the next two questions are related to if

7    there's any credible fear that I need to be aware of that

8    you haven't explained while in the sworn statement.

9              And then the last question, is there anything else

10   that you would like to add to conclude everything.

11   Q.  Now, if there had been credible fear, what would you

12   have done?

13   A.  This would have been referred to U.S. Citizenship and

14   Immigration Services for further review.

15   Q.  And in that last question, did Ms. Intarathong have

16   anything else she wanted to tell you?

17   A.  Yes, she answered.

18   Q.  And what did she tell you?

19   A.  She answered:  "No, but it isn't fair.  I didn't do

20   anything illegal."

21   Q.  And we've already established that she signed this jurat

22   in two different places, is that correct?

23   A.  Yes, that's correct.

24   Q.  And is this a sworn statement?

25   A.  Yes.

SIMON - DIRECT

1   Q.  And then you signed it as well as another witness,

2   Customs Border Protection Officer Erolin, is that right?

3   A.  That's correct.

4   Q.  So at that point had you communicated to the defendant

5   that she was inadmissible?

6   A.  Yes.

7   Q.  And had you given her the reasons for it?

8   A.  Yes.

9   Q.  How did she respond?

10  A.  She -- she understood.  She said, "Yes, I understand."

11  Q.  And in your process after you do the jurat, what happens

12  next?

13  A.  After the jurat?  Then we conclude with putting the file

14  together and she remains with it until the next available

15  flight.

16  Q.  And in putting the file together, is that the step at

17  which she reviews it?

18  A.  We give -- yeah, we give it to her, she reviews it, and

19  then she signs off with the initials on the bottom of each

20  page.

21  Q.  And did she do that here?

22  A.  Yes.

23  Q.  And those are her initials on the record of the sworn

24  statement?

25  A.  Yes.

SIMON - DIRECT

1   Q.  So after she reviewed it and signed off on it, what

2   happened next?

3   A.  We actually provide her a copy of her inadmissibility

4   and then she just remains with us until she departs the next

5   day.

6   Q.  And where is the location that she stays?

7   A.  She remains in our Secondary office, because at that

8   time we didn't have a detention facility at the

9   San Francisco International Airport, so she remains in the

10  lobby until then.

11  Q.  And is that the lobby of the Secondary area?

12  A.  Yes.

13  Q.  And was she under handcuffs?

14  A.  No.

15  Q.  Was she able to access the bathroom?

16  A.  Yes.

17  Q.  How about food and water?

18  A.  Yes.

19  Q.  You talked about she had to remain until the next

20  flight?

21  A.  Yes.

22  Q.  And how soon was the next flight available?

23  A.  Usually that is the following morning or early

24  afternoon.

25  Q.  And was that the case for Ms. Intarathong?

SIMON - DIRECT                                          48

1     A.  Yes.

2              THE COURT:  What happened?

3              MS. PROVINZINO:  I wonder if your mike -- is your

4     light on on your microphone, the green light on the base?

5     Do you see a green light on your microphone?

6              THE WITNESS:  There's no green light, no.

7              THE CLERK:  It turned off.  Sorry.

8              THE COURT:  Yeah.  I don't know why it powers off

9     in the middle of a hearing.

10          (Pause)

11             THE COURT:  It's powering up.  Sorry, guys.

12             MS. PROVINZINO:  No problem.

13          (Pause)

14             THE COURT:  Sorry for the delay.

15             MS. PROVINZINO:  No problem.

16             THE COURT:  We've had IT up here a couple of

17    times.

18          (Pause)

19             THE COURT:  We're back.  Please proceed.  You can

20    repeat the last question if you want.

21    BY MS. PROVINZINO:

22    Q.  We were talking about the conclusion of your process

23    where Ms. Intarathong was waiting for the next available

24    flight.  While she was doing that, was she waiting with

25    anyone?

1     A.  She was waiting with the other individuals that were

2     being returned.

3     Q.  So she was able to interact with them freely?

4     A.  Yes.

5               THE COURT:  Is that the three others?

6               THE WITNESS:  Yes, sir -- yes, Your Honor.

7     Q.  If Ms. Intarathong disagreed with your determination

8     that she wasn't admissible, could she have challenged that?

9     A.  At the port of entry, no.

10    Q.  Is there a process to petition that later?

11    A.  Yes.

12              THE COURT:  Folks, we're going to have to just

13    speak up.

14              Mr. Court Reporter, if at some point you cannot

15    hear or anyone on the defense can't hear, the interpreter,

16    Ms. Intarathong, others, let us know.

17         (Pause)

18              THE COURT:  Again, folks, I can hear so far, but

19    if anyone cannot, wave, do something to catch my attention

20    and then we can recess.  We have an IT person here.

21              It seems like it's just going on and off and it

22    seems like it's going back on again.

23              Again, I believe we were talking about the three

24    other individuals with Ms. Intarathong in the lobby of the

25    Secondary area waiting for the next flight.

1    BY MS. PROVINZINO:

2    Q.  And who were those other individuals with her?

3    A.  These were -- I don't know them by name, but I might

4    have wrote it the sworn statement, but the individuals that

5    came in with her.

6    Q.  Now, if she had disagreed with your decision that she

7    wasn't admissible, could she challenge that?

8    A.  No, not at the port of entry.

9    Q.  After the port of entry after she's removed, is there a

10   process to challenge it?

11   A.  Yes.

12   Q.  What would that be?

13   A.  She would have to visit the Department of State and

14   bring the paperwork that I did give her and say that this

15   was incorrect, the determination was wrong.

16   Q.  Did she do that in this case?

17   A.  Not that I'm aware of, no.

18   Q.  At the end of your administrative process --

19           THE COURT:  Just to be clear, so that would occur

20   overseas then, right?

21           THE WITNESS:  Yes, sir -- yes, Your Honor.

22           THE COURT:  Thank you.

23           MS. PROVINZINO:  Thank you, Your Honor.

24   BY MS. PROVINZINO:

25   Q.  At the end of your interview with her, you in the report

1    document some questions you asked as to whether she'd been

2    treated fairly in the process.  Do you recall those?

3    A.  Yes.

4    Q.  Why do you ask those questions?

5    A.  We ask this because we want to make sure that we haven't

6    treated the individual or any other officer treated the

7    individual unfairly or did anything to the individual.

8    Q.  And how did Ms. Intarathong respond to those questions?

9    A.  She answered yes, she was treated fairly.

10   Q.  You also asked if she had been coerced or coached?

11   A.  Yes.

12   Q.  Why did you do that?

13   A.  We ask that so that we eliminate any issues that may

14   have occurred with any other officer or anything that is

15   incorrect entirely.

16   Q.  And she affirmed that she hadn't been coerced or coached

17   in her interactions with you, is that right?

18   A.  Right.  She said no, she wasn't.

19   Q.  How long in total did your interactions with the

20   defendant take?

21   A.  I would say my interaction with her was probably up to

22   three hours, but then from start to finish of the case when

23   she entered maybe went into six to seven hours.

24   Q.  And in the period of that interaction with her, did she

25   understand what was going on?

SIMON - DIRECT

```
1    A.  Yes.

2    Q.  Did she understand your questions?

3    A.  Yes.

4    Q.  How do you know that?

5    A.  I made sure that she -- I gave her the actual sworn

6    statement for her to read so that she can go over, and

7    during the course -- any time I was doing the sworn

8    statement anything that needed to be repeated or to be done,

9    we would do that.

10   Q.  And in the course of your interaction, did you ever

11   raise your voice with her?

12   A.  I did not.

13   Q.  Did you make promises to her?

14   A.  I did not.

15   Q.  Did you threaten her?

16   A.  No.

17   Q.  Did you draw a weapon?

18   A.  No.

19   Q.  Did you prevent her from getting food or using the

20   bathroom?

21   A.  No.

22   Q.  Did you observe or notice anything that was preventing

23   her from fully answering your questions?

24   A.  No, I did not.

25   Q.  Was there anything unusual about the process and the
```

SIMON - DIRECT

1    paperwork here?

