# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Case No. 16-cr-257 (1) (DWF/TNL) |
| Plaintiff, | **\*FILED UNDER SEAL\***[1] |
| v. | **REPORT & RECOMMENDATION** |
| Sumalee Intarathong, | |
| Defendant. | |

Laura M. Provinzino and Melinda A. Williams, Assistant United States Attorneys, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415 (for the Government); and

Aaron J. Morrison, Wold Morrison Law, 331 Second Avenue South, Suite 705, Minneapolis, MN 55401 (for Defendant).

This matter is before the Court, United States Magistrate Judge Tony N. Leung, on Defendant Sumalee Intarathong's Motion to Suppress Statement from July 7, 2011 (ECF No. 898) and Motion to Suppress Statement from January 13, 2017 (ECF No. 899). These motions have been referred to the undersigned for a report and recommendation to the district court, the Honorable Donovan W. Frank, District Judge of the United States District Court for the District of Minnesota, under 28 U.S.C. § 636 and D. Minn. LR 72.1.

---

[1] A number of documents to which this Court cites in this Report & Recommendation were filed under seal. (*See* ECF Nos. 910, 911, 913, 932.) This includes certain exhibits which were later entered into evidence at the motions hearing. The Court also cites to other documents that are filed under seal. (*See* ECF Nos. 2, 7.) Out of an abundance of caution, this Report & Recommendation is being filed under seal. Therefore, 14 days from the date of this Report & Recommendation, the parties shall submit a proposed joint redacted version of the Report & Recommendation to the Court. Should the Court not receive a proposed joint redacted version of the Report & Recommendation at that time, the Court will unseal the Report & Recommendation in its entirety.

# I.  INTRODUCTION

Defendant is charged by way of a superseding indictment with conspiracy to commit sex trafficking in violation of 18 U.S.C. § 1594; sex trafficking by use of force, fraud, and coercion in violation of 18 U.S.C. § 1591; conspiracy to commit forced labor in violation of 18 U.S.C. § 1594; conspiracy to commit transportation to engage in prostitution in violation of 18 U.S.C. § 371; transportation to engage in prostitution in violation of 18 U.S.C. § 2421; conspiracy to engage in money laundering in violation of 18 U.S.C. § 1956; conspiracy to use a communication facility to promote prostitution in violation of 18 U.S.C. § 371; and conspiracy to commit visa fraud in violation of 18 U.S.C. § 371.  (ECF No. 279.)  These charges stem from Defendant's alleged participation in "a large-scale international sex trafficking organization."  (ECF No. 932 at 1.[2])

A criminal motions hearing was originally scheduled for August 17, 2021.  (*See* ECF No. 906.)  During that hearing, Defendant expressed she had trouble understanding the interpreter, suggesting that he spoke a different dialect of the Thai language.  (ECF No. 916.)  Defense counsel stated that Defendant had not met with this interpreter prior to the hearing, and that while Defendant has some command of the English language, she has difficulty with complex legal matters.  (*Id.*)  The hearing was continued to October 7, 2021 so a new interpreter could be secured.  (*Id.*)

A subsequent hearing was held on October 7, 2021.  (ECF No. 927.)  Assistant United States Attorneys Laura M. Provinzino and Melinda A. Williams appeared on behalf

---

[2] This memorandum has been filed under seal.

of the United States of America (the "Government").  Attorney Aaron J. Morrison appeared

on behalf of Defendant Sumalee Intarathong.  Interpreter Chintana Barden provided Thai

interpretation for Defendant.  The following exchange took place on the record:

> **THE COURT**: So I just want to make a short record.  This matter was continued from the previous hearing date, August 17, 2021, because Defendant had trouble understanding her interpreter.  And while at the last hearing the Court discussed that this was a dialect matter, counsel for Defendant I think indicated that it was really an issue of accent, Mr. Morrison, you indicated, and that that was why Ms. Intarathong could not understand the accent of a non-native speaker.
>
> Mr. Morrison, I think that's correct, but do you care to elaborate any more on that?
>
> **MR. MORRISON**: No, Your Honor.
>
> **THE COURT**: Okay.  Since that time, the Court has looked and secured an interpreter this afternoon.  We are joined by Chintana Barden.  And Mr. Morrison, you have communicated with your client and that the accent or any issues, dialect issues and the like, are not – are fine in this situation, is that correct?
>
> **MR. MORRISON**: It is, Your Honor.  We did a test together on Zoom and Ms. Intarathong has indicated that she can understand the interpreter that's present today.

(Tr.[3] 4:3-23, ECF No. 926.)

At the hearing, the Government offered and the Court received into evidence the

following exhibits: Government Exhibit 1, a Homeland Security Investigations ("HSI")

Interview Report of Defendant dated July 7, 2011;[4] Government Exhibit 2, which is a series

---

[3] The Court notes that, although the transcript has been temporarily sealed to allow for the process of redacting any personal identifiers, *see generally* D. Minn. LR 5.5, any notice of intent to request redaction was due November 2, 2021, and no such notice was filed. (ECF No. 926.)  *But see supra* at 1 n.1 (discussing the sealing of the Report & Recommendation).

[4] This exhibit was admitted over the objection of Defendant.

of documents: an I-213 Record of Deportable/Inadmissible Alien; an I-867A Record of Defendant's Sworn Statement conducted by Supervisory Customs and Border Patrol ("CBP") Officer Phillip Simoy; an I-867B Jurat for Record of Sworn Statement; and a photo lineup; Government Exhibit 3, HSI's Report of Investigation detailing the January 13, 2017 interview of Defendant, dated January 24, 2017; Government Exhibit 4, a report entitled "Pro Justitia Subsequent Proces-Verbal," which details the "hearing" of Defendant in Liege, Belgium dated January 13, 2017[5]; and Government Exhibit 5, a set of emails between HSI Special Agent Tonya Price and other individuals, and a letter from Defendant[6] dated December 7, 2016.

Post-hearing briefing is now complete, and these motions are ripe for a determination by the Court. Based upon all the files, records, and proceedings herein, along with the evidence presented, the undersigned recommends that Defendant's motions to suppress be denied.

## II.  MOTIONS TO SUPPRESS STATEMENTS

### A.  General Legal Standard

Defendant seeks suppression of a number of statements made to law enforcement and other governmental officials. The Fifth Amendment requires that law enforcement inform a person of his or her rights under *Miranda v. Arizona*, 384 U.S. 436 (1966) before beginning a custodial interrogation. *United States v. New*, 491 F.3d 369, 373 (8th Cir.

---

[5] This report is of the interview of an "Alice Spencer." Alice Spencer Warren is one of Defendant's known aliases. (*See* ECF No. 279.) The parties do not dispute this report details the January 13, 2017 interview of Defendant in Liege, Belgium.
[6] Defendant identifies herself as Alice Spencer-Warren in this letter.

2007). A defendant may waive his or her *Miranda* rights, provided that the defendant does so voluntarily, knowingly, and intelligently. *United States v. Gallardo,* 495 F.3d 982, 990 (8th Cir. 2007). A waiver is made voluntarily only if "it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

A waiver is made knowingly and intelligently only if the defendant has "'full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" *Gallardo*, 495 F.3d at 990 (quoting *Moran,* 475 U.S. at 421). The Court considers the totality of the circumstances in determining whether a waiver is valid. *Id*. The burden is on the Government to show the waiver was valid by a preponderance of the evidence. *United States v. Black Bear*, 422 F.3d 658, 663 (8th Cir. 2005).

### B. July 7, 2011 Statements

In her motion, Defendant asks the Court to suppress "any confessions, or statements in the nature of confessions, and any evidence derived or discovered as a result of any confessions obtained" from Defendant on July 7, 2011, "because her statements were made without the benefit of *Miranda*." (ECF No. 898 at 1.) This motion applied to the statement Defendant gave to Supervisory CBP Officer Simoy. (*See* Tr. 24:16-19.)

At the hearing and in post-hearing briefing, Defendant expanded her request, asking the Court to suppress an additional statement she made on July 7, 2011. (ECF No. 931 at 1.) Defendant stated that when she filed her motion to suppress, the interview memorialized in Government Exhibit 1 had not been disclosed. (*Id.*; *see also* Tr. 24:16-

23.)  This interview of Defendant was conducted by HSI Special Agent Alex Chan.  (Gov't

Ex. 1 at 1.)  Defendant asserts that "her Due Process rights and her rights to confrontation

have been violated by the Government's failure to present testimony from [Special Agent

Chan] who allegedly provided her *Miranda* warning in this case."  (ECF No. 931 at 2.)