2    A.  No.

3    Q.  We talked earlier about this being an interview that you

4    remember and using your field training even though it was

5    ten years ago.  What was significant or what was memorable

6    for you about this interaction?

7    A.  This was one of the only cases where HSI initiated, but

8    did not complete.  That's one thing I did remember about it.

9           And then this is one of the cases that I've done

10   that has resulted in nothing that's typical with other

11   extraditable people or inadmissibility cases.

12   Q.  And what do you mean by that?

13   A.  Typical inadmissibility or extraditable cases involve

14   somebody that's just working without authorization, someone

15   working illegally in the United States.

16   Q.  What was different about this one?

17   A.  This wasn't working.  This was along the lines of

18   context of bringing people into the United States.

19   Q.  And you've also learned something from the earlier

20   interaction when the defendant had been frustrated and upset

21   with law enforcement and you kind of corrected that.

22   Describe that for the Court.

23   A.  I was able to recover by talking to her after that

24   encounter with HSI Special Agent Chan, just letting her know

25   that whatever she needs -- I can get her food, I actually

SIMOY - CROSS

1    did get her food, and then we would talk later on for the

2    sworn statement.

3            MS. PROVINZINO:  No further questions at this

4    time.

5            THE COURT:  Okay.  When you're ready,

6    Mr. Morrison.

7            MR. MORRISON:  Thank you, Judge.

8

9                    **CROSS-EXAMINATION**

10   BY MR. MORRISON:

11   Q.  Officer Simoy, Aaron Morrison is my name.  I introduced

12   myself to you the last time we were in court back in

13   August or September, wherever that was.

14   A.  Yes.

15   Q.  Thanks for coming back again.

16           I want to start off by talking about Exhibit 1.

17   Just to be clear, you did not participate in this interview

18   that's reflected in Exhibit 1 in any way, is that true?

19   A.  I did not participate in the interview.

20   Q.  Okay.  You weren't in the room and it was in a separate

21   room with other agents, correct?

22   A.  Yes.

23   Q.  Okay.  So as far as your firsthand knowledge of anything

24   that's written in the report of Exhibit 1, that's pretty

25   much zero, fair, so as reflected by what was said during the

1    interview?

2    A.  Right.

3    Q.  Okay.  I just want to -- you talked about this a little

4    bit on direct, but at the conclusion of the interview, you

5    indicated that Agent Chan and Ms. Intarathong were both

6    upset, correct?

7    A.  Correct.

8    Q.  And Agent Chan said something to the effect of, "Get

9    this lady out of here"?

10   A.  Yes.

11   Q.  What did you take that to mean?

12   A.  I took that to mean that he didn't accomplish or

13   complete his objective or whatever he was needing to do.

14   That's what I took out of it.

15   Q.  Okay.  And, "Get this lady out of here," was that in

16   reference to getting her out of the United States, or out of

17   the interrogation room?  What was your take on that?

18   A.  My take was that he -- to remove the person from the

19   United States.

20   Q.  And Ms. Intarathong was also upset when she was leaving

21   that room.

22   A.  Yes.

23   Q.  And you answered a question on direct in relation to her

24   invoking her rights.  Is that something that Agent Chan told

25   you she did or is that just something you now know from

SIMON - CROSS

1    reviewing Government Exhibit 1?

2    A.  That's something that I deduced when they came out of

3    the room, because he said -- I don't -- "Get this lady out

4    of here," but I don't -- I don't respond to HSI.  I talk to

5    my supervisor.

6    Q.  Okay.  Now, looking at Exhibit 2, there is on the first

7    page a:  "Date, Place, Time, and Manner of Last Entry," and

8    that indicates July 7, 2011, at 1738, correct?

9    A.  Where is this?  Where are you looking?

10   Q.  We're on Exhibit 2, the very first page, fourth box down

11   on the left-hand side.

12   A.  Okay.

13   Q.  So I assume that that's essentially when her airplane

14   landed at the San Francisco International Airport, is that

15   fair?

16   A.  I would say Korean Airlines was usually in the morning,

17   but, yeah.  Because there's -- the time was on here, it was

18   created, that I recall.

19   Q.  And then on the same first page on the right-hand side

20   about six boxes down there's a date and hour of July 7,

21   2011, 2029.

22   A.  Yes.

23   Q.  What does that reference?

24   A.  That's the reference of when the system -- or when we

25   were inputting stuff into the system into our -- for her A

SIMON  CROSS

1    file generation.

2    Q.  And would that have occurred before you sat down to meet

3    with her?  Is that after you sat down to meet with her?

4    A.  This was before my statement.

5    Q.  Okay.  And then going to that statement, page 1 of the

6    I-867A form, it indicates that the interview occurred at the

7    San Francisco International Airport on July 8, 2011.

8    A.  Yes.

9    Q.  So can you explain -- so was she interviewed on the 8th

10   of July or on the 7th of July?

11   A.  She was -- she was interviewed on the 7th.

12   Q.  Okay.  Just a typo on that, or was that when this report

13   was created?

14   A.  When we enter this information, it creates its own time

15   stamp when we're putting it into the system.

16   Q.  Okay.  So the information on I-867A was not inputted

17   into the system until the following day of Ms. Intarathong's

18   interview, is that correct?

19   A.  No, because it's also using Eastern Standard Time, and

20   this was on the West Coast.

21   Q.  Got you.  Okay.  So can you give us an idea, then, of

22   approximately what time Ms. Intarathong would have entered

23   Primary immigration?

24   A.  I don't recall when she entered Primary.  I would not

25   remember that.  I would only remember it's towards the

1    morning or afternoon when Korean Airlines came in.

2    Q.  Okay.  And do you remember approximately what time you

3    first had an interaction with Ms. Intarathong?

4    A.  It would be early -- best guess I would do would be like

5    early afternoon.

6    Q.  So early afternoon you have an interaction, and at what

7    time does your interview with her as reflected in the I-867A

8    occur?

9    A.  It's at 9:50, 2150.

10   Q.  2150.  Okay.  And essentially, when Ms. Intarathong

11   arrived at the airport, she entered Primary immigration,

12   correct?

13   A.  Yes.

14   Q.  And then she was diverted to a Secondary screening by an

15   alert that was placed by Homeland Security, correct?

16   A.  Yes.

17   Q.  During the time from when she's directed from Primary

18   screening to Secondary screening, fair to say she wasn't

19   free to leave the airport, correct?

20   A.  That's correct.

21   Q.  She essentially wasn't free to leave your custody and

22   care as immigration officers, correct?

23   A.  That's correct.

24   Q.  So following the interview with Agent Chan, you provided

25   Ms. Intarathong with some food, correct?

1    A.  Yes.

2    Q.  And there was a break in time?

3    A.  Yes.

4    Q.  And do you recall how long that break was?

5    A.  I want to say probably about two hours, two hours or so.

6    Q.  Okay.  And it wasn't Ms. Intarathong who reinitiated

7    wanting to talk to you, is that fair?

8    A.  I initiated it, that's correct.

9    Q.  You initiated the second conversation with

10   Ms. Intarathong, correct?

11   A.  Yes.

12   Q.  Okay.  And in that interrogation, the second one, it's

13   you as a uniformed officer with another uniformed officer?

14   A.  Yes.

15   Q.  And Ms. Intarathong wasn't free to leave the airport at

16   that time, correct?

17   A.  Yes.

18   Q.  And you never provided her with a Miranda warning,

19   correct?