She further argues that without presenting a recording of this statement or sworn testimony

describing it, the Government has not met its burden to show that Defendant made a

voluntary, knowing, and intelligent waiver of her *Miranda* rights prior to giving this

statement.  (*Id.*)  The Court will thus consider both the statement made to Special Agent

Chan and the statement made to Supervisory CBP Officer Simoy.

## 1.  Findings of Fact

### a. Background

The Court heard testimony from Supervisory CBP Officer Simoy.  (ECF No. 927.)

Supervisor Simoy has worked for CBP for 15 years.  (Tr. 12:1-2.)  Prior to becoming a

CBP Officer, Supervisor Simoy received a Bachelor of Science in forensic and cultural

anthropology from Virginia Commonwealth University and attended the Federal Law

Enforcement Training Center for approximately three and a half to four years.  (Tr. 12:7-

20.)  He participates in continued training, including training on the subjects of human

smuggling and human trafficking.  (Tr. 12:21-23; 13:21-14:4.)

In the past 15 years, Supervisor Simoy has held various positions in the areas of

immigration and customs.  (Tr. 12:3-5.)  Through his work, Supervisor Simoy is familiar

with various types of visas, including the B-1/B-2 nonimmigrant visa for foreign travelers

entering the United States for business or pleasure, more commonly known as a "tourist

visa." (Tr. 14:5-25.)  He has worked at the Chicago O'Hare International Airport port of entry for approximately four or five years.  (Tr. 12:25-13:3.)  In July of 2011, he was working at the San Francisco International Airport ("SFO"), where he had been working for approximately four years. (Tr. 13:10-13.)  Specifically, at that time, Supervisor Simoy worked in CBP's Passport Control Secondary Inspections ("Secondary Inspection"), an area at the airport that is outside of the United States.  (Tr. 15:2-10; Gov't Ex. 1 at 1; *see also* Tr. 62:18-21 (explaining that during her interview Defendant was "not in the United States because she's functionally at a border that's inland.").)  As described by Supervisor Simoy, individuals go to Secondary Inspection "to undergo further questioning" about discrepancies in paperwork or "about [their] true intent or purpose for coming into the United States."  (Tr. 15:12-17.)

Supervisor Simoy became aware of Defendant on July 7, 2011, when she was referred to Secondary Inspection.  (Tr. 16:10-12.)  Defendant was referred to Secondary Inspection because she was subject to a "TECS lookout"[7] created by an HSI Agent in Seattle, which alleged that Defendant had trafficked individuals from Thailand.  (Gov't Ex. 2 at 6588.[8])  Supervisor Simoy was aware that when HSI was involved at the border, it was typically to interview an individual "potentially involved in illegal matters, or criminal matters."  (Tr. 16:24-17:2; *see also* Tr. 20:16-19 ("[W]hen they question anybody, it's along the lines of some sort of criminal issue.").)

---

[7] "TECS" is the Treasury Enforcement Communication System.  (Tr. 60:8-9.)
[8] Because Government Exhibit 2 is comprised of a number of different documents, the Court refers to it using its Bates pagination, except in the instance of the photo lineup.  The photo lineup, which is the last page of Government Exhibit 2, is unnumbered.  The Court thus refers to this page as "Photo Lineup."

### b. Statement to HSI Special Agent Chan

On July 7, 2011, Special Agent Chan was contacted by Supervisory CBP Officer Saefong, who informed him that CBP had referred Defendant to Secondary Inspection at SFO for further inspection, on the basis that she was attempting to smuggle four Thai females into the United States. (Gov't Ex. 1 at 1.) Three of those women were also referred to Secondary Inspection. (*Id.*)

After approximately 1 hour and 52 minutes of detention in Secondary Inspection, Special Agent Chan began an interview of Defendant along with CBP Enforcement Officer Flores. (*Id.*) Defendant stated that she had lived in the United Kingdom ("U.K.") for 10 years and that she was fluent in English. (*Id.* at 2.) Defendant provided a statement to Special Agent Chan after being advised of her *Miranda* rights. (*Id.*) This statement included answering questions about the purpose for her travel, her history of travel to the United States, and her relationship to the three Thai women traveling with her who were also referred to Secondary Inspection. (*Id.* at 2-3.)

Special Agent Chan then confronted Defendant with the statement of one of the other women, who had "confessed in a sworn statement that she was a prostitute in Thailand and she intended to come to the U.S. seeking illegal employment" by working with Defendant. (*Id.* at 4.) At this point, Defendant "became very upset," "asked [Special Agent] Chan to show the proof of her receiving money for smuggling the three (3) females," and "invoked her rights and refused to answer any questions." (*Id.*) The interview concluded after approximately 1 hour and 25 minutes. (*Id.*) Special Agent Chan

referred Defendant to the United States Attorney's Office for prosecution, however prosecution was declined. (*Id.*)

Supervisor Simoy is familiar with and has interacted with Special Agent Chan in the course of their respective work at SFO. (Tr. 25:4-17.) While he did not observe or participate in Defendant's interview with Special Agent Chan on July 7, 2011, Supervisor Simoy did witness its immediate aftermath. (Tr. 25:24-26:17.) He personally witnessed that both Defendant and Special Agent Chan were "visibly upset" when exiting the interview room. (Tr. 26:4-8; *see also* Tr. 19:23-24.) He understood that Defendant's interview concluded when she invoked her right not to answer any more questions. (Tr. 26:14-17; *see also* Tr. 56:2-5 (stating he "deduced" that Defendant had terminated the interview based on the words and actions of Special Agent Chan).[9]) Supervisor Simoy is now familiar with the statement Defendant made to Special Agent Chan and memorialized in Government Exhibit 1 because it is a part of her "A File," which is her official immigration history with the United States. (Tr. 21:11-22:3.) Supervisor Simoy relies on records within an individual's A File in the course of his duties as a CBP Officer. (Tr. 22:4-5.)

---

[9] At the hearing, Supervisor Simoy also made statements suggesting that he was unaware Special Agent Chan had *Mirandized* Defendant. (*See* Tr. 54:23-55:2 (admitting he had no first-hand knowledge of the interview conducted by Special Agent Chan); 59:24-60:4 (stating he did not know on the date in question that Special Agent Chan had read Defendant her *Miranda* rights).) However, in her post-hearing briefing, Defendant concedes that her statement to Special Agent Chan was *Mirandized* and that Supervisor Simoy was aware of this fact at the time he administratively interviewed Defendant. *See infra* Section II.B.2.a.

### c. Supervisory CBP Officer Simoy's Research

While Special Agent Chan interviewed Defendant, Supervisor Simoy reviewed Defendant's history of travel to the United States for the purpose of determining whether or not she would be admitted into the country. (Tr. 17:9-20.) He discovered "that there was a pattern of [Defendant] entering the United States with other people who subsequently were overstaying, unlawfully present in the United States." (Tr. 17:24-18:2.) He put together a photo lineup with the intention of asking Defendant about the individuals that had overstayed on their tourist visas. (Tr. 18:4-9.) Supervisor Simoy knew prior to conducting his interview that there had been an alert related to allegations that Defendant was involved in human trafficking. (Tr. 60:4-19.)

### d. Statement to Supervisory CBP Officer Simoy

After Defendant's interview with Special Agent Chan, there was an approximately two-hour break wherein Supervisor Simoy continued to gather information for his administrative interview. (Tr. 26:24-27:3; 59:4-5.) Defendant's bags were searched and she was given food. (Tr. 27:3-4; 53:25-54:2.)

Supervisor Simoy then took a sworn statement from Defendant for the purpose of determining if she was admissible to this country, and, if not, if she had any fear regarding return to her home country.[10] (Tr. 27:7-16; *see also* Gov't Ex. 2.) Supervisor Simoy's "responsibility [was] only determining admissibility into the United States." (Tr. 17:5-6;

---

[10] Supervisor Simoy explained that in the event an individual interviewed by CBP is determined not to be admissible, the next step in the process is to inquire whether they have a credible fear of returning to their home country. (Tr. 19:6-14.) If a credible fear is expressed by an interviewee, "we would send them to Immigration Service to further determine their credible fear or asylum application." (Tr. 19:13-14.)