20   A.  Correct.

21   Q.  And you're familiar with Miranda warnings as a sworn

22   officer?

23   A.  Yes.

24   Q.  You never referred back to or reminded her of her

25   Miranda rights that were read to her by Agent Chan, correct?

SIMON - CROSS

1     A.  I didn't.

2     Q.  Because you didn't know that they'd been read, correct?

3     A.  Correct.

4     Q.  And prior to you starting your Secondary interview to

5     determine admissibility, you knew that there was a TECS

6     lookout alert, correct?

7     A.  Yes.

8     Q.  And what TECS stand for?

9     A.  That's the Treasury Enforcement Communication System.

10    Q.  Okay.  And you knew that that alert related to

11    allegations she was involved in human trafficking, correct?

12    A.  Yes.

13    Q.  And you knew that it was significant enough that

14    criminal investigators from Homeland Security came to

15    interview Ms. Intarathong.

16    A.  Yes.

17    Q.  And you knew all of that before you started your

18    interview process.

19    A.  Yes.

20    Q.  Okay.  Now looking at Exhibit 2, starting with your

21    I-867A, you essentially have a Q & A with typed questions,

22    typed answers, correct?

23    A.  That's correct, yes.

24    Q.  And you did not record this interview, is that correct?

25    A.  Right, correct.

SIMOY - REDIRECT

1    Q.  And as you're creating this, are you typing this as you

2    go?

3    A.  Yes.

4    Q.  So is this as close to a verbatim transcript of your

5    conversation with Ms. Intarathong as you could get?

6    A.  Yes.

7    Q.  Anything in reviewing this for the hearing today that

8    you left out of this exchange?

9    A.  No, not that I'm --

10   Q.  It's accurate and complete and captures in your mind the

11   entirety of the interview with Ms. Intarathong that you

12   conducted?

13   A.  Yes.

14   Q.  Thank you, Officer Simoy.

15          MR. MORRISON:  I have no other questions.

16          THE COURT:  Redirect.

17          MS. PROVINZINO:  Briefly, Your Honor.  Thank you.

18

19                     **REDIRECT EXAMINATION**

20   BY MS. PROVINZINO:

21   Q.  Would you have still had to do your administrative

22   interview regardless of whether his had done anything?

23   A.  Yes.

24   Q.  And why is that?

25   A.  Partly because there was the alert, as well as the other

1   individuals that were also being removed.  So regardless of

2   HSI's involvement, it was because of the other people she

3   was associated with, what I put together, she would be also

4   subject to being removed.

5   Q.  And you had to make that determination as to whether

6   she's admissible, right?

7   A.  Yes.

8   Q.  And you do that every day for hundreds of individuals

9   who are sent to Secondary, fair?

10  A.  Yes.

11  Q.  And during that time, you were asked questions about

12  whether she was free to leave the airport, true?

13  A.  Yes.

14  Q.  And how do you understand -- is she actually in the

15  United States when she was in the airport?

16  A.  She is not in the United States.

17  Q.  And explain that.

18  A.  She's not in the United States because she's

19  functionally at a border that's inland, whereas in Canada

20  there's an actual physical barrier of a border.  Since she's

21  inland, she's just at the airport.

22          MS. PROVINZINO:  No further questions, Your Honor.

23          MR. MORRISON:  Brief follow-up.

24

25

1                    **RECROSS-EXAMINATION**

2    BY MR. MORRISON:

3    Q.  Your follow-up and your questions regarding

4    admissibility in this situation, your concern was she was

5    committing a crime by coming into the United States, is that

6    fair?

7    A.  My concern was determining her status as a bona fide

8    visitor.

9    Q.  And the question raised about whether or not she was a

10   bona fide visitor was whether or not she was committing

11   human trafficking, which is a crime, correct?

12   A.  For administrative purposes, it was the result of seeing

13   if she was a bona fide visitor.

14   Q.  Okay.

15            MR. MORRISON:  I don't have any other questions.

16            THE COURT:  Anything else?

17            MS. PROVINZINO:  We'll end on that, Your Honor.

18   Nothing further.

19            THE COURT:  Okay.  Thank you for testifying.  You

20   may step down.

21                 (Witness steps down)

22            THE COURT:  Still your case.

23            MS. WILLIAMS:  Your Honor, switching to the motion

24   to suppress Ms. Intarathong's statements, fast-forwarding a

25   bit, on January 13th, 2017 -- so this is Defendant ECF 899,

1    our response ECF 911 -- we call Special Agent Tonya Price to

2    the stand.

3              THE COURT:  Give me a second here.

4         (Pause)

5              THE COURT:  Okay.

6

7              **TONYA PRICE, GOVERNMENT'S WITNESS, SWORN**

8              THE WITNESS:  I do.

9              THE COURT:  Okay.  Please sit down.

10             And I believe we have the same protocol that we

11   had used earlier.  There's some documents in front of you.

12   If you could make sure that all of those are turned over at

13   this point and you're free to reference them as needed to

14   refresh your recollection, and if you could just indicate

15   that when you do so or the context may show that there's a

16   question relating to a certain exhibit.  I think that will

17   be obvious on the record.

18             With whom are you employed?

19             THE WITNESS:  Homeland Security Investigations.

20             THE COURT:  And how long have you been employed

21   with Homeland Security Investigations?

22             THE WITNESS:  Since December of 2008.

23             THE COURT:  Thank you.

24             Please proceed.

25

1                    **DIRECT EXAMINATION**

2    BY MS. WILLIAMS:

3    Q.  Special Agent Price, we are here in the case of United

4    States versus Sumalee Intarathong.  What is your role in

5    this particular case?

6    A.  I am the lead investigator.

7    Q.  And we're talking about an interview that you and others

8    conducted with Ms. Intarathong on January 13th, 2017 in

9    Liege, Belgium, is that right?

10   A.  That's correct.

11   Q.  Let's give the Court just a little bit of timeline as we

12   build up to that interview, all right?

13              THE COURT:  Sorry.  Could you spell Liege?  Is it

14   L-I-E-G-E?

15              MS. WILLIAMS:  I think so.

16   BY MS. WILLIAMS:

17   Q.  Special Agent Price?

18   A.  I'm not confident about the L-E.  L-E-I-G --

19              MR. MORRISON:  L-I-E-G-E according to Exhibit 4.

20              MS. WILLIAMS:  L-I-E-G-E, yes.

21              (Laughter)

22   BY MS. WILLIAMS:

23   Q.  On July 29th, 2016, so about six months before

24   Ms. Intarathong is interviewed, does a then under-seal

25   criminal complaint issue for Ms. Intarathong?

1    A.  Yes.

2    Q.  And I believe that's, for the record, DCD number 1 in

3    this case.

4          On August the 5th of 2016, is Ms. Warren

5    arrested -- or Ms. Intarathong, rather -- arrested on a

6    provisional arrest warrant based on this criminal complaint

7    in Liege, Belgium?

8    A.  Yes.

9    Q.  And on September 17th, 2016, are 17 members of the

10   criminal conspiracy, including the defendant, indicted in

11   this case in what is at that point an under-seal indictment?

12   A.  That's correct.

13   Q.  And on October the 4th, 2016, there is what we call a

14   takedown in this case, and are numerous members of the

15   criminal conspiracy at that point arrested on the

16   indictment?

17   A.  Yes.

18   Q.  And the indictment becomes unsealed.

19   A.  Yes.

20   Q.  As to Ms. Intarathong, did she remain redacted from the

21   indictment because she was not in custody in the United

22   States?

23   A.  Yes.

24   Q.  So what I'm getting at is, between October 4th, 2016 and

25   the time that a U.S. delegation travels to meet with

PRICE - DIRECT

1      Ms. Intarathong on January 13th, 2017, does the

2      investigative team receive contacts from Ms. Intarathong

3      that come through her Belgian fiance, Philippe Milants?