*see also* Tr. 63:7-8 ("My concern was determining her status as a bona fide visitor.").) His administrative questioning of Defendant would have taken place even if Special Agent Chan had not interviewed her. (Tr. 61:21-62:4.)

The interview took place in a "pretty big," private area within CBP's Secondary Inspection offices. (Tr. 34:10-18.) This private area is off the lobby, wherein other individuals wait to be questioned. (Tr. 34:19-24.) The interview was not recorded, but Supervisor Simoy typed his questions and Defendant's responses in real-time, meaning the I-867A Record of Sworn Statement is as close to a verbatim transcript as Supervisor Simoy could create. (Tr. 60:24-61:6; *see* Gov't Ex. 2 at 6589-98.)

During the interview, Supervisor Simoy was assisted by a witness, CBP Officer Erolin. (Tr. 34:25-35:2; Gov't Ex. 2 at 6598.) Supervisor Simoy wore his duty uniform and carried a weapon on the date of the interview. (Tr. 35:5-18.) He did not draw his weapon at any point in time. (Tr. 35:19-20.) He spoke with Defendant using a professional tone at normal volume. (Tr. 35:21-25.) Supervisor Simoy did not raise his voice, make any promises to, or threaten Defendant. (Tr. 52:10-16.) Defendant was not prevented from getting food or using the restroom. (Tr. 52:19-21.)

Supervisor Simoy did not provide a *Miranda* warning prior to this interview because it is not required at the border when determining an individual's admissibility into the United States. (Tr. 31:19-25.) He did provide Defendant an advisement and put her under oath. (Tr. 32:1-8; Gov't Ex. 2 at 6588-89.) The advisement and oath are memorialized in the I-867A Record of Sworn Statement:

I am an officer of the United States Department of Homeland Security. I am authorized to administer the immigration laws and to take sworn statements. I want to take your sworn statement regarding your application for admission to the United States. Before I take your statement, I also want to explain your rights, and the purpose and consequences of this interview.

You do not appear to be admissible or to have the required legal papers authorizing your admission to the United States. This may result in your being denied admission and immediately returned to your home country without a hearing. If a decision is made to refuse your admission into the United States, you may be immediately removed from this country, and if so, you may be barred from reentry for a period of 5 years or longer.

This may be your only opportunity to present information to me and the Department of Homeland Security to make a decision. It is very important that you tell me the truth. If you lie or give misinformation, you may be subject to criminal or civil penalties, or barred from receiving immigration benefits or relief now or in the future.

Except as I will explain to you, you are not entitled to a hearing or review.

U.S. law provides protection to certain persons who face persecution, harm or torture upon return to their home country. If you fear or have a concern about being removed from the United States or about being sent home, you should tell me so during this interview because you may not have another chance. You will have the opportunity to speak privately and confidentially to another officer about your fear or concern. That officer will determine if you should remain in the United States and not be removed because of that fear.

Until a decision is reached in your case, you will remain in the custody of the Department of Homeland Security.

Any statement you make may be used against you in this or any subsequent administrative proceeding.

(Gov't Ex. 2 at 6589.)

Supervisor Simoy asked Defendant if she was comfortable with speaking in the English language at the outset of the interview. (Tr. 32:9-21; Gov't Ex. 2 at 6589.) Supervisor Simoy then asked Defendant if she was willing to answer his questions and Defendant replied, "[y]eah, okay." (Gov't Ex. 2 at 6589.) He then put Defendant under oath and inquired if Defendant was mentally able to answer his questions, including whether she was under the influence of any medications or alcohol. (Tr. 33:9-34:7; Gov't Ex. 2 at 6589-90.)

Defendant was willing to answer questions. (Tr. 36:17-19.) During the interview, Defendant "was really calm." (Tr. 36:25.) Defendant spoke freely to Supervisor Simoy and told him that "[y]ou're a lot more calm and nicer" than Special Agent Chan. (Tr. 37:6.)

Defendant "was very familiar with the English language." (Tr. 37:22.) Supervisor Simoy learned that Defendant had married a U.K. citizen and that she had previously been a resident of the U.K. (Tr. 37:22-24; Gov't Ex. 2 at 6590-91.) She answered his questions appropriately. (*See generally* Gov't Ex. 2.) At the conclusion of her interview, Defendant was given a copy of her sworn statement for her to read and sign, which she did. (Tr. 52:5-9; Gov't Ex. 2.) Supervisor Simoy further understood that Defendant's statement to Special Agent Chan was also given in English. (Tr. 32:22-25.) He did not observe or notice anything that prevented Defendant from fully answering his questions. (Tr. 52:22-24.)

Supervisor Simoy asked Defendant biographical questions and other questions with the purpose of determining whether she had any derivative status through herself or family members which would permit her to enter the United States. (Tr. 37:25-39:9; Gov't Ex. 2

13

at 6590-91.)  Concluding that she did not have any derivative or immigration status, he started focusing on Defendant's purpose for coming to the United States on a tourist visa. (Tr. 39:10-40:1; Gov't Ex. 2 at 6591-93.)

One of the women traveling with Defendant had "provided more information about [Defendant] and what their true intention coming to the United States was," and so Supervisor Simoy expanded his questioning of Defendant to learn her true intent for traveling to the United States.  (Tr. 40:19-41:1.)  Supervisor Simoy asked her additional questions about her past travels, people she had previously traveled with to the United States, and the other women she was traveling with on that date.  (Tr. 41:4-5; Gov't Ex. 2 at 6592-96.)  Defendant answered these questions and stated that she had helped a number of individuals with their visa applications to enter the United States.  (Gov't Ex. 2 at 6592-96.)  At times, Defendant stated the reason(s) for travel of individuals she had assisted. (*Id.*)  At one point, Defendant stated that she was aware that one of the individuals she assisted was unlawfully in the United States.  (*Id.* at 6595.)

 Officer Simoy also showed Defendant a photo lineup and asked her to identify the people in the lineup.   (Tr. 42:20-23.)   She identified certain individuals, including individuals she had traveled with, using checkmarks on the photo lineup.  (Tr. 43:8-44:6; Gov't Ex. 2 at 6594-96; Photo Lineup.)  Defendant also signed the photo lineup and made notations in English on that document.  (Gov't Ex. 2 at Photo Lineup.)

Through his investigation and questioning, Supervisor Simoy confirmed "that there was a pattern" of individuals who had traveled with Defendant overstaying in the United States on their tourist visas, "as well as what was currently happening with three other

14

individuals that were also being removed administratively." (Tr. 44:9-12.) It was determined that Defendant was inadmissible to the United States. (Tr. 44:18; Gov't Ex. 2 at 6596.) The following transpired:

> **OFFICER SIMOY**: [Y]ou have been determined inadmissible to the United States per section 212(a)(7)(A)(i)(I), as an immigrant without the proper immigrant documents, of the INA, because you helped people with their United States visa application and have provided accommodations for some individuals upon entry, which has resulted in 4 individuals being unlawfully present in the United States, one of which is or was your sister-in-law. Furthermore, as a result of the three individuals traveling with you today, who were found inadmissible as a result of admitting to malafide intent upon entering the United States you have been found inadmissible as well. Do you understand?
>
> **DEFENDANT**: Yes I understand.

(Gov't Ex. 2 at 6596.) Defendant was then told she would be removed and placed on the next available flight home. (*Id.*)

Defendant stated she was treated fairly during this process and that her answers had not been coerced or coached. (Tr. 50:25-51:18; Gov't Ex. 2 at 6596-97.) Supervisor Simoy then asked Defendant questions on the I-867B Jurat, including whether she had a fear of returning to her home country. (Tr. 44:19-21; Gov't Ex. 2 at 6598.) Defendant expressed no such fear. (Gov't Ex. 2 at 6598.) When asked if she had any questions or had anything that she would like to add, Defendant replied, "No, but it isn't fair I didn't do anything illegal." (*Id.*; *see also* Tr. 45:15-20.)