4      A.  Yes, we did.

5      Q.  Okay.  So I would ask you to look at -- I think in front

6      of you -- Government's Exhibit 5.

7             Do you see that?

8      A.  Yes.

9      Q.  And is this one such communication from Mr. Milants, an

10     email that purports to contain letters from Ms. Intarathong

11     to the U.S. investigative team?

12     A.  Yes.

13            MS. WILLIAMS:  Your Honor, the Government moves

14     Exhibit 5 into evidence.

15            MR. MORRISON:  No objection.

16            THE COURT:  Court receives Government 5.

17     BY MS. WILLIAMS:

18     Q.  Special Agent Price, this is a fairly lengthy document.

19     I see two kind of email strings at the beginning, beginning

20     on December 10th, 2016.  It looks like it winds its way and

21     eventually lands on your lap December 13, 2016, is that

22     right?

23     A.  That's correct.

24     Q.  And everything we see printed out behind it, some of

25     which is in English and some of which is in French, were

68

FRIED - DIRECT

1    these the various attachments that Mr. Milants attached to

2    that email?

3    A.  Yes, that's correct.

4    Q.  Okay.  And the Court can read it and this is long, so we

5    won't go through it at length, but is it fair to say, first

6    of all, that these purport to be letters written by the

7    defendant?

8    A.  Yes.

9    Q.  And does the defendant repeatedly offer to fully

10   cooperate with the American justice system about how people

11   "send me clients for visa applications"?

12   A.  Yes, she does.

13   Q.  Does the defendant say:  "I realize now this is a big

14   organization for human trafficking using me and my company

15   for their criminal acts"?

16   A.  Yes.

17   Q.  Does she identify various members of this criminal

18   conspiracy, including who she calls the ring leader of the

19   case?

20   A.  Yes, she does.

21   Q.  And does she also note that she has concerns for the

22   safety of her and her family and does she ask for witness

23   protection?

24   A.  Yes, she expressed those concerns.

25   Q.  Okay.  Upon receiving Government's Exhibit 5, does a

FRIED - DIRECT

1    delegation then travel to Belgium to meet with

2    Ms. Intarathong?

3    A.  Yes, we did.

4    Q.  And at this point she has two different cases, is that

5    right?

6    A.  That's correct.

7    Q.  She has a case in Belgium where she is being prosecuted

8    for sex trafficking in Belgium?

9    A.  Yes.

10   Q.  And then she has the current case where she's been

11   arrested on the provisional arrest warrant.

12   A.  That's correct, here in the United States.

13   Q.  I see.  Okay.  At the -- and I'm going to -- also, do

14   you see Government's Exhibit 3 in front of you?

15   A.  Yes, I have it here.

16   Q.  You were a part of this interview?

17   A.  Yes, I was.

18   Q.  Do you write a 12-page report of investigation

19   summarizing that interview?

20   A.  Yes, I did.

21   Q.  And is that Government's Exhibit 3?

22   A.  It is.

23          MS. WILLIAMS:  Government moves Exhibit 3 into

24   evidence.

25          MR. MORRISON:  No objection.

FRIED - DIRECT

```
1              THE COURT:  Court receives Government's 3.
2    BY MS. WILLIAMS:
3    Q.  Again, we can all read so we won't go through this at
4    length, but -- and I will refer everyone to the first page
5    of Government's Exhibit 3.
6              Are there a total of 11 people at this interview?
7    A.  Yes.
8    Q.  And do these people include you, myself, Ms. Provinzino,
9    Ms. Intarathong, Ms. Intarathong's attorney, a Thai
10   translator, an attorney-in-training, a Homeland Security
11   representative, and then three investigators based in Liege,
12   Belgium, investigators?
13   A.  Yes, that's everyone that was present.
14   Q.  Okay.  Does the interview start at about 10:30 a.m.?
15   A.  It does.
16   Q.  Could you tell us a little bit about where this
17   interview occurred, what the room was like, that sort of
18   thing.
19   A.  The room was rather large and it was empty except for a
20   couple of tables and a few chairs for everyone to sit.
21   There was a restroom also available in the larger room that
22   we had access to.
23   Q.  And as far as you know, except for maybe some bathroom
24   breaks, was everyone present for all of the interview?
25   A.  Yes.  I think at one point one of the supervisors over
```

FRIED - DIRECT

1    the Liege Police Department had stepped out, but other than

2    that, everyone was present.

3    Q.  And more specifically, was Ms. Intarathong's attorney

4    and the interpreter present at all times?

5    A.  The entire time, yes.

6    Q.  How did the interview begin?

7    A.  (No response).

8    Q.  Well, did Ms. Intarathong do anything when she saw you?

9    A.  She did.  When we entered the room, she actually hugged

10   me.

11   Q.  Did she seem happy to see you?

12   A.  She did.  She expressed that she was grateful that we

13   were there.

14   Q.  Was Ms. Intarathong -- did you read her her Miranda

15   rights right off the bat?

16   A.  I did, yes.

17   Q.  Tell us about how that went.

18   A.  I maintain my Miranda rights card in my HSI credentials,

19   in my badge, so I utilize that to read verbatim.

20   Q.  Presumably, you read it in English?

21   A.  Yes, I read it in English and it was translated into

22   Thai.

23   Q.  By the interpreter?

24   A.  That's correct.

25   Q.  Okay.  Now, what languages were spoken -- during the

FRIED - DIRECT

72

1   entire interview, what were all of the languages that were

2   spoken?

3   A.  English, obviously, French, and Thai.

4   Q.  French is the language utilized in the southern part of

5   Belgium where Liege is located?

6   A.  That's correct.

7   Q.  And to your knowledge, which, if any, of these languages

8   does Ms. Intarathong speak?

9   A.  My understanding is she speaks all of them.

10   Q.  Okay.  And her native language is Thai, though.

11   A.  That's correct.

12   Q.  Did Ms. Intarathong indicate that she understood her

13   Miranda rights?

14   A.  Yes.

15   Q.  Did she indicate she wanted to speak with U.S.

16   investigators?

17   A.  Yes, and her preference was to do that in English,

18   except for if there were other unique words specific to law

19   enforcement or lawyer words, that she would then ask for

20   additional assistance from the Thai interpreter.

21   Q.  And did she have that interpreter on standby for

22   anything that she didn't understand at all?

23   A.  Yes.

24   Q.  And based on your interactions with her, did she seem to

25   speak English fluently?

FRIED - DIRECT

```
 1    A.  Yes.

 2    Q.  Was she told that she could stop the questioning at any

 3    point?

 4    A.  Yes.

 5    Q.  Was she told she could speak with her attorney at any

 6    point?

 7    A.  Yes.

 8    Q.  Was she told that it was fine not to answer a question?

 9    A.  Yes.

10    Q.  And in fact, did she and her attorney take a break at

11    one point to speak privately?

12    A.  They did, yes.

13    Q.  After she was read and waived her Miranda rights, was

14    she also provided with a written copy of her declaration of

15    rights, essentially the European equivalent?

16    A.  Yes, that's correct.

17    Q.  What did she --

18              THE COURT:  Counsel?

19              MS. WILLIAMS:  Yes.

20              THE COURT:  Could you lay a little foundation for

21    that?  Was she even Mirandized?

22              MS. WILLIAMS:  Oh, I'm sorry.  I thought --

23    A.  She was Mirandized.

24    Q.  Yes.  I'm sorry if that wasn't clear.  Was she fully

25    Mirandized?
```