Supervisor Simoy then put the reports together in a file. (Tr. 46:13-14.) Defendant reviewed the I-867A Record of Sworn Statement, initialed the bottom of each page, and

signed her full name on the I-867B Jurat.  (Tr. 46:16-25; Gov't Ex. 2 at 6589-98.)

Defendant then waited in the lobby area of Secondary Inspection until the next available

flight to her home country.  (Tr. 47:7-10, 19-24.)  Defendant was not in handcuffs, had

access to food and water, and was able to speak to the individuals she had been traveling

with that were also being returned.  (Tr. 47:13-18; 48:24-49:6; 50:2-5.)  Supervisor Simoy

spent approximately three hours with Defendant.  (Tr. 51:21-22.)

### 2.  Conclusions of Law

#### a.  Statement to HSI Special Agent Chan

Defendant submits that Government Exhibit 1, the Interview Report of Defendant

dated July 7, 2011, and written by Special Agent Chan, "is not sufficient to meet its burden

that [Defendant] was provided a *Miranda* warning and if she was provided the warning

that she waived it knowingly, intelligently, and voluntarily."  (ECF No. 931 at 1.)  Later in

her briefing, however, Defendant concedes that her statement to Special Agent Chan was

*Mirandized*.  (*See id.* at 3 ("CBP Officer Simoy knew [Defendant] had invoked her

*Miranda* rights but he nevertheless reinitiated questioning in violation of her rights.").)

Further evidence, including Government Exhibit 1 and the testimony of Supervisor Simoy,

supports that Defendant was *Mirandized* prior to giving her custodial statement to Special

Agent Chan.  The Court thus focuses on Defendant's remaining arguments—namely that

Defendant's due process and confrontation rights "have been violated by the Government's

failure to present testimony from the agent" and "that because there is no recording of the

interview and no sworn testimony that *Miranda* warnings were actually provided," the

Government has not met its burden to establish that Defendant made a voluntary, knowing,

and intelligent waiver of her *Miranda* rights prior to giving a statement to Special Agent Chan. (ECF No. 931 at 2.)

As a preliminary matter, the Court stands by its admission of Government Exhibit 1 into evidence over Defendant's objection and finds that Defendant's due process and confrontation rights were not violated by Government Exhibit 1's admission or by Special Agent Chan's absence from the hearing. "[T]he right of confrontation in pretrial suppression hearings does not apply to the same extent at trial because 'the interests at stake in a suppression hearing are of a lesser magnitude than those in the criminal trial itself.'" *United States v. Smith*, No. 12-cr-183 (SRN/AJB), 2012 WL 5497862, at *2 (D. Minn. Nov. 13, 2012) (quoting *United States v. Boyce*, 797 F.2d 691, 693 (8th Cir. 1986)) (additional quotation omitted). The Court "may accept hearsay evidence at a suppression hearing if the court is satisfied that the statements were made and that there is nothing to raise serious doubt about their truthfulness." *Boyce*, 797 F.2d at 693 (citing *United States v. Matlock*, 415 U.S. 164, 175-77 (1974)); *see also United States v. Thompson*, 533 F.3d 964, 969 (8th Cir. 2008) ("Although not admissible at trial, the district court may rely on hearsay evidence at a suppression hearing.") (citing *United States v. Raddatz*, 447 U.S. 667, 679 (1980)).

Supervisor Simoy relies on an individual's A File, including official reports such as the one authored by Special Agent Chan at issue in this case. (Tr. 21:11-22:5.) He witnessed the conclusion of Defendant's interview with Special Agent Chan and Defendant cited to her interactions with Special Agent Chan while she was speaking with him. (Tr. 25:24-26:17; 36:25-37:6.) The Court finds no reason to doubt that the out-of-court

statements were made and there is no reason to doubt the testimony of Supervisor Simoy regarding Defendant's statement to Special Agent Chan. *See Smith*, 2012 WL 5497862, at *3 (finding that when all testimony in a suppression hearing came in through one officer, there was "no reason to doubt her testimony, particularly as it was obtained from discussions with officers on the scene and her review of applicable reports"). And, "presuming that the appropriate witness(es) will testify and be subject to cross-examination at trial with respect to relevant matters, there is no violation of the defendant's right to confront the witness who was absent from the suppression hearing." *Id.* (citations omitted).

The record further shows that Defendant made a voluntary, knowing, and intelligent waiver of her *Miranda* rights prior to making her statement to Special Agent Chan. As outlined above, *see supra* Section II.A, Defendant's *Miranda* waiver "must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran*, 475 U.S. at 421. She also must have waived her rights "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* The Court considers the totality of the circumstances when determining whether Defendant's waiver was valid. *Id.* This includes "the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition." *United States v. Vega*, 676 F.3d 708, 718 (8th Cir. 2012) (quotation omitted).

"Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, the accused's uncoerced statement establishes an implied waiver of the right to remain silent." *Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010).

Here, Defendant spoke with Special Agent Chan at length after she was given a *Miranda* warning. (Gov't Ex. 1 at 2.) She answered Special Agent Chan's questions appropriately, though it is obvious from the report that Special Agent Chan was not always satisfied with her responses. (*See generally id.*) There is no evidence that Defendant was coerced into making her statement. *See United States v. Vinton*, 631 F.3d 476, 482 (8th Cir. 2011) ("There is no credible evidence that the police coerced [Defendant] into making the statements, or that [her] decision to speak with them was the product of anything other than a free and unconstrained choice."). In fact, Defendant invoked her rights when confronted with certain information and refused to answer any additional questions. (Gov't Ex. 1 at 4.) The interview was then suspended. (*Id.*)

The invoking of her rights mid-interview also suggests that Defendant had made a knowing and intelligent waiver with "'full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" *Gallardo*, 495 F.3d at 990 (quoting *Moran,* 475 U.S. at 421). Defendant's waiver can be inferred from her responding to questions posed by Special Agent Chan after she was read her *Miranda* rights. *See United States v. House*, 939 F.2d 659, 662 (8th Cir. 1991) ("[W]aiver may be inferred from the fact that the defendant responded to questions posed by the interviewer after being advised of [her] rights.") (citing *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)); *see also United States v. Adams*, 820 F.3d 317, 323 (8th Cir. 2016) ("Waiver of the right to remain silent 'can be clearly inferred from the actions and words of the person interrogated.'") (quoting *Butler*, 441 U.S. at 373). Defendant also spoke in English the entire time, and there is nothing in the record suggesting that she had a difficult time

19

understanding Special Agent Chan. *See United States v. Gayekpar*, 678 F.3d 629, 639 (8th Cir. 2012) (finding a waiver of a Liberian national valid because he had no difficulty understanding English and spoke English during his entire interview).

Considering the totality of the record, the Government has met its burden to show by preponderance of the evidence that Defendant's waiver of her *Miranda* rights was valid when she gave her custodial statement. *Black Bear*, 422 F.3d at 663. The Court thus recommends that her motion be denied insofar as it seeks suppression of her statement made to Special Agent Chan on July 7, 2011.

### b. Statement to Supervisory CBP Officer Simoy

Defendant argues that her statement to Supervisor Simoy must be suppressed because he did not advise her of her rights pursuant to *Miranda*. (ECF No. 931 at 2-3.) "Routine questioning by customs officials" like Supervisor Simoy, however, "is normally not custodial interrogation that triggers a *Miranda* warning." *United States v. Layne*, 973 F.2d 1417, 1420 (8th Cir. 1992) (citations omitted); *see also United States v. Blackwell*, No. 18-cr-138 (PJS/LIB), 2018 WL 6804803, at *5 (D. Minn. Dec. 27, 2018) ("The Eighth Circuit has held that *Miranda* warnings need not be given at the border 'unless and until [1] the questioning agents have probable cause to believe that the person questioned has committed an offense, or [2] the person questioned has been arrested.'") (quoting *United States v. Oyekan*, 786 F.2d 832, 839 n.12 (8th Cir. 1986)) (additional quotation omitted). In addition, "detentions during legitimate . . . border searches do not constitute arrests . . . ." *Oyekan*, 786 F.2d at 839 n.12 (quoting *United States v. Espericueta-Reyes*, 631 F.2d 616, 622 (9th Cir. 1980)).