FRIED - DIRECT

```
1    A.  Yes.

2    Q.  And did she waive her Miranda rights?

3    A.  She waived.

4    Q.  After that was she by the Belgian investigators provided

5    with a written copy of her declaration of rights?

6    A.  She was, yes.

7    Q.  And is that essentially a similar group of rights that

8    is commonly utilized in Europe?

9    A.  Yes, that's my understanding.

10   Q.  Did she sign each of the four pages of the declaration

11   of rights?

12   A.  She did.

13   Q.  Did she say anything at that point?

14   A.  Essentially that she had read that so many times that

15   she almost had it memorized.

16   Q.  Before we get into the substance of the interview, let

17   me ask you a few more questions about the context.

18             Was Ms. Intarathong handcuffed for the interview?

19   A.  Not during the interview, no.

20   Q.  Was she handcuffed during the transport?

21   A.  The transportation she was, yes.

22   Q.  Were those removed for the interview?

23   A.  They were, yes.

24   Q.  Did anyone at any point display any weapons?

25   A.  No.
```

FRIED - DIRECT

```
1    Q.  In fact, were you armed?

2    A.  No.  As a U.S. law enforcement Special Agent, I'm not

3    allowed to travel to Belgium with my duty weapon.

4    Q.  For any of the Liege officers that may have been armed,

5    at any point did they display their weapons?

6    A.  No.

7    Q.  Did anybody point any weapons at her at any point?

8    A.  No.

9    Q.  What were you wearing?

10   A.  I was in plainclothes, I believe blue jeans and a suit

11   jacket, blouse.

12   Q.  What was the tone of the interview?

13   A.  It was more of a fluid conversation between three

14   different languages, essentially.  It was back and forth.

15   Q.  Let me ask you, did anyone yell at Ms. Intarathong at

16   any point?

17   A.  No.

18   Q.  Was any harsh language used?

19   A.  No.

20   Q.  Was it a warm interview?

21   A.  I would say so.

22   Q.  A friendly interview.

23   A.  Yes.

24   Q.  Did she express gratitude that the interview was

25   occurring?
```

FRIES - DIRECT

 1    A.  She did.

 2    Q.  Okay.

 3    A.  She had tears in her eyes at one point.  She was

 4    relieved that we were there having this conversation.

 5    Q.  So let me talk to you a little bit about that.  What did

 6    she say at the outset of the interview?

 7    A.  That she -- that we were grateful -- she was grateful

 8    that we were there and that she had also prayed for the

 9    delegation's safety.

10    Q.  Did the interview begin with a personal history of

11    Ms. Intarathong?

12    A.  It did, yes.

13    Q.  And did we learn during that personal history -- or

14    maybe it was reiterated -- that she has two undergraduate

15    degrees, I believe, and a master's degree?

16    A.  Yes.

17    Q.  That she has lived in Vienna and the U.K.?

18    A.  Yes.

19    Q.  And that at one point she was married to a U.K. citizen?

20    A.  Yes.

21    Q.  Did you ask Ms. Intarathong if she had in fact sent the

22    letters that prompted our arrival?

23    A.  Yes.  That was part of the questioning.

24    Q.  And what did she say?

25    A.  She had admitted that she was the one that prepared and

1    sent the letters.

2    Q.  Did she -- she obviously provided information about the

3    criminal conspiracy in her letter.  Did she continue

4    providing information during this interview?

5    A.  Yes, she did.

6    Q.  Was she shown a series of photos?

7    A.  She was.

8    Q.  Did she identify members of the criminal conspiracy?

9    A.  Yes, and accurately.

10   Q.  Was she repeatedly told that she should tell the truth?

11   A.  Yes.

12   Q.  At one point did she and her attorneys, both the primary

13   attorney and kind of the training attorney, take

14   approximately a 15-minute break?

15   A.  Yes.

16   Q.  Now, after the break did Warren's attorney ask about the

17   possibility of her not being extradited back to the United

18   States?

19   A.  You did inquire as to that, yes.

20   Q.  And what was she told?

21   A.  Essentially that we were not able to agree to that and

22   it would not be possible.  Essentially, we were seeking

23   extradition.

24   Q.  Did Ms. Intarathong re -- I guess reiterate the concerns

25   that she had already expressed in her letters, concerns for

1    the safety of her family in Thailand?

2    A.  Yes, she did.

3    Q.  And did she specifically talk about a threatening call

4    that had been received by her mother and some investigation

5    that her sister was doing into the traffickers in Thailand?

6    A.  Yes.

7    Q.  What was she told at that point?

8    A.  She was advised that it's best for family members to not

9    interact and do their own investigations as far as

10   questioning the actual targets, members of the criminal

11   conspiracy that reside in Thailand.  The concern is for

12   their safety.  As Sumalee, or Ms. Intarathong, has already

13   expressed to us, we shared those concerns.

14   Q.  And without getting into any great detail, were there

15   safety concerns that had arisen in this investigation that

16   led you to believe that there really were safety concerns in

17   Thailand?

18   A.  Absolutely.

19   Q.  And was Ms. Intarathong told, essentially, let us be the

20   police, don't have your family interact with traffickers, to

21   ensure their safety?

22   A.  Yes.

23   Q.  At any point was Ms. Intarathong dissuaded from

24   investigating her own case?

25   A.  No.

1    Q.  But is it fair to say at this point in the interview,

2    were we viewing Ms. Intarathong as a cooperator?

3    A.  Yes, that's fair to say.

4    Q.  Okay.  Did Ms. Intarathong's attorney ask questions

5    about the penalties she faced in the United States?

6    A.  She did, yes.

7    Q.  Okay.  And in response to that, did we provide truthful

8    information about that?

9    A.  Yes, we did.

10   Q.  Following these questions, did Ms. Intarathong continue

11   to talk about the criminal organization?

12   A.  She did, yes.

13   Q.  Okay.  Is it fair to say that she made admissions as to

14   her guilt, but minimized her role in the investigation -- or

15   in the organization?

16   A.  Yes.

17   Q.  At the conclusion of the interview, was there some

18   write-up done of what had occurred?

19   A.  There was.

20   Q.  And I'm going to ask you, Special Agent Price -- the

21   final exhibit, Government's Exhibit 4, should be in front of

22   you.

23   A.  I have that here.

24   Q.  Is this the write-up, a summary, essentially, of the

25   interview?

1    A.  Yes.

2    Q.  Can you tell the Court a little bit about how that was

3    created.

4    A.  During the course of the interview, one of the other

5    Liege Police Department detectives was typing up the

6    majority of what was being said.  There was a first draft

7    that was provided to Ms. Intarathong as well as to her

8    attorney.  They reviewed that first draft page by page.

9    Ms. Intarathong made edits or changes, amendments to that

10   document.  It was then provided back to the Liege police

11   detectives.  Those changes were included in the final draft

12   and Ms. Intarathong and her attorney at the time reviewed

13   each of those pages as you can see in Government Exhibit 4.

14   It would be page 4 under the Hearing Report.  There are

15   signatures on the left-hand side of the document and

16   Ms. Intarathong signed as to reading that and that continues

17   on for each page.

18   Q.  And the final page of the document, is that also signed

19   by Ms. Intarathong, by yourself, by her attorneys and among

20   other people?