20

In *United States v. Kiam*, 432 F.3d 524 (3d Cir. 2006), a case on which the Government extensively relies (*see, e.g.*, ECF No. 910 at 6-7), the Third Circuit examined the application of *Miranda* in the context of inspections by immigration agents at international borders. The *Kiam* Court held that "[w]hile an alien is unquestionably in 'custody' until he is admitted to the country, normal *Miranda* rules simply cannot apply to this unique situation at the border." 432 F.3d at 529 (citation omitted); *see also United States v. St. Vallier*, 404 F. App'x 651, 656 (3d Cir. 2010) ("[N]ormal *Miranda* rules are . . . inapplicable to circumstances where border inspectors question persons seeking entry into the United States."); *United States v. Gupta*, 183 F.3d 615, 617 (7th Cir. 1999) ("A person seeking entry into the United States does *not* have the right to remain silent."). The *Kiam* Court also "reaffirm[ed] the well-establish authority of border inspectors to ask questions of those entering the United States." 432 F.3d at 529. It reasoned further that:

> This is a situation utterly unlike a normal law enforcement setting. The alien may be taken out of a primary inspection line for secondary questioning . . . . the alien [] must meet his information production burden, and the border inspector is accordingly entitled to ask questions and require answers. We will not impose an across-the-board rule requiring border inspectors to immediately cut off their questioning if they think they may be going beyond what could be considered "routine" immigration questioning. Nor will we extend *Miranda* beyond the holdings of our sister Circuits and hold that if a customs official subjectively suspects criminal conduct in addition to inadmissibility, he must Mirandize the alien before questioning him on any subject.

*Id.* at 529-30; *see also id.* at 531 ("Suspicion of criminal conduct cannot overrule the simultaneous responsibility of immigration or customs agents to inspect entrants at our borders.") (citation omitted). The court determined that *Miranda* is only required "[i]f the

inspector's questions objectively cease to have a bearing on the grounds for admissibility and instead only further a potential criminal prosecution." *Id.* at 530.

While the Court finds the ruling and reasoning of *Kiam* persuasive, it declines to extend Eighth Circuit precedent because the record before it indicates that Supervisor Simoy posed only routine questions to Defendant during his interview. Supervisor Simoy's research prior to interviewing Defendant focused on her previous travel to the United States and "putting things together just to determine whether or not she would be admissible." (Tr. 17:12-14.) After putting Defendant under oath, he asked her routine border questions regarding her background, citizenship, visa for entry, employment, and purpose for traveling. (Gov't Ex. 2 at 6590-92.) Because his prior research had established a pattern of Defendant entering the United States with other individuals that subsequently overstayed their tourist visas, he asked her more specific questions on those individuals and the individuals she was traveling with that day. (*See* Tr. 17:24-18:2; Gov't Ex. 2 at 6592-96.)

While Supervisor Simoy had some knowledge that HSI's prior interview with Defendant was criminal in nature, he did not know the scope of the interview beyond the fact that there had been an alert that she had been involved in human trafficking and that HSI had interviewed her. (Tr. 60:4-12.) Further, Supervisor Simoy witnessed the conclusion of Defendant's interview with Special Agent Chan and knew she had not been placed under arrest at its conclusion. (*See* Tr. 25:24-26:17.) He also would have needed to interview Defendant regardless of the prior custodial interview with HSI. (Tr. 61:21-62:4.) And, though Supervisor Simoy's ultimate finding that Defendant was inadmissible was in part based on the fact that three individuals traveling with her "were found to be

inadmissible as a result of admitting to malafide intent," he did not accuse her of smuggling or trafficking persons, and the main focus of his interview remained on her purpose of travel and her past and present actions of assisting others with travel and visa applications. (Gov't Ex. 2 at 6592-96.)

This Court has previously found that *Miranda* is not required during routine questioning at the border even when an individual is already under investigation concerning a sex trafficking organization. *See United States v. Unpradit*, No. 17-cr-107 (4) (DWF/TNL), 2018 WL 4483682, at *5 (D. Minn. May 14, 2018) ("While Defendant was already under investigation concerning a sex trafficking organization, she was not asked about that investigation . . . Because this examination did not stray beyond routine border questioning, no *Miranda* warning was required.") (citation omitted), *report and recommendation adopted*, 2018 WL 3377177 (D. Minn. July 1, 2018), *appeal filed sub nom. United States v. Pawinee Unpradit*, No. 20-1825 (8th Cir. Apr. 20, 2020). The record before the Court shows that Defendant was subject to routine border-inspection questions when being questioned by Supervisor Simoy and thus no *Miranda* warning was required. *Oyekan*, 786 F.2d at 839 n.12. Accordingly, the Court recommends that her motion be denied insofar as it seeks suppression of her statement made to Supervisor Simoy on July 7, 2011.

### C. January 13, 2017 Statement

On January 13, 2017, Defendant gave a statement in Liege, Belgium to HSI and other individuals. (Gov't Ex. 3.) Defendant moves to suppress "any confessions, or statements in the nature of confessions, and any evidence derived from or discovered as a

result of any confessions obtained" from Defendant on January 13, 2017, "because her statements were made without a knowing and voluntary waiver of *Miranda* and in violation of her Sixth Amendment right to counsel." (ECF No. 899 at 1.) Defendant further asserts that she was not properly notified that she may have her consulate notified. (*Id.* at 5.) She also asks the Court to suppress a subsequent letter she sent to the Government on March 20, 2017.[11] (*Id.*)

### 1. Findings of Fact

#### a. Case History and Defendant's Prior Contact With HSI

On July 29, 2016, an under-seal criminal complaint issued for Defendant. (ECF No. 1; *see also* Tr. 65:23-66:1.) A warrant for Defendant issued on the same day. (ECF No. 2.[12]) On August 5, 2016, Defendant was arrested in Liege, Belgium pursuant to the complaint. (Tr. 66:4-8; *see also* Tr. 86:8-10 ("Once we had obtained the warrant and submitted the red notice, [Belgian authorities] executed an arrest on her and she was then placed in custody.").) On September 17, 2016, 17 persons, including Defendant, were indicted in an under-seal indictment alleging each person's participation in a large-scale international sex trafficking organization. (ECF No. 5; *see also* Tr. 66:9-12.) A subsequent arrest warrant issued for Defendant. (ECF No. 7.[13])

---

[11] This letter was not mentioned further either at the hearing or in Defendant's post-hearing briefing. "A motion must state the grounds on which it is based and the relief or order sought." Fed. R. Crim. P. 47(b); *see also* D. Minn. LR 12.1(1)(c)(1)(B) ("To the extent practicable, a motion under Fed. R. Crim. P. 12(b) to suppress evidence must identify that evidence and the nature of the challenge."). Defendant has not provided any specific support for why this letter should be suppressed, and thus the Court recommends denying this request.

[12] This warrant is filed under seal.

[13] This warrant is filed under seal.

On September 27, 2016, the Government filed a Motion to Provide Sealed Indictment and Arrest Warrant to Foreign Law Enforcement. (ECF No. 26.[14]) Because the indictment was still under seal, the Government requested "authority to provide the indictment and arrest warrant to the relevant law enforcement entities, including foreign law enforcement partners in Belgium, to proceed with the extradition" of Defendant. (ECF No. 26 at 2.) The motion was granted on September 29, 2016. (ECF No. 27.[15])

On October 4, 2016, there was a takedown in the case and numerous members of the criminal conspiracy were arrested on the indictment. (Tr. 66:13-17.) Defendant was not among those arrested as she was not in the United States, and her name remained redacted from the indictment when it was unsealed after the takedown. (Tr. 66:18-23.)

On December 13, 2016, HSI Special Agent Tonya Price received email correspondence from a member of law enforcement, who was forwarding messages from an individual claiming to be Defendant's fiancé. (Gov't Ex. 5 at 1; Tr. 67:18-68:3.) This individual wrote that he was forwarding a letter from Defendant, "concerning [her] International Arrest." (Gov't Ex. 5 at 2.[16]) In this letter, Defendant requested witness protection for her and her family, commented on threats she and her family had been receiving in Thailand, and detailed her arrest in Belgium. (Gov't Ex. 5 at 3-4.) Defendant stated she wanted to "full[y] cooperate with American justice about the people how [sic]

---

[14] This motion was originally filed under seal and has since been unsealed.