21   A.  Yes.

22   Q.  Okay.

23          MS. WILLIAMS:  Your Honor, at this point the

24   Government has no further questions.

25          THE COURT:  Have you offered to have it admitted?

PRICE - CROSS

```
1              MS. WILLIAMS:  Oh, I thought I did.  I apologize
2      if I did not.  The Government moves to admit Exhibit 4.
3              MR. MORRISON:  No objection.
4              THE COURT:  Received.  Just to clean up the
5      exhibits, did we get a record of admitting 1?
6              THE CLERK:  I believe we did.
7              THE COURT:  Just in case --
8              MS. WILLIAMS:  Your Honor, we would formally --
9      and maybe we didn't -- move to admit Government's 1 through
10     5, which are all the exhibits that we intend to admit at
11     this hearing.
12             MR. MORRISON:  And Exhibit 1 was received over
13     objection and I have no objection to the remaining exhibits.
14             THE COURT:  We'll note that there's no waiver of
15     the objection as to Exhibit 1.  Thank you.  The Court
16     receives them.
17             MS. WILLIAMS:  Thank you, and no further questions
18     from the Government, Your Honor.
19             MR. MORRISON:  May I proceed, Judge?
20             THE COURT:  I'm just putting -- noting the
21     objection.  Anyway, yes, please.
22
23                        CROSS-EXAMINATION
24     BY MR. MORRISON:
25     Q.  Good afternoon, Special Agent Price.  How are you?
```

PRICE - CROSS

1   A.  I'm well.  Are you?

2   Q.  Oh, I'm okay.  I'm busy.

3       (Laughter)

4   Q.  You had a lot of questions about Ms. Intarathong's

5   attorney in Belgium.  Do you recall those questions on

6   direct?

7   A.  Yes.

8   Q.  Let's be clear for the record.  This was not an attorney

9   licensed to practice law in the United States of America,

10  correct?

11  A.  To my knowledge, that's correct.

12  Q.  Okay.  He was a Belgian attorney, correct?

13  A.  Yes.

14  Q.  And you don't speak Thai?

15  A.  Sawadee ka, kob kun ka.  That's about it.

16  Q.  Okay.  And other than Ms. Intarathong and the

17  interpreter, was there anybody else present during the

18  interview that spoke fluent Thai that you were aware of?

19  A.  Not that I'm aware of.

20  Q.  Okay.  And you read your -- the Miranda warning to

21  Ms. Intarathong, correct?

22  A.  Correct.

23  Q.  And that was translated into Thai, correct?

24  A.  Yes.

25  Q.  We don't have a recording of this interview that was

1    conducted, correct?

2    A.   That's correct.

3    Q.   We don't know the skill level of the interpreter that

4    was there that day, correct, you don't?

5    A.   I don't, no.

6    Q.   And I want you to take a look at Exhibit 4, and you can

7    turn -- page in where it starts as "Part 2."

8         (Pause)

9    A.   Can you specify?

10   Q.   So we're starting at "Part 2."  Do you see that we're on

11   the same page here?  Maybe I gave you a wrong page number

12   then.

13            I'm sorry.  It's the fifth page, "Part 2" in bold

14   near the top?

15   A.   I see that.  Thank you.

16   Q.   I apologize.  I put you to the wrong page.

17   A.   No, that's okay.

18   Q.   Essentially, this is an English translation produced by

19   a Belgian, correct?

20   A.   I'm not certain how the trans -- how the document went

21   from French to English.  I'm not certain if we requested for

22   that here in the United States to occur or if that occurred

23   in Belgium.

24   Q.   Okay.  So somehow this got translated from French,

25   though, into English for this document.

PRICE    CROSS

1    A.  That's correct.

2    Q.  And as we look down from Part 2, we have a bunch of

3    asterisks and it's -- essentially, it looks like it's

4    attempting to translate your Miranda reading to

5    Ms. Intarathong.

6    A.  That's correct.

7    Q.  And in this translation it talks about:  "You explain to

8    me that I have the right to remain silent; all that I say

9    can be used against me in court."  It says:  "I have the

10   right to consult an attorney prior to my hearing and to be

11   assisted by an attorney during my hearing," correct?

12   A.  That's what it reads, yes.

13   Q.  Yeah.  And that's not actually what you read to her,

14   correct?

15   A.  That's correct.

16   Q.  Okay.  She actually had a right to have an attorney

17   assisting her during her interrogation, correct?

18   A.  During my interview, yes, and her attorney was present.

19   Q.  She has a right to have an attorney -- Mr. Monfort

20   wouldn't have been a competent attorney to be assisting her

21   in the United States during an interrogation, correct?

22        MS. WILLIAMS:  Objection.  Your Honor, I think

23   that calls for the witness's speculation.  She's already

24   said she doesn't know this attorney's qualifications, far

25   outside of this witness's purview.

PRICE - CROSS

1      THE COURT:  You can answer if you know.

2    A.  I had never met that attorney prior to that day.  I

3    don't have a sense of his accomplishments or history.

4      THE COURT:  Sustained.

5    BY MR. MORRISON:

6    Q.  You testified earlier that you knew he wasn't licensed

7    to practice law in the United States, Agent Price.  Do you

8    remember just saying that?

9    A.  I ascertained that.

10   Q.  Okay.  He wasn't a licensed attorney in the United

11   States, correct?

12   A.  That's correct.

13   Q.  He wouldn't have been competent to sit in with an

14   interrogation because he's not a competent United States

15   attorney, correct?

16      MS. WILLIAMS:  Objection, Your Honor.  Counsel can

17   make this argument, but it's not for the witness.

18      THE COURT:  I think the record is there for both

19   sides to argue.

20   BY MR. MORRISON:

21   Q.  Ms. Price -- or Agent Price; apologies -- you never

22   advised Ms. Intarathong of her right to have somebody from

23   her embassy, her Thai embassy, present during the interview,

24   is that correct?

25   A.  Not during the course of that interview.

PRICE - CROSS

1    Q.  Okay.  Ms. Intarathong was in custody in Belgium,

2    correct?

3    A.  Yes.

4    Q.  She was in custody pursuant to a Belgian court order or

5    law, as you understood it, correct?

6    A.  Yes.  When we first identified that she was in Belgium,

7    she was not in custody on that particular court case.  She

8    was free to remain at her home.  Once we had obtained the

9    warrant and submitted the red notice, they executed an

10   arrest on her and she was then placed in custody.

11   Q.  Okay.  So she was in custody back in Belgium per the

12   United States' request, correct?

13   A.  That's correct.

14   Q.  And she was not free to leave Belgium, correct?

15   A.  Yes.

16   Q.  And in fact, she was not free to leave the facility that

17   she was being held at, correct?

18   A.  Correct.

19   Q.  And she was handcuffed when she was brought to the

20   interview room with you, correct?

21   A.  Yes.

22   Q.  And she was handcuffed when she left the interview room

23   after meeting with you, correct?

24   A.  Yes.

25   Q.  When you and the Assistant United States Attorneys

PRICE - CROSS

1    traveled to Belgium to interview Ms. Intarathong, a number

2    of defendants in this indictment had already made

3    appearances in the District of Minnesota, is that correct?

4    A.  Yes.

5    Q.  And would it be fair to say that one of the objectives

6    you had in traveling to interview Ms. Intarathong was to ask

7    her questions about her involvement in a sex trafficking

8    enterprise, correct?

9    A.  Yes.

10   Q.  A secondary reason for conducting the interview was to

11   ascertain her ability to potentially cooperate in that

12   investigation, is that fair?

13   A.  Yes.

14   Q.  During your interview with her, she was told that

15   without cooperating with you, she would be facing 15 years

16   to life in prison, is that correct?

17   A.  Her attorney had inquired as to the potential penalties

18   in the United States and those were explained, yes.

19   Q.  And it was explained to her that without cooperation she

20   was facing 15 years to life, correct?

21   A.  That's true.

22   Q.  It was clear Ms. Intarathong was presenting you with

23   evidence that she believed exonerated her from the charges,

24   correct?

25   A.  That I can't speak to.

1    Q.  She certainly didn't believe she was the big boss of

2    your sex trafficking conspiracy, correct?

3    A.  She did make that statement a number of times, yes.

4    Q.  And she told you about the investigation she was trying

5    to conduct with the assistance of her family, correct?