[15] This order was originally filed under seal and has since been unsealed.

[16] Government Exhibit 5 contains no page markings beyond the first two pages, which contain a string of emails. The exhibit includes a number of other documents, including a letter with attachments written by Defendant dated December 7, 2016, and addressed to the Embassy of the United States of America in Thailand. Certain pages of Government Exhibit 5 are written in English, and others are written in French or Thai. The Court cites to marked and unmarked pages in this exhibit by its own counting of the entire document packet it was provided.

send me clients for visa applications." (*Id.* at 3.) She stated she "realize[d] now this is a big organization for human trafficking using me and my company for their criminal acts" and that she wanted "to prove my innocence, because that is very important to me to prove that I am innocent and not the criminal person or the 'Big BOSS' of the human trafficking organization in Thailand that you are looking for." (*Id.*)

After receiving these communications, a delegation traveled to Belgium to meet with Defendant.[17] (Tr. 68:25-69:3.) This delegation included Special Agent Price. (*See, e.g.*, Gov't Ex. 3.)

### b. Interview in Liege, Belgium

The Court heard testimony from Special Agent Price. (ECF No. 927.) Special Agent Price has been employed with HSI since December of 2008. (Tr. 64:20-22.) She is the lead investigator in this case. (Tr. 65:4-6.) She was one of 11 people at the January 13, 2017 interview in Liege, which also included two Assistant United States Attorneys, Defendant, Defendant's attorney, a Thai interpreter, an attorney-in-training, a Homeland Security Representative, and three Belgian investigators based in Liege. (Tr. 70:6-13; Gov't Ex. 3 at 2.) Defendant's attorney was not licensed to practice law in the United States. (Tr. 82:8-11.) Defendant was not advised that she had the right to have a consulate from the Thai embassy present during this interview. (Tr. 85:21-25.)

The interview took place in a "rather large" room that was "empty except for a couple of tables and a few chairs for everyone to sit." (Tr. 70:19-20.) Participants had

---

[17] At the time, Defendant was also being prosecuted for sex trafficking in Belgium. (Tr. 69:7-9; Gov't Ex. 5 at 3.)

access to a restroom.  (Tr. 70:21-22.)  While a Belgian investigator may have left the interview room at a certain point, Defendant's attorney and the Thai interpreter were present throughout the entirety of the interview.  (Tr. 70:23-71:5.)  Defendant was handcuffed for transport to and from the interview, but she was not handcuffed during the interview. (Tr. 74:18-23.)  Special Agent Price was not armed for the interview, and at no point did any individual display or point a weapon at Defendant.  (Tr. 74:24-75:8.)  Special Agent Price wore plainclothes.  (Tr. 75:10-11.)

The interview with Defendant "was more of a fluid conversation between three different languages . . . It was back and forth."  (Tr. 75:13-14.)  No one yelled at Defendant and no harsh language was used.  (Tr. 75:15-19.)  Defendant "had tears in her eyes at one point" and stated, "she was grateful [the U.S. delegation was] there and that she had also prayed for the delegation's safety."  (Tr. 76:7-9; *see also* Tr. 94:16 ("She appeared free to express herself.").)  She hugged Special Agent Price when she entered the room.  (Tr. 71:9-10.)

French is the primary language spoken in the southern part of Belgium where Liege is located.  (Tr. 72:4-6.)  Thus, English, Thai, and French were spoken during the interview. (Tr. 71:25-72:3.)  Special Agent Price understood that Defendant spoke all three of these languages.  (Tr. 72:7-9.)  Her native language is Thai.  (Tr. 72:10-11.)  She indicated during the interview that "her preference" was to speak with the U.S. delegation in English "except for if there were other unique words specific to law enforcement or lawyer words, that she would then ask for additional assistance from the Thai interpreter."  (Tr. 72:17-20; *see also* Gov't Ex. 3 at 2.)  Defendant appeared to speak English fluently and understood what

Special Agent Price was saying in English. (Tr. 72:24-73:1; 98:15-19.) She also never expressed complaints about the quality of the Thai interpreter's services. (Tr. 94:6-8.)

Special Agent Price read Defendant her *Miranda* rights in English from her HSI credentials, which she "utilize[d] . . . to read verbatim." (Tr. 71:18-21; *see also* Tr. 89:20-90:5; 92:3-5 (stating she reads from her HSI credentials "word for word"); 96:3-4; Gov't Ex. 3 at 2.) The *Miranda* warning informed Defendant that she had: (1) the right to remain silent; (2) that anything she said could be used against her in a court of law; (3) that she had the right to consult with a lawyer before questioning and to have a lawyer present during questioning; and (4) that if she could not afford a lawyer, one would be appointed to represent her free of charge prior to any questioning. (Tr. 95:11-21.) The warning was translated from English into Thai by the Thai interpreter.[18] (Tr. 71:21-23; 90:8.) Defendant stated she understood those rights and wished to speak with the U.S. delegation. (Tr. 72:12-17; *see also* Tr. 73:23-74:3 (stating, "[s]he was *Mirandized*" fully and waived her rights); Tr. 95:22-96:4 (concluding "[s]he was willing to speak and . . . to waive her rights.").)

Defendant was also told that she could stop questioning at any point, that she could speak with her attorney at any point, and that she did not have to answer any particular question. (Tr. 73:2-9.) At one point, Defendant did take a break to speak privately with her attorney. (Tr. 73:10-12; *see also* Gov't Ex. 3 at 5.)

---

[18] The *Miranda* warning was also translated into French for the Belgian detectives. (Tr. 90:8-9.) According to Special Agent Price, "[a]ll of the communication had to be translated eventually into French for the detectives. That was part of the agreement." (Tr. 90:11-13.)

After being read her *Miranda* rights, Defendant was also provided with a written declaration of rights commonly used in Europe.  (Tr. 74:4-9; Gov't Ex. 4 at 4;[19] *see also* Gov't Ex. 3 at 2.)  This document was written in English and French, and Defendant signed each of the four pages of the French copy.  (Gov't Ex. 3 at 2.)

During her interview, Defendant stated she has two undergraduate degrees and a master's degree.  (Tr. 76:14-16; *see also* Gov't Ex. 3 at 3-4.)  She had lived in Vienna and the U.K., and had previously been married to a U.K. citizen, Steven Spencer Warren.  (Tr. 76:17-20; Gov't Ex. 3 at 4.)  Prior to marrying Warren, Defendant lived with a different British man.  (Gov't Ex. 3 at 4.)

Defendant admitted to sending the December 6, 2017 letter later forwarded to Special Agent Price.  (Tr. 76:21-77:1; Gov't Ex. 3 at 4.)  She continued providing information into the human trafficking organization during her interview, including by identifying members using photographs provided by investigators.  (Tr. 77:3-9.)  Defendant made admissions about her involvement in the conspiracy but minimized her role in the larger criminal organization.  (Tr. 79:13-16.)

At one point during the interview, Defendant's attorney asked if it would be possible for Defendant not to be extradited to the United States to face the charges in this case.  (Tr. 77:16-19; Gov't Ex. 3 at 5.)  She was told "it would not be possible" and that the Government was seeking extradition.  (Tr. 77:21-22; *see also* Gov't Ex. 3 at 5.)  When Defendant expressed concern about her family in Thailand and stated her sister had been

---

[19] Government Exhibit 4 contains no page markings beyond the first three pages. The Court cites to marked and unmarked pages in this exhibit by its own counting of the entire document packet it was provided.

gathering information in Thailand regarding the larger sex trafficking operation, she was told "to allow the U.S. investigators to continue the investigation and to tell her family to stop any further investigation in Thailand to ensure their safety." (Gov't Ex. 3 at 6; *see also* Tr. 78:8-22.) Defendant was not dissuaded from investigating her own criminal case. (Tr. 78:23-25.)

Investigators instructed Defendant not to talk about the case or share information regarding her meeting with the U.S. delegation and told Defendant not to send or have others send letters or emails on her own behalf. (Tr. 97:2-8; Gov't Ex. 3 at 11.) These instructions were given for Defendant's safety and are a standard set of instructions given to individuals cooperating with the Government.[20] (Tr. 97:9-17.)