6    A.  I don't know that she used the term "investigations,"

7    but she was explaining that her family was reaching out to

8    the Thai bosses on her behalf.

9    Q.  And you told her that she should stop any investigation

10   she was doing, correct?

11   A.  Are you referencing a particular page?

12   Q.  I'm just asking you did you tell her that.

13   A.  To stop the investigations?  No.

14   Q.  Okay.  And you specifically told her that she should

15   have no further communication about the case with her

16   fiance, correct?

17   A.  I don't recall a conversation pertaining to her fiance.

18   Q.  Okay.  She was also told by either you or the Assistant

19   United States Attorneys that she was not to share

20   information regarding her meeting with the U.S. delegation,

21   correct?

22   A.  I don't recall.

23   Q.  Given your lack of recollection, I just want to confirm

24   a few things.  Your report is Government Exhibit 3, is that

25   correct?

1    A.  Yes.

2    Q.  And you had an opportunity to review this report prior

3    to your testimony today?

4    A.  Briefly, yes.

5    Q.  Okay.  When you write a report it's complete, correct?

6    A.  Yes.

7    Q.  It's accurate, correct?

8    A.  Yes.

9    Q.  Okay.  What's reflected in this report reflects what was

10   said during your interview -- interrogation of

11   Ms. Intarathong, is that fair?

12   A.  Fair.

13   Q.  Okay.  Thank you, Special Agent Price.  I don't have any

14   further questions right now.

15         THE COURT:  I have a couple of follow-up questions

16   and then both sides can follow up.

17

18                    E X A M I N A T I O N

19   BY THE COURT:

20   Q.  Special Agent Price, did you advise Defendant her

21   Miranda rights at this interview we're talking about?

22   A.  Yes.

23   Q.  How did you do that?

24   A.  Utilizing my Miranda card that I carry with me in my

25   credentials.

1    Q.  So what is that Miranda card?  Do you have it?

2    A.  It's in my purse, actually, at the U.S. Attorney's

3    Office.

4    Q.  Okay.  And what language did you advise it in?

5    A.  English.

6    Q.  And then how -- was it then translated into French, or

7    how was that?

8    A.  Translated into Thai, and it was also translated into

9    French for the detectives.

10   Q.  So it was first English, then Thai, and then French.

11   A.  Yes.  All of the communication had to be translated

12   eventually into French for the detectives.  That was part of

13   the agreement.

14   Q.  Given you don't have the advisory card on you, do you

15   have a recollection of what that card says in terms of

16   referencing -- I believe the comment was, quote,

17   "hearing" --

18            MR. MORRISON:  Hearing, Your Honor.

19            THE COURT:  -- end quote, as opposed to anything

20   else?

21   A.  Can you repeat the question?

22   Q.  You don't have your Miranda card with you today?

23   A.  No, it's in Melinda's office.

24            MS. WILLIAMS:  I'm happy to get it, Your Honor, if

25   that's helpful.

PRICE - REDIRECT

1    BY THE COURT:

2    Q.  Do you have a recollection -- I think the part we're

3    talking about, the part relating to the right to have an

4    attorney, and I think the translation in French, as I

5    understand it, is, quote, "hearing," end quote, as opposed

6    to before asking questions, answering questions and so

7    forth.  Do you know what your card says?

8    A.  Well, this is also why we keep the Miranda cards with

9    us.

10           So, my recollection, our actual Miranda does not

11   use the word "hearing."  "You have a right to have an

12   attorney present" -- sorry.  I apologize.  I would have to

13   read it from the card.

14           MS. WILLIAMS:  If I can pick up on this, Your

15   Honor?

16           THE COURT:  Yes.  And both sides can follow up.

17

18                    **REDIRECT EXAMINATION**

19   BY MS. WILLIAMS:

20   Q.  Is this a standard-issue HSI card that you keep with you

21   and read from verbatim so you don't miss a word of the

22   Miranda rights?

23   A.  Yes.

24   Q.  Okay.  And --

25           THE COURT:  Counsel, I'll strike the "verbatim"

PRICE - REDIRECT

1    part, but you can ask if this is what you use.

2    BY MS. WILLIAMS:

3    Q.  I'm sorry.  When you read it, how do you read it?  Do

4    you read it word for word?

5    A.  Word for word.

6    Q.  Is that what you did with Ms. Intarathong?

7    A.  Yes.

8    Q.  Okay.  So I think Mr. Morrison was looking at

9    Government's Exhibit 4 and talking about a hearing.  Would

10   have you have said that if that is not part of the Miranda

11   warning?

12   A.  I would not.

13   Q.  Okay.  So does it seem likely that that is a product of

14   translating from English to French, back into English?

15   A.  Yes.

16   Q.  And let's pull back just a little bit.

17              Did this interview have the tone of an

18   interrogation?

19   A.  No.

20   Q.  Were we essentially invited guests by Ms. Intarathong?

21   A.  Yes.

22   Q.  And did she express her repeated appreciation that we

23   were there to hear what she had to say?

24   A.  Yes.

25   Q.  Mr. Morrison asked you some questions about whether she

1    viewed this as her being exonerated.  Is it fair to say that

2    she repeatedly said in her letters and in the interview that

3    she was not the big boss of the organization?

4    A.  Yes.

5    Q.  And did she provide the name of higher up traffickers in

6    Thailand?

7    A.  She did, yes.

8    Q.  But was she clear that she worked for those traffickers?

9    A.  She was, yes.

10   Q.  Did she acknowledge understanding that women were sent

11   over to the United States for sex under bondage debts?

12   A.  Yes.

13   Q.  And did she acknowledge at least some of her role in

14   that scheme?

15   A.  Yes.

16   Q.  In fact -- and I'll refer you back to I believe it's

17   Government's 5 -- did she say in her letter to us before any

18   of this interview occurred:  "I realize now this is a big

19   organization for human trafficking using me and my company

20   for their criminal acts"?

21   A.  She did, yes.

22   Q.  Mr. Morrison asked you some questions about the skill

23   level of the Thai interpreter that was present.  Do you

24   remember those questions?

25   A.  Yes.

1    Q.  Now, obviously you don't speak fluent Thai and cannot

2    speak to that person's translation, is that right?

3    A.  That's correct.

4    Q.  But of course Ms. Intarathong speaks Thai, right?

5    A.  Yes.

6    Q.  Were there any complaints from Ms. Intarathong about the

7    quality of that interpretation?

8    A.  None that was expressed to us.

9    Q.  Did she appear to understand everything that was being

10   said?

11   A.  Yes.

12   Q.  Okay.  And was this a conversation where Ms. Intarathong

13   appeared to feel free to express herself?  Did she seem

14   intimidated or did she seem free to express herself

15   throughout this interview?

16   A.  She appeared free to express herself.  Again, grateful

17   that we were there.  At one point she had tears in her eyes

18   and she hugged me, which was frankly unexpected, but --

19              THE COURT:  Could you repeat that, please?

20   A.  She appeared grateful that we were there, had tears in

21   her eyes at one point, and in fact had hugged me.

22              MS. WILLIAMS:  Your Honor, may I approach the

23   witness?

24              THE COURT:  Yes.

25              MS. WILLIAMS:  Thank you.

PRICE - REDIRECT

1    BY MS. WILLIAMS:

2    Q.  Special Agent Price, I'm handing you your purse.  If you

3    could retrieve your Miranda card if it is in there.

4    A.  (Complies).

5    Q.  And is this either the exact same or the same type of

6    Miranda card that you would have utilized at this interview

7    of Ms. Intarathong?

8    A.  Yes.

9    Q.  Could you just read into the record what it says on

10   that?

11   A.  "Advisement and Waiver of Miranda Rights.

12          "Before I ask you any questions, I want to explain

13   your rights to you.