Defendant was also told on a number of occasions during the interview that she should tell the truth. (Tr. 77:10-11.) At one point, Defendant's attorney asked questions about the penalties Defendant faced in the United States. (Tr. 79:4-6.) Defendant was told that a judge in the United States would ultimately decide her penalty. (Gov't Ex. 3 at 6.) Defendant was also informed that "without cooperation, her sentence will be 15 years to life. With cooperation, it is possible to get a smaller sentence." (Gov't Ex. 3 at 6; *see also* Tr. 79:4-9.) After being informed of these possible penalties, Defendant continued to speak with Special Agent Price and the other law enforcement present about the larger criminal organization and her involvement therein. (Tr. 79:10-12; *see also* Gov't Ex. 3 at 6-11.)

---

[20] Special Agent Price nevertheless continued to receive information from Defendant's fiancé. (Tr. 97:11-13.)

During the interview, one of the Belgian detectives "was typing up the majority of what was being said." (Tr. 80:5-6.) This was memorialized in an official statement. (Gov't Ex. 4.[21]) The first draft of the statement was provided to Defendant and her attorney, who reviewed it page by page. (Tr. 80:6-8.) After Defendant made edits, changes, and amendments to the statement, it was provided back to the detectives, and the changes were included in the final draft. (Tr. 80:9-11.) Upon reviewing the draft, Defendant signed each page of her statement. (Gov't Ex. 4 at 4-12.) Defendant, her attorney, Special Agent Price, and other individuals signed the last page of her statement. (*Id.* at 13.)

### 2. Conclusions of Law

#### a. Right to Counsel and Sufficiency of *Miranda* Warning

Defendant first argues that the *Miranda* warning given on January 13, 2017 was insufficient, arguing that the translation, at least as it related to the French/English translation, "was wrong in a very material way." (ECF No. 930 at 2.) She also argues that she was not represented by an attorney licensed to practice law in the United States in violation of the Sixth Amendment. (*Id.*)

A criminal defendant's right to counsel under the Sixth Amendment "guarantees an accused the right to rely on counsel as a medium between [her] and the authorities." *United States v. Bird*, 287 F.3d 709, 713 (8th Cir. 2002) (citing *Maine v. Moulton*, 474 U.S. 159, 176 (1985)). A statement that law enforcement deliberately elicits from an accused after he has been indicted must be suppressed. *Massiah v United States*, 377 U.S. 201, 207

---

[21] This document was originally written in French and subsequently translated into English. (*See* Tr. 83:18-84:1.)

(1964); *Bird*, 287 F.3d at 713. As a general matter, however, *Miranda* warnings are sufficient to advise a defendant of their Sixth Amendment right to counsel and a valid waiver after a *Miranda* warning is a knowing waiver for Sixth Amendment purposes. *See Patterson v. Illinois*, 487 U.S. 285, 296 (1988).

It is undisputed that Defendant was in custody during this interview. As stated above, *see supra* Section II.A., the Fifth Amendment requires that law enforcement inform a person of his or her rights under *Miranda* before beginning a custodial interrogation. *New*, 491 F.3d at 373. Specifically, *Miranda* requires that a suspect in custody "be warned that [she] has the right to remain silent, that any statement [she] does make may be used as evidence against [her], and that [she] has a right the presence of an attorney, either retained or appointed." 384 U.S. at 444. During the interrogation "[i]f the individual indicates in any manner, at any time prior to or during questioning, that [she] wishes to remain silent, the interrogation must cease." *Id.* at 473-74.

However, "the Constitution does not require police to administer the particular *Miranda* warnings." *Dickerson v. United States*, 530 U.S. 428, 440 n.6 (2000); *see also Florida v. Powell*, 559 U.S. 50, 60 (2010) (although "[t]he four warnings *Miranda* requires are invariable, . . . [the] Court has not dictated the words in which the essential information must be conveyed.") (citations omitted); *Duckworth v. Eagan*, 492 U.S. 195, 202 (1989) ("We have never insisted that *Miranda* warnings be given in the exact form described in that decision."); *California v. Prysock*, 453 U.S. 355, 359 (1981) (per curiam) ("*Miranda* itself indicated that no talismanic incantation [i]s required to satisfy its strictures."). As the Eighth Circuit has described:

32

> *Prysock* recognized that *Miranda* announced procedural safeguards including the now familiar *Miranda* warnings . . . *or their equivalent* . . . *Duckworth* makes clear that reviewing courts . . . need not examine *Miranda* warnings as if construing a will or defining the terms of an easement. The inquiry is simply whether the warnings reasonably convey to a suspect [her] rights as required by *Miranda*.

*United States v. Caldwell*, 954 F.2d 496, 502 (8th Cir. 1992) (quotations and citations omitted).

Further, the fact that the U.S. delegation was conducting this interview abroad is an important factor in this Court's analysis. It is "well-established that the Fifth Amendment privilege against self-incrimination protects nonresident aliens facing a criminal trial in the United States even where the questioning by United States authorities takes place abroad." *United States v. Clarke*, 611 F. Supp. 2d 12, 29-30 (D.D.C. 2009) (citing *In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 177, 198-201) (2d Cir. 2008) (additional citations omitted). However, "where *Miranda* has been applied to overseas interrogations by U.S. agents, it has been so applied in a flexible fashion to accommodate the exigencies of local conditions." *In re Terrorist Bombings*, 552 F.3d at 205. "This is especially true with regard to informing suspects of their right to counsel—a right that may be difficult, if not impossible, for a U.S. official to effectuate when a suspect is in a foreign country in the custody of a foreign government." *Clarke*, 611 F. Supp. 2d at 30 (citations omitted).

Taken together, the record supports the conclusion that Defendant was given a proper *Miranda* warning while in custody in Liege, Belgium. Special Agent Price read Defendant her *Miranda* rights in English from her HSI credentials. (*See, e.g.*, Tr. 71:18-

21; Gov't Ex. 3 at 2.) This was translated into Thai by an interpreter. (Tr. 71:21-23; 90:8.) And while her attorney was not licensed to practice law in the United States, Defendant did have an attorney with her throughout the entirety of the interview. Defendant was told she could speak privately with this attorney at any point during the interview, and she exercised that right. Defendant was further provided a written declaration of rights commonly used in Europe, which comprised of similar rights, including the right to be assisted by counsel and the right to remain silent. (Gov't Ex. 4 at 4-5.) This declaration also provided that any statement she made could be used as evidence against her in court. (*Id.* at 4.) She initialed each page of her statement after reviewing it with her attorney, acknowledging the accuracy of its contents, and further signed the last page of her statement. (Tr. 80:6-21; Gov't Ex. 4 at 4-13.)

Defendant argues that the French/English translation of Special Agent Price's *Miranda* warning suggests that Defendant was not given an accurate translation of her rights and thus the warning was insufficient. (ECF No. 930 at 2.) The Court disagrees for a number of reasons. First, the record as a whole indicates that Defendant understood English when Special Agent Price conveyed her rights to her.[22] (*See* Tr. 72:24-73:1; 98:15-19.) Second, the substitution of the word "hearing" for "questioning" is not fatal to the warning given to Defendant. (*See* Gov't Ex. 4 at 5.) It is true that the translation of Defendant's *Miranda* warning from English to French and back to English shifted the sentence "I have the right to consult an attorney prior to questioning" to "I have the right

---

[22] The contention that Defendant did not understand English and that she did not receive proper interpretation services is further discussed *infra* at Section II.C.2.b.

to consult with an attorney prior to my hearing." (*See id.*)  However, the entirety of

Defendant's interaction with American and Belgian law enforcement on January 13, 2017

was labeled a "hearing" by Belgian officials, suggesting that the message conveyed to

Defendant was that she could consult with counsel prior to giving her statement to the U.S.

delegation and Belgian law enforcement.  (*See, e.g.*, *id.* at 4 (listing out the European

declaration of rights "[p]rior to the hearing.").)  In addition, the mislabeling of one word

does not mean that Defendant's rights were inadequately expressed to her.  *See, e.g.*,

*Prysock*, 453 U.S. at 359; *Caldwell*, 954 F.2d at 501-02.  Finally, Defendant was read an

additional declaration of European rights and was represented by an attorney during her

interview.  *See In re Terrorist Bombings*, 552 F.3d at 205.