14          "You have the right to remain silent.  Anything

15   you say can be used against you in a court of law.

16          "You have the right to consult with a lawyer

17   before questioning and to have a lawyer present during

18   questioning.

19          "If you cannot afford a lawyer, one will be

20   appointed to represent you free of charge prior to any

21   questioning.

22          "Do you understand your rights?  Are you willing

23   to waive these rights and talk to me now without a lawyer

24   being present?"

25   Q.  And what would Ms. Intarathong have said to both of

1    those questions if she was willing to speak with you and to

2    waive her rights?

3    A.  She was willing to speak and -- both -- to waive her

4    rights.

5    Q.  And of course, she did have an attorney present.

6    A.  And she did, yes.

7    Q.  Okay.  And then, Special Agent Price, if you could pick

8    up Government's 3 in front of you.  I know Mr. Morrison

9    asked you some questions about the instructions you gave

10   Ms. Warren during the end of the interview, and I just want

11   to give you a chance to refresh your recollection on that.

12   A.  Thank you.

13   Q.  If you can go to page 11.

14   A.  (Pause).  I'm there.

15   Q.  Okay.  And if you just want to read the first two full

16   paragraphs.

17   A.  That begin with --

18   Q.  Just read them to yourself.

19   A.  Oh.  (Witness complies).

20   Q.  Had Ms. Intarathong expressed concern about a particular

21   trafficker known as "Odd" being able to hurt her family?

22   A.  Yes.

23   Q.  And were we aware of this trafficker?

24   A.  We were.

25   Q.  And did we share in some of her safety concerns?

1    A.  You did.

2    Q.  Did you instruct her not to talk about the case or to

3    share information regarding her meeting with the U.S.

4    delegation?

5    A.  Yes.

6    Q.  And did you also instruct her not to send or have others

7    send letters or emails on her behalf?

8    A.  Yes.

9    Q.  And was that instruction given specific to her safety?

10   A.  It was.

11   Q.  And to be clear, did you continue to receive information

12   from her fiance?

13   A.  Yes.

14   Q.  Okay.  Is that the standard type of safety talk that you

15   would give anyone cooperating with the Government in this

16   type of case?

17   A.  It is a unique case, but yes.

18          MS. WILLIAMS:  Your Honor, I think that's all I

19   have at this point.

20          THE COURT:  When you're ready, Mr. Morrison.

21

22                      **RECROSS-EXAMINATION**

23   BY MR. MORRISON:

24   Q.  You, Agent Price, have no knowledge of the

25   qualifications of the Thai interpreter that was present

 1   during your interrogation of Ms. Intarathong, true?

 2   A.  True.

 3   Q.  You have no knowledge of whether or not your Miranda

 4   warning was interpreted correctly to Ms. Intarathong into

 5   the Thai language, correct?

 6   A.  Correct.

 7          MR. MORRISON:  Your Honor, I have no further

 8   questions.

 9

10                  **FURTHER REDIRECT EXAMINATION**

11   BY MS. WILLIAMS:

12   Q.  You do know that it was read correctly in English,

13   correct?

14   A.  Correct.

15   Q.  Does Ms. Intarathong speak English?

16   A.  Yes.

17   Q.  And did she appear to understand in English what you

18   were saying?

19   A.  Yes.

20          MS. WILLIAMS:  No further questions.

21

22                  **FURTHER RECROSS-EXAMINATION**

23   BY MR. MORRISON:

24   Q.  And Ms. Intarathong specifically told you before the

25   interview that she needed a Thai interpreter when we talk

 1    about lawyer things, correct?

 2    A.  Correct.

 3              MR. MORRISON:  No further questions.

 4              THE COURT:  I don't remember the, quote, lawyer

 5    things.

 6              MR. MORRISON:  She just answered that that was

 7    correct, Judge.

 8              MS. WILLIAMS:  Your Honor, may I clarify?

 9

10                **FURTHER REDIRECT EXAMINATION**

11    BY MS. WILLIAMS:

12    Q.  I think what Mr. Morrison is referring to is a line in

13    your ROI, page 2 of 12:

14              "WARREN consented to proceed in English unless

15    there was a specific 'lawyer word' or 'police word,' which

16    might be helpful to have translated into Thai."

17              Is that correct?

18    A.  That's correct.

19              MS. WILLIAMS:  Thank you.

20              THE COURT:  Okay.  For the record --

21              MR. MORRISON:  No further questions.

22              MS. WILLIAMS:  I think we're done.

23              THE COURT:  Mr. Morrison, is that --

24              MR. MORRISON:  That's fine.

25              THE COURT:  Thank you for testifying.  You may

1    step down.

2              THE WITNESS:  Thank you, Your Honor.

3              THE COURT:  Government, still your case.

4              MS. WILLIAMS:  Nothing further from the

5    Government, Your Honor.

6              MR. MORRISON:  I have no witnesses.  Your Honor, I

7    would request an opportunity to get a transcript and provide

8    supplemental briefing.  I'll advise the Court that I start a

9    trial in front of Judge Frank on Tuesday.  It should be

10   a two- to three-week long trial, so I'm just taking that

11   into account for setting the briefing schedule.

12             THE COURT:  Let's go off the record and talk about

13   scheduling.

14             (Discussion off the record)

15             THE COURT:  Okay.  We are back on the record in

16   the case of United States of America versus Intarathong,

17   Case Number 16-CR-257(1).  We've had off-the-record

18   discussions about a transcript, briefing.  The transcript,

19   that will be October 21, Defendant's brief will be

20   November 12, and Government's response will be November 30.

21             Anything else for the record for purposes of today

22   from the Government?

23             MS. WILLIAMS:  Not from the Government.  Thank

24   you.

25             THE COURT:  From defense?

1          MR. MORRISON:  No, Your Honor.  Thank you.

2          THE COURT:  Thank you, everyone, for being here

3     today, and thank you, Madam Interpreter, for traveling all

4     this way, and good luck to both sides.

5          MS. PROVINZINO:  Thank you, Your Honor.

6          (Proceedings concluded at 3:15 p.m.)

7                    *       *       *       *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**I  N  D  E  X**

**W I T N E S S E S:**                                          **PAGE**


**PHILLIP SIMOY**

    Direct Examination by Ms. Provinzino          11
    Cross-Examination by Mr. Morrison             54
    Redirect Examination by Ms. Provinzino        61
    Recross-Examination by Mr. Morrison           63


**TONYA PRICE**

    Direct Examination by Ms. Williams            65
    Cross-Examination by Mr. Morrison             81
    Examination by the Court                      89
    Redirect Examination by Ms. Williams          91
    Recross-Examination by Mr. Morrison           97
    Further Redirect Examination by Ms. Williams  98
    Further Recross-Examination by Mr. Morrison   98
    Further Redirect Examination by Ms. Williams  99


**\* \* \* \* \***


**E  X  H  I  B  I  T  S**

| NUMBER | FOR ID | IN EVIDENCE |
|---|---|---|
| Government 1 | | 24 |
| Government 2 | | 31 |
| Government 5 | | 67 |
| Government 3 | | 70 |
| Government 4 | | 81 |

**C E R T I F I C A T E**

I, **TIMOTHY J. WILLETTE**, Official Court Reporter

for the United States District Court, do hereby

certify that the foregoing pages are a true and

accurate transcription of my shorthand notes,

taken in the aforementioned matter, to the best

of my skill and ability.


*/s/ Timothy J. Willette*


**TIMOTHY J. WILLETTE, RDR, CRR, CRC**
Official Court Reporter - U.S. District Court
Warren E. Burger Federal Building & U.S. Courthouse
316 North Robert Street - Suite 146
St. Paul, Minnesota  55101
651.848.1224