Thus, the warnings given to Defendant—both the oral warning by Special Agent

Price and the written European declaration of rights—were consistent with *Miranda* and

accommodated the exigencies of the local conditions in Belgium with regard to

Defendant's access to counsel.  *See Clarke*, 611 F. Supp. 2d at 31 (citing *In re Terrorist

Bombings*, 552 F.3d at 205) (additional citations omitted).

### b.  Waiver

The Court also finds that Defendant made a voluntary, knowing, and intelligent

waiver of her *Miranda* rights when she spoke to the U.S. delegation.[23]  As discussed *supra*

at Section II.A., the inquiry into a *Miranda* waiver has two parts: (1) "the relinquishment

---

[23] The Government argues that it appears Defendant has abandoned her argument that her statement was involuntarily made.  (ECF No. 932 at 3 n.1.)  However, as Defendant makes clear in her post-hearing briefing, "she relies on her arguments contained in her Motion to Suppress as to whether her waiver of her *Miranda* rights was voluntary."  (ECF No. 930 at 1.)

of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception;" and (2) "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran*, 475 U.S. at 421. "Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Id.* (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)); *see Vega*, 676 F.3d at 718.

Defendant first argues that her waiver was not voluntary because the U.S. delegation told Defendant that she and her family should not conduct any investigation; that she was threatened with a lengthy sentence if she did not cooperate; and that she was improperly promised governmental help during her interview. (ECF No. 899 at 3-4.) The Court disagrees.

"Coercive official activity is a necessary predicate to a finding that a statement is not voluntary." *Layne*, 973 F.2d at 1421 (citing *Colorado v. Connelly*, 479 U.S. 157, 163-64 (1986)). Here, Defendant initiated the meeting with the U.S. delegation by communicating that she would like to cooperate fully in the Government's investigation into the sex trafficking organization. (Gov't Ex. 5 at 3-4.) She hugged Special Agent Price when she entered the room and stated she was grateful the delegation had traveled to speak with her in Belgium. (Tr. 71:9-10; 76:7-9.) The conversation was "fluid," "back and forth," and no harsh language was used. (Tr. 75:13-19.) Defendant was told she could

stop questioning at any point and that she could speak with her attorney at any point, which she did do. (Tr. 73:2-12.)

In addition, the communications made to Defendant by the U.S. delegation did not amount to threats or promises. While Defendant was told that her cooperation could help reduce her sentence, the delegation made clear that a judge would ultimately determine her sentence. (Gov't Ex. 3 at 6.) And, though Defendant was told that she and her family should stop further investigation of the sex trafficking organization in Thailand to ensure their safety, she was not told to cease investigating her own criminal case. (Tr. 78:8-25; 97:9-17.) There is simply no credible evidence that the U.S. delegation coerced Defendant into making her statement, "or that [her] decision to speak with them was the product of anything other than a free and unconstrained choice." *Vinton*, 631 F.3d at 482.

Defendant's statement was also knowingly and intelligently made. Defendant argues that her waiver was not knowingly and intelligently made for a number of reasons, including that there is no evidence that the *Miranda* warning was translated accurately into Thai and that the inaccurate translation from French to English in Government Exhibit 4 demonstrates that she was given an inaccurate warning as a matter of law. (ECF No. 899 at 4; ECF No. 930 at 1-2.) The Court notes that it has already found that the *Miranda* warning given to Defendant was sufficient and reasserts those findings here to the extent they relate to Defendant's ability to make a knowing and intelligent waiver of her rights. *See supra* Section II.C.2.a.

The Court also finds that the record as a whole demonstrates that Defendant understood the *Miranda* warning read to her, both in English and in Thai. As an initial

matter, the record is replete with evidence that Defendant understands English. For example, she spoke English when giving statements to Special Agent Chan and Supervisor Simoy in 2011. (*See, e.g.*, Gov't Exs. 1, 2.) She reviewed and signed off on the statement she gave to Supervisor Simoy, which was written in English. (Gov't Ex. 2 at 6589-98.) Her December 2016 communication offering to cooperate with the Government was written in English. (*See* Gov't Ex. 5.) She had lived in the U.K. (Gov't Ex. 3 at 4.)

Further, during her interview on January 13, 2017, she stated that it was "her preference" to speak in English "except for if there were other unique words specific to law enforcement or lawyer words," in which case Defendant would ask for assistance from the Thai interpreter provided to her. (Tr. 72:17-20; Gov't Ex. 3 at 2.) Defendant never expressed that she needed certain words or phrases clarified by the interpreter during the interview. (*See* Gov't Exs. 3, 4.) In fact, Special Agent Price understood that Defendant spoke all three languages spoken during the interview. (Tr. 72:7-9.) This included English, which Defendant appeared to speak fluently. (Tr. 72:24-73:31; 98:15-19.) Defendant stated she understood her *Miranda* rights and that she wanted to speak with the U.S. Delegation. (Gov't Ex. 3 at 2.) She appropriately answered questions throughout the interview. (*See generally id.*) Taken together, this evidence supports that Defendant understood English during this interview and thus made a knowing and intelligent waiver of her *Miranda* rights. *See Gayekpar*, 678 F.3d at 639.

And, though Defendant had no difficulty understanding English and chose to speak it throughout the interview, she also had the benefit of a Thai interpreter. Defendant's argument that she did not have a competent interpreter is belied by the record. She never

expressed complaints about the Thai interpreter's services or expressed that she was unable to understand a point of translation. (*See* Tr. 94:6-8.) This is in contrast to these very proceedings, where Defendant asked for a continuance on the basis that her interpreter had an accent that was difficult for her to understand. (*See* ECF No. 916; Tr. 4:3-23.) There is no credible evidence that Defendant was unable to understand her interpreter or that her interpreter did not properly translate what was said to Defendant in English.

In sum, the Court concludes that the Government has met its burden to prove, by preponderance of the evidence, that Defendant voluntarily, knowingly, and intelligently waived her *Miranda* rights when giving her statement to Special Agent Price and the other members of the U.S. delegation on January 13, 2017 in Liege, Belgium. *Gallardo*, 495 F.3d at 990. Nothing in the record suggests that Defendant lacked full awareness of the nature of her rights and the consequences of her decision to abandon those rights when she gave this statement. *See Moran*, 475 U.S. at 421. Based on the foregoing, the Court concludes that Defendant validly waived her *Miranda* rights before making this statement and recommends that Defendant's motion to suppress the statement made on January 13, 2017 be denied.

### c. Consulate Issues

Finally, Defendant argues that her January 13, 2017 statement should be suppressed because her rights were violated under Article 36 of the Vienna Convention on Consular Relations, which requires authorities to inform detained or arrested foreign nationals that

they may have their consulates notified of their arrest status.[24]  (ECF No. 899 at 5 (citing *United States v. Santos*, 235 F.3d 1105, 1107 (8th Cir. 2000).)   It is well-settled that "suppression is not an appropriate remedy for violating the Vienna Convention on Consular Relations."  *United States v. Morales-Vazquez*, No. 08-cr-264 (3) (DWF/JSM), 2008 WL 4833106, at *5 n.1 (D. Minn. Nov. 4, 2008) (citing *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 343-44 (2006); *United States v. Ortiz*, 315 F.3d 873, 886 (8th Cir. 2002)).[25]  The Court thus recommends that Defendant's request to suppress her January 13, 2017 statement on this legal basis be denied.

[continued on next page]

---

[24] Again, contrary to the Government's assertions, Defendant has not abandoned this argument.  (*See* ECF No. 930 at 1.)

[25] While the Government provided no specific citation to the Court, it has also asserted that Thailand is a "non-mandatory notification country" under the convention. (ECF No. 911 at 8.)

## III. RECOMMENDATION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY RECOMMENDED** that:

1.  Defendant's Motion to Suppress Statement from July 7, 2011 (ECF No. 898) be **DENIED**.

2.  Defendant's Motion to Suppress Statement from January 13, 2017 (ECF No. 899) be **DENIED**.


Date: December __30__, 2021                   *s/Tony N. Leung*
                                              Tony N. Leung
                                              United States Magistrate Judge
                                              District of Minnesota


                                              *United States v. Intarathong*
                                              Case No. 16-cr-257 (1) (DWF/TNL)


## **NOTICE**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.